1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

SAN JOSE DIVISION

11

| | |
|---|---|
| 12 RODERICK MAGADIA, | Case No. 17-CV-00062-LHK |
| 13      Plaintiff, | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| 14    v. | |
| 15 WAL-MART ASSOCIATES, INC., et al., | |
| 16      Defendants. | |

17

18        Plaintiff Roderick Magadia, on behalf of 3 classes (collectively, "Plaintiffs"), brings suit

19 against Defendants Wal-Mart Associates, Inc. and Wal-Mart Stores, Inc. (collectively, "Wal-

20 Mart") regarding alleged violations of California wage and hour laws. Specifically, Plaintiffs

21 claim Wal-Mart violated: (1) Cal. Lab. Code § 226.7 for failure to pay adequate compensation for

22 missed meal breaks; (2) Cal. Lab. Code § 226 for failure to provide accurate itemized wage

23 statements; (3) Cal. Bus. & Prof. Code § 17200 *et seq.* ("UCL") for engaging in unfair and

24 unlawful business practices; and (4) Cal. Lab. Code § 2698 ("PAGA") because Wal-Mart failed to

25 pay adequate compensation for missed meal breaks and failed to provide accurate itemized wage

26 statements. ECF No. 1-1 at ¶¶ 24-42. However, the operative claims are claims (1) and (2) because

27 as explained below, the UCL merely extends the statute of limitations for claim (1), and PAGA

28

1

1   provides for penalties for underlying violations of the California Labor Code.

2          On January 9, 2018, the Court granted Plaintiffs' motion for class certification. The Court

3   certified the following 3 classes:

> **Meal Period Regular Rate Class**: All current and former California non-exempt retail store employees of [Wal-Mart] who received non-discretionary remuneration, including "MYSHARE INCT," and was paid any meal period premium payments in the same period that the non-discretionary remuneration was earned, at any time between December 2, 2012, through the present.

> **Overtime/INCT Wage Statement Class**: All current and former California non-exempt employees of [Wal-Mart] who received "OVERTIME/INCT," at any time between December 2, 2015, through the present.

> **Final Wage Statement Class**: All former non-exempt employees who worked for [Wal-Mart] in the State of California and whose employment terminated (whether voluntarily or involuntarily) at any time from December 2, 2015 to the present.

ECF No. 84 at 22. The Court also appointed Roderick Magadia as class representative. *Id.*

          Wal-Mart moved to decertify the Meal Period Regular Rate Class. ECF No. 132. The

Court denied Wal-Mart's decertification motion on November 13, 2018. ECF No. 187.

          On October 30, 2017, Plaintiffs moved for partial summary judgment on Plaintiffs' claim

under PAGA, Cal. Lab. Code §§ 2698–2699.5. ECF No. 67. On May 11, 2018, the Court granted

Plaintiffs' motion for partial summary judgment on Plaintiffs' PAGA claims. ECF No. 121. On

June 25, 2018, the Court denied Wal-Mart's request for leave to file a motion for reconsideration.

ECF No. 130.

          On July 26, 2018, Wal-Mart moved for partial summary judgment on Plaintiffs' three

remaining claims. ECF No. 131. On September 27, 2018, the Court denied Wal-Mart's motion for

partial summary judgment.  ECF No. 157.

          The Court held a 3-day bench trial in this matter beginning on November 30, 2018. The

parties filed post-trial briefs on December 7, 2018. ECF Nos. 214, 215. Having considered the

evidence and arguments of counsel, the relevant law, and the record in this case, the Court hereby

enters the following findings of fact and conclusions of law.

2

# I.   FINDINGS OF FACT

## A.  Stipulated Facts

The Parties stipulated to the following facts:

1.      From June 17, 2008 to September 12, 2016, Magadia worked as an hourly associate at a Wal-Mart retail store in San Jose, California as a stock associate/cart pusher. ECF No. 176 at 8.

2.      On September 12, 2016, Magadia was terminated for absenteeism. *Id.*

3.      During the relevant time period, Wal-Mart used a "Myshare" incentive program for its employees in California retail stores, the details of which are set forth in its written "Myshare Quarterly Incentive Plan." *Id.*

4.      During the relevant time period, Wal-Mart has provided, and continues to provide, all eligible associates when they begin their employment a copy of Wal-Mart's written "MyShare Quarterly Incentive Plan" in effect at that time. *Id.*

5.      MyShare incentive plan payments, a type of bonus, appear on wage statements as "MYSHARE/INCT." *Id.*

6.      Employees who received a MyShare bonus *and* worked overtime during the relevant time period also receive an incremental overtime payment adjustment. The wage statements report that payment as "OVERTIME/INCT." *Id.*

7.      The OVERTIME/INCT payment is listed on the wage statement as a lump sum without "hours worked" or "hourly rate." This has been Wal-Mart's practice during the relevant time period and continues to be Wal-Mart's current practice. *Id.*

8.      The formula for calculating the OVERTIME/INCT payment cannot be determined from the wage statement alone. *Id.*

9.      Wal-Mart employees, during their employment, have online access to their time records and wage statements via Wal-Mart's intranet. *Id.*

10.      Wal-Mart employees are paid biweekly, and wage statements are produced biweekly to correspond to the biweekly pay periods. *Id.*

United States District Court
Northern District of California

11.     Wal-Mart's biweekly on-cycle wage statements include pay period start and end dates. *Id.*

12.     Magadia was aware that he was paid biweekly at all times during his employment with Wal-Mart. *Id.*

13.     When an employee is terminated, the employee immediately receives all wages earned through the date of termination by check. A "Statement of Final Pay" accompanies the check. *Id.* at 9.

14.     The Statements of Final Pay do not include pay period start or end dates. This has been Wal-Mart's practice during the relevant time period, and continues to be Wal-Mart's current practice. *Id.*

15.     Magadia received a Statement of Final Pay during his exit interview on the day of his termination. *Id.*

16.     Wal-Mart generates a daily Meal Exception Report at each store. The Meal Exception Report identifies all employees who had a meal exception as determined by the employee's time punches. *Id.*

17.     The Meal Exception Report reflects a meal exception irrespective of whether the associate voluntarily or involuntarily skipped their lunch, voluntarily or involuntarily took a less-than-30-minute break, voluntarily or involuntarily took a late meal period, or actually took a full, compliant meal period but merely forgot to clock in or out for lunch.

18.     All employees who appear on the final weekly Meal Exception Report, for whatever reason, receive a meal period premium payment equivalent to one hour of compensation at the employee's base rate of pay. *Id.*

19.     Wal-Mart pays meal period premiums using the employee's base rate of pay. *Id.*

**B.  Cal. Lab. Code § 226.7 for Failure to Pay Adequate Compensation for Missed Meal Breaks**

A meal exception occurs when a Wal-Mart employee misses a meal, begins their meal late, or cuts a meal short. Tr. at 241:14-17. If a meal exception occurs, an informal conversation takes

United States District Court
Northern District of California

place between a supervisor and the employee to determine the reason the exception occurred. *Id.* at 244:12-24. If necessary, an internal Wal-Mart investigation may begin based on the reason for the meal exception. *Id.* at 244:25-245:4. This investigation is conducted using a meal investigation worksheet. *Id.* On the worksheet, the employee reports the reason the meal exception occurred. *Id.* at 250:9-13. Then, the supervisor determines whether the meal exception was voluntary or involuntary. *Id.* at 306:9-307:8. Once that takes place, the results of the investigation are encoded into Wal-Mart's Exception Management System ("EMS") as numbered codes that stand for a particular reason the Wal-Mart employee reported as resulting in a meal exception. *Id.* at 309:10-15. There are three codes that are relevant to the instant case: code 1 (associate initiated customer support); code 5 (manager directed, no coverage for customer support); and code 12 (management directed). *Id.* at 276:18-21; *id.* at 360:22-24; *id.* at 361:8-17.

However, Magadia, the named Plaintiff, never suffered a meal exception coded as 1, 5, or 12. ECF No. 214 at 15. Moreover, Magadia always received a meal break, albeit the break was sometimes later than scheduled. Tr. at 108:18-109:8. None of these late breaks were after the fifth hour worked, with a sole exception. *Id.* at 118:25-119:5. During the entire time he worked at Wal-Mart, Magadia recalled only having one meal break after the fifth hour worked, but does not recall what date or year that meal exception took place. *Id.*

When a Wal-Mart employee incurs a meal exception, a meal premium is automatically paid. *Id.* at 144:11-20. The meal premium is paid at the employee's base rate of pay. *Id.* at 145:13-16. That means the rate paid for the meal premium is not adjusted upward based on, for instance, MyShare incentive plan payments. *Id.* at 145:17-146:1.

### C. Cal. Lab. Code § 226(a) for Failure to Provide Accurate Itemized Wage Statements

#### 1. Statements of Final Pay

Wal-Mart pays employees on a biweekly basis. ECF No. 176 at 8. In line with this practice, Wal-Mart provides employees with biweekly wage statements corresponding to the pay period. *Id.* These wage statements list the start and end dates of the pay period. *Id.* When an

5

employee is terminated, Wal-Mart pays all wages earned through the date of termination by check on the day of termination. *Id.* at 9. On the date of termination, the employee also receives a "Statement of Final Pay" that lists the wages being paid to the employee at the end of employment. Ex. 13-1. These statements of final pay do not specify pay period start or end dates. ECF No. 176 at 9. However, Wal-Mart also generates a final wage statement at the close of the normal biweekly pay period that does contain pay period start and end dates. Tr. at 171:10-12; Ex. 16-1. Wal-Mart tells a terminated employee how to access this final wage statement during the employee's exit interview. Tr. at 165:16-167:5. Upon his termination from Wal-Mart, Magadia received a statement of final pay that did not include the pay period start and end dates. Ex. 13-1.

### 2. OVERTIME/INCT Line Item on Wage Statements

Wal-Mart employees who receive a MyShare incentive award at the end of a quarter and also worked overtime during that quarter are given additional overtime pay based on having received the incentive. ECF No. 176 at 8. The additional overtime pay appears retroactively on the employee's wage statement as "OVERTIME/INCT." *Id.* The amount of additional overtime pay is determined by a formula that accounts for the number of overtime hours the employee worked, the employee's overtime rate, and the incentive award amount paid. Tr. at 136:14-19. The OVERTIME/INCT item appears on the employee's wage statement as a lump sum and does not specify how many hours the employee worked or the employee's hourly rate. ECF No. 176 at 8. Magadia received wage statements containing OVERTIME/INCT line items that did not include the hours worked and the rates of pay. Ex. 17-1.

### D. Damages Calculations

Plaintiffs' expert, Dr. Brian Kriegler, was certified at trial as an expert in wage and hour damages. Tr. at 437:18-19. Dr. Kriegler relied upon a computational code written by his associates to arrive at his final results; he did not manually calculate anything by hand due to the volume of data provided. *Id.* at 486:9-17. For the calculation of all damages, Dr. Kriegler used the data provided to him by Wal-Mart. Ex. 102-7 to 102-8. The Court will first address Dr. Kriegler's calculations regarding Plaintiffs' first claim, which alleged that Wal-Mart failed to pay adequate

6

United States District Court
Northern District of California

compensation for missed meal breaks. Then, the Court will address Dr. Kriegler's calculations

regarding Wal-Mart's second claim, which alleged that Wal-Mart failed to provide accurate

itemized wage statements.

### 1.   Failure to Pay Adequate Compensation for Missed Meal Breaks

Dr. Kriegler calculated the meal exception claim damages under Plaintiffs' two theories of

liability. First, Dr. Kriegler calculated damages for those employees who had meal exceptions

coded in EMS as 1, 5, or 12 ("Theory 1"). Ex. 201-7. The three relevant codes are: code 1

(associate initiated customer support); code 5 (manager directed, no coverage for customer

support); and code 12 (management directed). Tr. at 276:18-21; *id.* at 360:22-24; *id.* at 361:8-17.

Second, Dr. Kriegler calculated damages for employees who had meal exceptions coded as 5 or 12

("Theory 2"), but not 1. Ex. 201-7.

For the calculation of principal damages under both theories of liability, Dr. Kriegler first

looked in the data for meal exceptions coded as 1, 5, or 12 (or alternatively, 5 or 12 under Theory

2). Tr. at 470:17-22. Then, Dr. Kriegler looked at the MyShare data, which showed the non-

discretionary bonus amounts, covering the period that included the meal exceptions. *Id.* Using

these two pieces of information, Dr. Kriegler gave an example of how he did the calculation:

> So, for instance, if there was a meal exception on February 1, 2013,
> and there was a quarterly bonus going from January 1, 2013, through
> March 31, 2013, hypothetically let's suppose that award amount was
> $1000 . . . and hypothetically let's say there were ten workweeks with
> some work time. . . . So per workweek, that [award amount] ends up
> being $100 per workweek. For the workweek that the meal exception
> occurred, I then prorated that $100 to a dollar amount per hour. So
> that would be—let's suppose there were 30 straight time hours in the
> workweek, so I would take $100 and divide it by 30 hours to get
> $3.33, and that would be the damages amount for that particular meal
> exception.

*Id.* at 470:23-471:11. Dr. Kriegler conducted the above calculation for every single unique

employee that had a meal exception coded as 1, 5, or 12 (or alternatively, just 5 or 12), added up

the amounts, and arrived at his principal damages calculation of $21,115 for Theory 1. *Id.* at

471:13-17; Ex. 201-7. His principal damages for Theory 2 were calculated to be $3,911. Ex. 201-

7. Under both Theories, the damages run from December 2, 2012 (the statute of limitations date)

Case No. 17-CV-00062-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1      to August 5, 2018 (the most up-to-date data that Wal-Mart provided). *Id.*; Tr. at 471:21-22.

2          Dr. Kriegler also calculated pre-judgment interest. He did so by computing per annum

3 interest at a rate of 10%, with a pre-judgment accrual date of November 30, 2018. Tr. at 471:23-

4 472:7. Under Theory 1, this computation resulted in a pre-judgment interest amount of $7,402. Ex.

5 201-7. Under Theory 2, his computation resulted in a pre-judgment interest amount of $1,533. *Id.*

6          Dr. Kriegler additionally calculated waiting time penalties under Cal. Lab. Code § 203 for

7 terminated employees only. Pursuant to Cal. Lab. Code § 203(a), "[i]f an employee willfully fails

8 to pay . . . any wages of an employee who is discharged or who quits, the wages of the employee

9 shall continue as a penalty from the due date thereof at the same rate until paid or until an action

10 therefor is commenced; but the wages shall not continue for more than 30 days." Dr. Kriegler

11 relied on the termination dates provided in Wal-Mart's data. Tr. at 472:22-473:13. Thus, Dr.

12 Kriegler assumed that each employee was working 8 hours a day and multiplied the employee's

13 last base rate of pay by 30. *Id.* at 473:14-19. The Court presumes that Dr. Kriegler multiplied the

14 base rate of pay by 30 because under Cal. Lab. Code § 203(a), "the wages shall not continue for

15 more than 30 days" for any waiting time penalties. Thus, under Theory 1, § 203 penalties were

16 calculated to amount to $10,937,844. Ex. 201-7. Under Theory 2, § 203 penalties were calculated

17 to be $1,303,819. *Id.* These waiting-time penalties run from the statute of limitations date of

18 December 2, 2013 to August 5, 2018. *Id.*; tr. at 456:16-457:5.

19          Lastly, Dr. Kriegler calculated PAGA penalties for the meal exception claim. For each pay

20 period after October 4, 2015 (the statute of limitations date for the PAGA penalties) that there was

21 an alleged underpayment for a meal exception, Dr. Kriegler multiplied that by $100. Tr. at 478:1-

22 479:10. The results obtained were $821,400 under Theory 1, and $70,000 under Theory 2. Ex.

23 201-7. The PAGA penalties run from October 4, 2015 to August 5, 2018. *Id.* Next, the Court will

24 address Dr. Kriegler's calculations regarding Wal-Mart's second claim, which alleged that Wal-

25 Mart failed to provide accurate itemized wage statements.

26        **2. Failure to Provide Accurate Itemized Wage Statements**

27          Under Plaintiffs' theory that Wal-Mart failed to provide accurate itemized wage statements

28

Case No. 17-CV-00062-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

*United States District Court*
*Northern District of California*

as required by Cal. Lab. Code § 226(a), statutory penalties for violations of that portion of the Labor Code are provided in Cal. Lab. Code § 226(e). Cal. Lab. Code § 226(e) specifies a $50 penalty for the initial pay period in which a violation occurs and a $100 penalty for violations in subsequent pay periods, not to exceed an aggregate penalty of $4,000. Wal-Mart is accused of failing to provide accurate itemized wage statements in two respects. First, Wal-Mart is accused of failing to provide the rates and hours worked for the OVERTIME/INCT line item. Second, Wal-Mart is alleged to have failed to provide the pay period start and end dates for the final wages paid in the statement of final pay. The Court addresses Dr. Kriegler's damages calculations for each of these alleged violations in turn.

a.   OVERTIME/INCT Line Item

To calculate the § 226(e) penalty, Dr. Kriegler took Wal-Mart's data, and for the first pay period in which there was an overtime incentive payment (i.e., OVERTIME/INCT line item), Dr. Kriegler assessed a $50 penalty per employee. Tr. at 446:25-447:14. For each subsequent pay period in which there was an OVERTIME/INCT line item, Dr. Kriegler assessed a $100 penalty per employee. *Id.* Dr. Kriegler calculated the total amount of § 226(e) damages for the OVERTIME/INCT Wage Statement Class to be $48,046,000. Ex. 201-7. This calculation runs from the statute of limitations date of December 2, 2015 to August 5, 2018. Tr. at 447:19-448:8.

To calculate the PAGA penalties, Dr. Kriegler multiplied each instance of an OVERTIME/INCT line item per pay period by $250. *Id.* at 452:12-117. The total amount of PAGA penalties calculated is therefore $131,427,750. Ex. 201-7. However, Dr. Kriegler admitted that he made a mistake in calculating PAGA penalties here. Instead of using the PAGA statute of limitations of October 4, 2015, he erroneously used a starting date of December 2, 2015 to calculate the PAGA penalties. Tr. at 452:19-453:16. Thus, the calculated PAGA penalties run from December 2, 2015 to August 5, 2018. *Id.* The actual PAGA penalties, had they been calculated starting on the correct date of October 4, 2015, would have been higher. *Id.* at 451:25-452:4.

b.   Statements of Final Pay

9

United States District Court
Northern District of California

1    To calculate the § 226(e) penalty, Dr. Kriegler adopted the same tack as described above.

2    For a first termination, he assessed $50. *Id.* at 458:22-459:10. For subsequent terminations (as

3    there were some Wal-Mart employees who were hired and terminated more than once), he

4    assessed $100 per termination. *Id.* The total amount of damages calculated was $5,823,900. Ex.

5    201-7. This calculation runs from the statute of limitations date of December 2, 2015 to August 5,

6    2018. Tr. at 459:11-12; *id.* at 460:14-15.

7    Moreover, in calculating PAGA penalties, Dr. Kriegler did not make the same mistake as

8    discussed above regarding the statute of limitations date for the PAGA penalties. He used the

9    correct statute of limitations date of October 4, 2015, and multiplied each instance of a termination

10   by $250. *Id.* at 460:19-461:14. Thus, Dr. Kriegler calculated $28,928,500 for PAGA penalties

11   running between October 4, 2015 and August 5, 2018. *Id.*

12   ### 3.   Total Statutory and PAGA Damages Sought

13   For the Meal Period Regular Rate Class, Plaintiffs have calculated damages for meal

14   exceptions coded as 1, 5, or 12 as well as for meal exceptions coded just as 5 or 12. Specifically,

15   for meal exceptions coded as 1, 5, or 12, Plaintiffs request: $21,115 in principal damages for Wal-

16   Mart's alleged violations of § 226.7; $7,402 in pre-judgment interest; $10,937,844 in § 203

17   waiting time penalties; and $821,400 in PAGA penalties. *Id.* Alternatively, for meal exceptions

18   coded just as 5 or 12, Plaintiffs request: $3,911 in principal damages for Wal-Mart's alleged

19   violations of § 226.7; $1,533 in pre-judgment interest; $1,303,819 in § 203 waiting time penalties;

20   and $70,000 in PAGA penalties.

21   For the Final Wage Statement Class, Plaintiffs request $5,823,900 in statutory § 226(e)

22   damages and $28,928,500 in PAGA penalties for Wal-Mart's alleged violation of § 226(a)(6). *Id.*

23   For the OVERTIME/INCT Wage Statement Class, Plaintiffs request $48,046,000 in

24   statutory § 226(e) damages and $131,427,750 in PAGA penalties for Wal-Mart's alleged violation

25   of § 226(a)(9). Ex. 201-7.

26   In total, Plaintiffs request $226,013,911 in damages for the OVERTIME/INCT Wage

27   Statement Class, the Final Wage Statement Class, and the Meal Period Regular Rate Class (for

28

Case No. 17-CV-00062-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
Northern District of California

1   meal exceptions coded as 1, 5, or 12). Alternatively, Plaintiffs request $215,605,413 in damages

2   for the OVERTIME/INCT Wage Statement Class, the Final Wage Statement Class, and the Meal

3   Period Regular Rate Class (for meal exceptions coded as 5 or 12).

4   **II.   CONCLUSIONS OF LAW**

5        The Court first turns to the Plaintiffs' first claim for failure to pay adequate compensation

6   for missed meal breaks. Then, the Court turns to the Plaintiffs' second claim for failure to provide

7   accurate itemized wage statements—namely, the failure to include the start and end dates of the

8   payment period on the statements of final pay, and the failure to list an hourly rate or hours

9   worked for the OVERTIME/INCT line item on wage statements. Lastly, the Court addresses the

10  parties' requests for judicial notice.

    **A.   Claim 1: Failure to Pay Adequate Compensation for Missed Meal Breaks, Cal.
Lab. Code § 226.7**

     Below, the Court analyzes whether Plaintiffs' § 226.7 class claims and Magadia's

13  individual § 226.7 claim can proceed as stated, the Court then finds that the § 226.7 class must be

14  decertified and that Magadia's individual claim fails. Nevertheless, the Court cannot eschew a

15  discussion of the merits of Plaintiffs' claims under § 226.7 because Plaintiffs still can demonstrate

16  that PAGA penalties should be awarded. *Huff v. Securitas Sec. Servs. USA, Inc.*, 23 Cal. App. 5th

17  745, 760-61 (2018) ("PAGA states that an action may be brought by an employee against whom

18  one or more of the alleged violations was committed, a clear expression that the Legislature

19  intended that a PAGA plaintiff be affected by at least one, *but not necessarily all*, of the violations

20  alleged in the action" (emphasis added) (internal quotation marks omitted).). Thus, after

21  discussing Plaintiffs' § 226.7 class claims and Magadia's individual § 226.7 claim, the Court will

22  then discuss the merits of Plaintiffs' PAGA claims under § 226.7.

    **1.   Whether Plaintiffs' Class Claims and Magadia's Individual Claim Can Proceed**

24       Magadia fails to satisfy the requirements of Rule 23(a) of the Federal Rules of Civil

25  Procedure as class representative of the Meal Period Regular Rate Class. Moreover, the Court

26  finds that Magadia has failed to show that his individual claim succeeds under the evidence

11

United States District Court
Northern District of California

1    presented at trial.

2              a.   The Class Claims

3          "Rule 23(a) states four threshold requirements applicable to all class actions: (1)

4    numerosity (a 'class [so large] that joinder of all members is impracticable'); (2) commonality

5    ('questions of law or fact common to the class'); (3) typicality (named parties' claims or defenses

6    'are typical . . . of the class'); and (4) adequacy of representation (representatives 'will fairly and

7    adequately protect the interests of the class.')." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591,

8    613 (1997).

9          Magadia's claims are not typical of the claims or defenses of the class. Thus, as class

10   representative, Magadia runs afoul of the typicality requirement of Fed. R. Civ. P. 23(a)(3).

11   Magadia also is not an adequate representative of the class. Thus, he does not meet the adequacy

12   requirement under Fed. R. Civ. P. 23(a)(4). It is of no moment that the Court already certified the

13   Meal Period Regular Rate Class as a class represented by Magadia. ECF No. 84 at 22. "Before

14   entry of a final judgment on the merits, *a district court's order respecting class status is not final*

15   *or irrevocable*, but rather, it is inherently tentative." *Officers for Justice v. Civil Service Comm'n*

16   *of City & Cty. of San Francisco*, 688 F.2d 615, 633 (9th Cir. 1982) (emphasis added).

17         First, "[t]he test of typicality is whether other members have the same or similar injury,

18   whether the action is based on conduct which is not unique to the named plaintiffs, and whether

19   other class members have been injured by the same course of conduct." *Hanon v. Dataproducts*

20   *Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).

21         A meal break is defined as "a meal period of not less than 30 minutes" every five hours.

22   Cal. Lab. Code § 512(a). Wal-Mart investigates noncompliant meal breaks (i.e., "meal

23   exceptions"), and then encodes the results of the investigation into its EMS as numbered codes

24   that stand for a particular reason the Wal-Mart employee reported as resulting in a meal exception.

25   Tr. at 309:10-15. As discussed above, there are three codes that are relevant to the instant case:

26   code 1 (associate initiated customer support); code 5 (manager directed, no coverage for customer

27   support); and code 12 (management directed). *Id.* at 276:18-21; *id.* at 360:22-24; *id.* at 361:8-17.

28

Case No. 17-CV-00062-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

*United States District Court*
*Northern District of California*

Plaintiffs' entire theory is predicated on employees who were allegedly denied a compliant meal break and as a result, had their meal exception coded as 1, 5, or 12 in the EMS system. *See, e.g.*, *id.* at 28:20-22 ("I want to say that the theory on [the meal break count] is based on what you heard defense counsel say, meal exception codes 1, 5, and 12."). Thus, the question becomes whether Magadia suffered a meal exception encoded as 1, 5, or 12 in Wal-Mart's EMS system.

In the joint pretrial statement the parties filed on November 1, 2018, Wal-Mart put Plaintiffs on notice that Plaintiffs must demonstrate that Magadia suffered a meal period exception coded as 1, 5, or 12. ECF No. 176 at 23. Specifically, Wal-Mart argued that "Plaintiff cannot prove that Walmart denied Plaintiff . . . a meal period required by section 226.7," and thus could not prove that Magadia suffered a meal exception coded as 1, 5, or 12. *Id.*

At trial, on direct examination, Plaintiffs' counsel only elicited that Magadia took "late" meal breaks; Magadia never specified whether or not those took place after the 5th hour worked as required for a § 226.7 violation.

> Q. And for the times that you asked [to take a meal break], have there been times then [your supervisor and assistant manager] told you that you couldn't go on your meal break?
> A. Yes.
> Q. And on those times, did you then have to take your meal break after the scheduled time?
> A. Yes.
> Q. So would you then take a late meal break?
> A. Yes.

Tr. at 85:12-19.

On cross-examination, counsel for Wal-Mart established that Magadia always received a meal break, though it was sometimes late.

> Q. And did [Wal-Mart] ever say, "no, you can't take a break now, not in 30 minutes, not in 1 hour, never?" Did that ever happen?
> A. What do you mean, never take – they give me – they give me a break, but a late break.
> Q. OK. So they always gave you a break, but sometimes the timing of it –
> A. Late break
> Q. – Was late based on the time it was scheduled?
> A. Yes, sir.

*Id.* at 110:15-111:6

13

Case No. 17-CV-00062-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
Northern District of California

On redirect examination, Plaintiffs' counsel failed to establish that Magadia ever suffered a meal exception coded as 1, 5, or 12 in Wal-Mart's EMS system, or that the sole meal exception Magadia could remember took place within the 4-year statute of limitations.

> Q. And was there a time when you got a lunch that was after the fifth hour worked?
> A. Yes.
> Q. Do you recall how many times that happened?
> A. I think I – I think at this – I think once, but I don't remember what date or what year.

Tr. at 118:25-119:5.

During oral closing arguments, Plaintiffs' counsel did not dispute that Plaintiffs failed to show at trial that Magadia had a meal exception coded as 1, 5, or 12. Tr. at 583:9-10 ("Now, again, I'm not disputing the fact that I did not show that evidence."). Nevertheless, Plaintiffs' counsel misleadingly represented to the Court that Magadia had meal exceptions coded as 1, 5, or 12, and even told the Court to go find that information in the record: "It's in the data. I mean, you can pull it up in the data." *Id.* at 583:16-17. But in the end, in their post-trial briefing, Plaintiffs' counsel conceded that Magadia did not *ever* have a meal break exception coded as 1, 5, or 12. ECF No. 214 at 15 ("Plaintiff concedes that [Magadia's] meal exceptions were not coded as 1, 5, or 12 in the EMS.").

Therefore, Magadia has failed to show that he personally suffered a violation of Cal. Lab. Code § 226.7 per Plaintiffs' theory that meal exceptions coded as 1, 5, or 12 in EMS reflected violations of § 226.7. Thus, Magadia's claim is not typical of the class he purports to represent.

In *Valentino v. Carter-Wallace, Inc.*, the district court appointed class representatives to represent people who used a particular liver drug and developed "aplastic anemia or liver failure" as a result. 97 F.3d 1227, 1229 (9th Cir. 1996). However, the Ninth Circuit vacated and remanded the district court's decision. *Id.* at 1235. As part of its reasoning, the Ninth Circuit doubted that typicality had been established because the class representatives did not suffer from aplastic anemia and had difficulty withdrawing from the drug in question. *Id.* at 1234. Here, like the *Valentino* class representatives, the named Plaintiff Magadia did not suffer the same type of injury

14

United States District Court
Northern District of California

as the class he purports to represent. He does not have a meal break violation coded as EMS codes 1, 5, or 12. Therefore, Magadia does not satisfy the typicality requirement of Fed. R. Civ. P. 23(a)(3).

Second, Magadia fails to satisfy the adequacy requirement of Fed. R. Civ. P. 23(a)(4). "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625. "[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Id.* at 625-26 (quoting *East Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)). The interests of the single class must be aligned with that of the named plaintiff. *Id.* at 626.

Magadia has a conflict of interest with the class he purports to represent because he does not possess the same interest and suffer the same injury as the class members. In *Amchem*, the United States Supreme Court found it inappropriate that "named parties with diverse medical conditions sought to act on behalf of a single giant class rather than on behalf of discrete subclasses. In significant respects, the interests of those within the single class are not aligned." *Id.* Here, Magadia sought to act on behalf of a class of Wal-Mart employees with meal exceptions coded as 1, 5, or 12 in the EMS system when he himself did not have meal exceptions coded as such. Thus, Magadia's interests in resolving the case conflict with the interests of the class members. Therefore, Magadia is not an adequate class representative.

In conclusion, the Court hereby decertifies the Meal Period Regular Rate Class because Magadia fulfills neither the typicality requirement of Fed. R. Civ. P. 23(a)(3) nor the adequacy requirement of Fed. R. Civ. P. 23(a)(4).[1] As the meal period regular rate class has been decertified, the Court now turns to Magadia's individual claim that he is owed compensation for his meal

---

[1] Plaintiffs also argue that if the Court were to find that Magadia lacks Article III standing, the Court should remand the matter to state court. Here, the Court has not found a lack of Article III standing, so the Court declines to remand the instant action to state court. Furthermore, remand is only required if the Court lacks subject matter jurisdiction over *all* claims in the matter. *Lee v. American Nat'l Ins. Co.*, 260 F.3d 997, 1008 (9th Cir. 2001). Such is not the case here as evidenced by this Court's jurisdiction over Plaintiffs' second cause of action, discussed below.

Case No. 17-CV-00062-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1    period violation.

2             b.   Magadia's Individual Claim

3             Magadia could only recall one instance where he received a noncompliant meal break, but

4    could not remember the incident's year or date. Because Plaintiffs bring a UCL claim, "[a]ny

5    action on *any* UCL cause of action is subject to the four-year period of limitations created by that

6    section." *Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal. 4th 163, 179 (2000) (emphasis in

7    original). A business practice that violates the California Labor Code through failure to pay wages

8    is a UCL cause of action. *Id.* at 178-79. Thus, the December 2, 2012 date is the cutoff date for the

9    4-year statute of limitations, as Plaintiffs first filed their claim on December 2, 2016. ECF No. 1-1

10   at Cover Sheet.

11            Magadia worked for Wal-Mart from 2008 to 2016. ECF No. 176 at 8. Because Magadia's

12   employment at Wal-Mart began well before December 2, 2012, Magadia's noncompliant meal

13   break may have occurred before the cutoff date for the statute of limitations for the meal period

14   claim. When questioned at trial about whether he ever received a meal break after the fifth hour

15   worked and how many times such an event may have occurred, Magadia responded: "I think I – I

16   think at this – I think once, but I don't remember what date or what year." Tr. at 119:4-5. Magadia

17   bears the burden of proof at trial that his claims are timely by a preponderance of the evidence.

18   Thus, because Magadia's noncompliant meal break could have taken place before December 2,

19   2012, he has failed to prove by a preponderance of the evidence that the statute of limitations does

20   not bar his claim. *Cf. Ryan v. Microsoft Corp.*, 147 F. Supp. 3d 868, 896 (N.D. Cal. 2015)

21   (granting motion to dismiss because "[p]laintiffs have not shown that an exception to the statutes

22   of limitations or tolling doctrine should apply").

23            Moreover, as explained in detail above, Magadia's theory of liability is that those with

24   meal exceptions coded as 1, 5, or 12 were the ones who were wronged by Wal-Mart's payment

25   practices. *See, e.g.*, Tr. at 28:20-22 ("I want to say that the theory on [the meal break count] is

26   based on what you heard defense counsel say, meal exception codes 1, 5, and 12."). Magadia did

27   not have a meal exception coded as 1, 5, or 12 in Wal-Mart's EMS system. Therefore, Magadia's

28
                                                        16
     Case No. 17-CV-00062-LHK
     FINDINGS OF FACT AND CONCLUSIONS OF LAW

1   claim also fails because Magadia has failed to show he was wronged under his own theory of

2   liability.

3        Thus, Magadia's individual claim for a violation of Cal. Lab. Code § 226.7 fails because

4   Magadia has not shown that his claim is not barred by the statute of limitations. Furthermore,

5   Magadia's claim is inconsistent with his theory of liability that the rights of employees with meal

6   exceptions coded as 1, 5, or 12 were violated under Cal. Lab. Code § 226.7.

7        Even though Plaintiffs' class claim and Magadia's individual claim cannot proceed under §

8   226.7, the Court next turns to the merits of the claim that Plaintiffs may still establish a claim for

9   PAGA penalties if Wal-Mart violated § 226.7 with respect to employees other than Magadia.

10       **2.  Liability under Cal. Lab. Code § 226.7**

11       Under California law, if an employer fails to provide a compliant meal break, "the

12   employer shall pay the employee one additional hour of pay at the employee's regular rate of

13   compensation." Cal. Lab. Code § 226.7(c). A meal break is defined as "a meal period of not less

14   than 30 minutes" every five hours. Cal. Lab. Code § 512(a).

15       Wal-Mart currently does not factor in the MyShare incentive award, a nondiscretionary

16   quarterly bonus, Tr. at 134:22-135:8, in calculating what is an employee's regular rate of

17   compensation. Rather, Wal-Mart pays the meal period premium at the employee's base rate of

18   pay. ECF No. 176 at 9. The crux of Plaintiffs' argument is that the regular rate of compensation an

19   employee receives should factor in the MyShare incentive award. *Id.* at 3. In the Court's Order

20   denying Wal-Mart's motion for partial summary judgment, the Court adopted the Plaintiffs'

21   position that regular rate of compensation under § 226.7 means the employee's base rate of

22   compensation plus "other forms of qualifying compensation." ECF No. 157 at 8 (quoting *Ibarra v.*

23   *Wells Fargo Bank, N.A.*, 2018 WL 2146380, at *3 (C.D. Cal. May 8, 2018)). Therefore, Wal-Mart

24   is in violation of § 226.7 by failing to pay employees who had a meal exception at their regular

25   rate of compensation, which means the employee's base rate of compensation plus the employee's

26   MyShare incentive award.

27       The question now becomes whether Plaintiffs' Theory 1 (meal exceptions coded in the

28

17

United States District Court
Northern District of California

1   EMS as 1, 5, or 12) or Theory 2 (meal exceptions coded in the EMS as just 5 or 12) renders Wal-

2   Mart liable for violating § 226.7. As described above, EMS code 1 means a meal exception

3   resulting from "associate initiated customer support"; EMS code 5 means a meal exception that

4   was management directed because of no coverage for customer support; and code 12 means a

5   meal exception that was management directed. Tr. at 276:18-21; *id.* at 360:22-24; *id.* at 361:8-17.

6   The Court finds that Theory 2 is the correct method of assessing liability.

7          Courts interpreting § 226.7 have held that "an employer need only relinquish control of the

8   employee for an uninterrupted thirty-minute period; the employer need not ensure a meal break is

9   in fact taken." *McLeod v. Michael's Stores, Inc.*, 2009 WL 10674458, at *2 (C.D. Cal. Dec. 15,

10  2009); *see also Brown v. Fed. Express Corp.*, 249 F.R.D. 580, 585 (C.D. Cal. 2008) ("It is an

11  employer's obligation to ensure that its employees are free from its control for thirty minutes, not

12  to ensure that the employees do any particular thing during that time."); *White v. Starbucks Corp.*,

13  497 F. Supp. 2d 1060, 1088 (N.D. Cal. 2007) ("[I]t cannot be the rule that employers must ensure

14  that a meal period is actually taken, regardless of what an employee does, because that would

15  create a strict liability standard.").

16         Wal-Mart's director of global business services technology Victoria Moore testified that

17  "[a]ssociate initiated customer support [i.e., code 1] indicates *the associate made the decision* to

18  either miss their meal, have a short meal, or a meal late, a late meal, as a result of some type of

19  customer service action." Tr. at 265:11-14 (emphasis added). This testimony was unrebutted.

20  Therefore, for EMS code 1, trial testimony established that the employee *chose* to engage in

21  customer support despite it being their meal period. As *McLeod* held, Wal-Mart had already

22  relinquished control over the employee for their meal period. It is up to the employee to decide

23  what to do with his or her time. If the employee chose to engage in customer support even though

24  it was the employee's meal period, Wal-Mart cannot force that employee to take a compliant meal

25  period. There is no evidence here that Wal-Mart ordered the employee to engage in customer

26  service activities. Thus, the Court finds that EMS code 1 does not reflect a violation of § 226.7.

27         On the other hand, Moore testified that EMS codes 5 and 12 show that management

28

Case No. 17-CV-00062-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
Northern District of California

1   directed the employee to take a noncompliant meal break:

2   > Q. And the third code you mentioned this morning was management directed, no customer support. What does that mean?
3   > A. The associate is – that code means it was – the meal exception was manager directed. No coverage or for customer support.
4   > Q. And in our review of the data contained in the Exception Management System, we also came across the code that just says manager directed without the customer support blurb.
5   > A. Right.
6   > Q. Is that the same thing basically as management directed?
    > A. Yes.

7   *Id.* at 265:20-266:6. Thus, because codes 5 and 12 reflect a Wal-Mart management decision not to

8   let the employee take a compliant meal break, these codes reflect a violation of § 226.7.

9           Wal-Mart argues that the EMS codes do not show who was actually denied a meal break.

10  Rather, they only show what Wal-Mart employees *allege* to be the reason a meal exception

11  occurred. However, Wal-Mart's attempt to discredit its own process for investigating and

12  classifying meal exceptions in the EMS is unpersuasive. Testimony by Todd Stokes, Wal-Mart's

13  divisional human resources director, demonstrated that Wal-Mart itself relies on this investigation

14  and classification process for identifying problems with employees' behaviors relating to meal

15  periods:

16

17  > Q. And this investigation would ultimately, the purpose of that investigation is to end up determining who is accountable for that meal violation, whether it's management or the associate; is that correct?
18  > A. So one of the outcomes from that is that we can sometimes determine the associate worked too long and didn't take it, or sometimes we may learn that a manager pulled an associate away and didn't let them take it. So those are the two general outcomes that can come from that.
19
20  > Q. And those outcomes, as a matter of practice, should be recorded down somewhere; correct?
21  > A. So, yes, there's a form that's filled out.
22  > Q. And part of the reason for this investigation process is to determine who was accountable and have a discussion with them to make sure that it doesn't happen again, is that correct?
23  > A. That is – I would say that's a good classification. We want to make sure that we address the behavior that needs to change.

24  *Id.* at 146:9-147:3. As Wal-Mart conducts an investigation, assigns a code to each meal period

25  exception as a result of Wal-Mart's investigation, and relies upon the results of Wal-Mart's

26

27

28
Case No. 17-CV-00062-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
Northern District of California

1   investigation, Wal-Mart cannot turn around and repudiate the results of the investigation and

2   associated EMS entry to avoid liability. As such, the Court finds that the EMS codes are reliable

3   indicators of the reason why a meal exception occurred, because they are encoded as to the reason

4   a meal exception occurred after an investigation conducted by Wal-Mart.

5        In sum, the Court holds that Wal-Mart violated Cal. Lab. Code § 226.7(c) when it failed to

6   pay employees who had meal exceptions coded as 5 or 12 in the EMS system at their regular rate

7   of compensation. The regular rate of compensation includes the base rate of compensation plus the

8   employee's MyShare incentive award. The Court next turns to the question of damages, as Wal-

9   Mart has been found liable for violating § 226.7(c).

10       **3.  Damages**

11       Here, the Plaintiffs claim principal damages, pre-judgment interest, Cal. Lab. Code § 203

12   waiting time penalties, and PAGA penalties. However, because both the class claims and

13   Magadia's individual claim fail, the Court does not award principal damages, pre-judgment

14   interest, or § 203 waiting time penalties. Nevertheless, the Court awards PAGA penalties in the

15   amount of $70,000. *See* Ex. 201-7. Below, the Court discusses why it awards PAGA penalties

16   despite decertifying the class claims and finding that Magadia's individual claim fails.

17           a.  PAGA Penalties

18       The California Court of Appeal has held that "so long as [plaintiff] was affected by at least

19   one of the Labor Code violations alleged in the complaint, he can recover penalties for all the

20   violations he proves." *Huff*, 23 Cal. App. 5th at 761; *see also Holak v. K Mart Corp.*, 2015 WL

21   2384895, at *5 (E.D. Cal. May 19, 2015) ("By the plain language of the statute, an aggrieved

22   employee need only suffer one of the Labor Code violations alleged against his or her employer to

23   be able to bring a PAGA claim on behalf of . . . employees who suffered any Labor Code violation

24   at the hands of the employer. Plaintiff need not have actually suffered all of the Labor Code

25   violations she alleges to have taken place for purposes of seeking PAGA penalties."); *Jeske v.

26   Maxim Healthcare Servs., Inc.*, 2012 WL 78242, at *13 (E.D. Cal. Jan. 10, 2012) ("[Plaintiff] is

27   correct that she need not have suffered all PAGA violations for which she seeks to pursue civil

28

Case No. 17-CV-00062-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

*United States District Court*
*Northern District of California*

penalties."). *Huff* convincingly explains that because in a PAGA case, the plaintiff is standing in for the state, "it would be arbitrary to limit the plaintiff's pursuit of penalties to only those Labor Code violations that affected him or her personally." 23 Cal. App. 5th at 757.

As discussed in further detail below, Magadia was affected by violations of Cal. Lab. Code § 226 through Wal-Mart's failure to provide accurate itemized wage statements. Therefore, under *Huff*, it is of no moment that Wal-Mart did not violate Magadia's rights under § 226.7 for failure to pay adequate compensation for missed meal breaks. Magadia may still recover PAGA penalties for violations of § 226.7 that other Wal-Mart employees suffered. Dr. Kriegler calculated PAGA penalties under Theory 2 (meal exceptions coded in the EMS as just 5 or 12) to total $70,000. Ex. 201-7.

The Court acknowledges that it has discretion, pursuant to the California Labor Code, to reduce a PAGA penalty if, "based on the facts and circumstances of the particular case, to do otherwise would result in an award that is unjust, arbitrary and oppressive, or confiscatory." Cal. Lab. Code § 2699(e)(2). However, based on the facts and circumstances of the instant case, the Court does not find that a $70,000 PAGA penalties award is unjust, arbitrary and oppressive, or confiscatory. Therefore, the Court awards $70,000 in PAGA penalties to Wal-Mart employees who had meal exceptions coded in the EMS system under codes 5 or 12 from October 4, 2015 to August 5, 2018 for Wal-Mart's violation of Cal. Lab. Code § 226.7.

Next, the court turns to Plaintiffs' second claim for failure to provide accurate itemized wage statements.

**B.  Claim 2: Failure to Provide Accurate Itemized Wage Statements, Cal. Lab. Code § 226**

To state a claim for failure to provide accurate itemized wage statements, Plaintiffs must show that (1) Wal-Mart failed to provide compliant wage statements under Cal. Lab. Code § 226(a), (2) Wal-Mart's failure to do so was "knowing and intentional," and (3) Plaintiffs were injured as a result. Cal. Lab. Code § 226.

At summary judgment, the Court found that Wal-Mart's statements of final pay were

1    noncompliant because they do not include pay period start and end dates in violation of Cal. Lab.

2    Code § 226(a)(6). ECF No. 121 at 16. Moreover, the Court found that Wal-Mart's wage

3    statements were noncompliant because the OVERTIME/INCT line item does not list an hourly

4    rate or hours worked in violation of Cal. Lab. Code § 226(a)(9). *Id.* at 13-14. This satisfies prong

5    (1) of the above requirements. Thus, Plaintiffs still must prove prong (2), that Wal-Mart's failure

6    to provide compliant wage statements was "knowing and intentional," and prong (3), that

7    Plaintiffs were injured as a result. The Court addresses each in turn.

8         **1.   Whether Wal-Mart's Failure to Provide Compliant Wage Statements was**
          **"Knowing and Intentional"**
9
           As aforementioned, the California Labor Code requires that a violation of § 226 be
10
     "knowing and intentional." Plaintiffs' position is that provision of an inadequate wage statement
11
     that is not a clerical error or an inadvertent mistake satisfies the "knowing and intentional"
12
     requirement. ECF No. 214 at 9. On the other hand, Wal-Mart argues that knowing and intentional
13
     conduct is satisfied only when there is fair notice of the illegality of the practices at issue. ECF
14
     No. 215 at 9. Wal-Mart points out that "through its practices, policies, and procedures," Wal-Mart
15
     is "aware of the law and that it deliberately and intentionally tries to comply with the law." *Id.* As
16
     such, Wal-Mart asserts that it acted in good faith to comply with the law, which is enough to
17
     preclude liability. *Id.* at 8-11.
18
           The Court finds that the knowing and intentional requirement of § 226 is akin to a
19
     willfulness requirement. That is, in order to be liable, Wal-Mart must have willfully intended to
20
     issue wage statements that were out of compliance with § 226. The Court bases this conclusion on
21
     the fact that the California Supreme Court has linked the knowing and intentional standard to a
22
     willfulness standard; that the majority of state appellate and federal trial courts have done the
23
     same; that linking the knowing and intentional standard to willfulness is consistent with another §
24
     226 provision; and that the commonly-understood meanings of knowing and intentional support
25
     linking knowing and intentional to willfulness.
26
           First, the California Supreme Court has linked the "knowing and intentional" standard in
27

28                                                    22

Cal. Lab. Code § 216 to the "willfulness" standard in Cal. Lab. Code § 203. *Ex parte Trombley*, 31 Cal. 2d 801, 807-08 (1948). The California Supreme Court found that Cal. Lab. Code § 216, which criminalizes willful failures to pay wages, was constitutional because of the 'willfulness' limitation. *Id.* In coming to its conclusion, the California Supreme Court connected "willfulness" in § 203 to a knowing and intentional standard. *Id.* In *Trombley*, the California Supreme Court held:

> Subdivision (a) [of Section 216], construed together with the Penal Code definition of the word "willful," makes it a crime for an employer having the ability to pay, *knowingly and intentionally* to refuse to pay wages which he knows are due. The Court placed a similar construction on section 203 of the Labor Code which imposes penalties where an employer "willfully fails to pay . . . wages of an employee who is discharged or who quits." In interpreting that section, it was recognized that a dispute in good faith as to whether any wages were due would be a defense to an action for such penalties.

31 Cal. 2d at 807-08 (emphasis added); *see also Woods v. Vector Marketing Corp.*, 2015 WL 2453202, at *4 (N.D. Cal. May 22, 2015) ("The similarity between 'knowingly and intentionally' under Section 226 and 'willfully' under Section 203 with respect to their incorporation of a good faith dispute defense is consistent with the Labor Code generally . . . . The California Supreme Court has linked the two standards").

Moreover, although *Trombley* deals with Cal. Lab. Code § 216, a criminal statute, *Trombley* itself analogized the criminal statute to Cal. Lab. Code § 203, a civil statute. *Id.* Similarly, *Woods* found that the California Supreme Court's logic applied in the civil context as well. 2015 WL 2453202, at *4. Furthermore, "federal courts sitting in diversity cases, when deciding questions of substantive law, are bound by state court decisions as well as state statutes." *Hanna v. Plumer*, 380 U.S. 460, 465 (1965) (internal quotation marks omitted). As the California Supreme Court has linked the knowing and intentional standard to a willfulness standard, this Court must follow the California Supreme Court's decision.

Furthermore, there is no question that the "settled meaning of 'willful,' as used in § 203, is that an employer has intentionally failed or refused to perform an act which was required to be

Case No. 17-CV-00062-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
Northern District of California

1    done." *Amaral v. Cintas Corp. No. 2*, 163 Cal. App. 4th 1157, 1201 (2008). Thus, because

2    "willful" in Cal. Lab. Code § 203 is linked to "knowingly and intentionally," "knowingly and

3    intentionally" would correspondingly require that the employer "intentionally failed or refused to

4    perform an act which was required to be done." *Id.*

5         Second, the majority of courts have found that satisfying the knowing and intentional

6    requirement of § 226 requires something more than simply providing an inadequate wage

7    statement that is not a clerical error or inadvertent mistake. The majority view is that an

8    employer's good faith belief that it is not violating the California Labor Code precludes a finding

9    of a knowing and intentional violation. For example, the *Stafford v. Brink's, Inc.* court noted:

> Courts have diverged over the degree of intentionality required to
> establish a violation of § 226. All courts agree that the statute requires
> the employee to prove something more than a simple failure to
> provide required information. Some courts have held that provision
> of an inadequate wage statement is generally knowing and intentional
> so long as it was not a clerical error or inadvertent mistake. . . . *The
> majority of courts, however, have not taken this expansive view of the
> knowing-and-intentional requirement*. In particular, many courts
> have held that the employer's good faith belief that it is not in
> violation of § 226 precludes a finding of a knowing and intentional
> violation.

16   2014 WL 12586066, at *5 (C.D. Cal. Aug. 5, 2014) (emphasis added). The *Stafford* court noted

17   that the majority of courts have rejected the view that the mere provision of an inadequate wage

18   statement that is not a result of clerical error or an inadvertent mistake is enough to give rise to

19   liability under § 226. *Id.*

20        In the instant case, this Court declines to take the approach for which Plaintiffs advocate

21   and that a *minority* of courts have adopted, which is that the knowing and intentional requirement

22   can be satisfied by simply showing that an employer provided an inadequate wage statement not

23   as a result of clerical error or inadvertent mistake. Rather, the Court adopts the majority of courts'

24   view that an employer's good faith belief that it is not violating § 226 precludes a finding of a

25   knowing and intentional violation. *See, e.g.*, *Apodaca v. Costco Wholesale Corp.*, 2014 WL

26   2533427, at *3 (C.D. Cal. June 5, 2014) ("Where an employer has a good faith belief that it is not

27   in violation of Section 226, any violation is not knowing and intentional."); *Wright v. Adventures*

28
                                              24

Case No. 17-CV-00062-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
Northern District of California

*Rolling Cross Country, Inc.*, 2013 WL 1758815, at *9 (N.D. Cal. Apr. 24, 2013) (same); *Ricaldi v. U.S. Investigations Servs., LLC*, 878 F. Supp. 2d 1038, 1047 (N.D. Cal. 2012) (same); *Dalton v. Lee Publ'ns, Inc.*, 2011 WL 1045107, at *5 (S.D. Cal. Mar. 22, 2011) (same); *see also Hoffman v. Construction Protective Servs., Inc.*, 293 Fed. App'x 462, 463 (9th Cir. 2008) ("We affirm the district court in this instance because the record contains no evidence that any violation of § 226 was knowing and intentional as required under California law. Indeed, the jury's conclusion that [the defendant] did not intentionally fail to pay [the plaintiff] all wages upon termination of employment supports the conclusion that the evidence does not support a finding of knowing and intentional conduct."). Indeed, as explained below, § 226's good faith dispute originates from the good faith dispute under Cal. Lab. Code § 203. Courts have extended § 203's good faith dispute to § 226. *See, e.g.*, *Woods*, 2015 WL 2453202, at *3 (noting that courts have interpreted the "'good faith dispute' rule . . . to apply to California Labor Code Section 226 wage statement penalties"); *Villalpando v. Exel Direct Inc.*, 2015 WL 5179486, at *37 (N.D. Cal. Sept. 3, 2015) ("[T]he good faith defense that applies to claims under section 203 also applies to Claims asserted under section 226 . . . ."); *Wright*, 2013 WL 1758815, at *9 ("There is no dispute by the parties that there is a comparable good faith defense for § 226 which, similar to § 203, requires knowing and intentional conduct").

Third, the Court's approach is consistent with the statutory language of § 226(e)(3). Cal. Lab. Code § 226(e)(3) allows courts "[i]n reviewing for compliance with this section" to determine "whether the employer, prior to an alleged violation, has adopted and is in compliance with a set of policies, procedures, and practices that fully comply with this section." The statute explicitly gives courts permission to consider the *circumstances* surrounding a § 226 violation.

Fourth, the interpretation that an employer's good faith belief precludes a finding of a knowing and intentional violation is consistent with the general understanding of "knowing and intentional." *Black's Law Dictionary* defines "knowing" as "[h]aving or showing awareness or understanding." Knowing, *Black's Law Dictionary* (10th ed. 2014). Similarly, "intentional" is defined as "[d]one with the aim of carrying out the act." Intentional, *id.* Knowingness and

25

1    intentionality are scienter requirements. To adopt an interpretation that would essentially read out

2    any scienter requirement from "knowing and intentional" would create tension with the

3    commonly-understood legal meanings of these words. *See, e.g.*, *Dalton*, 2011 WL 1045107, at *5

4    (describing "knowing and intentional" as the "requisite scienter" requirements for a violation of §

5    226); *cf. Johnson v. United States*, 260 F. 783, 786 (9th Cir. 1919) (holding that in the context of a

6    criminal statute, "we think the court below correctly defined the word 'willfully' as meaning

7    'knowingly and intentionally'").

8          The Court now turns to whether Wal-Mart's noncompliance with § 226(a) was knowing

9    and intentional. First, the Court analyzes Plaintiffs' § 226(a)(6) claim regarding Wal-Mart's

10   statements of final pay. Then, the Court analyzes Plaintiffs' § 226(a)(9) claim regarding the

11   OVERTIME/INCT line item on Wal-Mart's wage statements.

12          a.   Whether Wal-Mart Knowingly and Intentionally Violated § 226(a)(6)
               Regarding the Statement of Final Pay

13         Cal. Lab. Code § 226(a)(6) requires wage statements to contain "the inclusive dates of the

14   period for which the employee is paid." Wal-Mart admits that "it is aware of the law." ECF No.

15   215 at 9. Yet, Wal-Mart issued and continues to issue deficient statements of final pay. Plaintiffs

16   argue that because the intentional omission of the dates for which the employee is paid from the

17   statement of final pay was and continues to be Wal-Mart's practice, Wal-Mart is liable. ECF No.

18   214 at 12-13. Wal-Mart argues that a good faith dispute excuses any liability under § 226(a)(6).

19   ECF No. 215 at 10-11. For the reasons stated below, the Court finds that Wal-Mart has shown that

20   a good faith dispute precludes a finding that Wal-Mart knowingly and intentionally violated §

21   226(a)(6) prior to the issuance of the Court's May 11, 2018 summary judgment order. However,

22   the Court also finds that Wal-Mart knowingly and intentionally violated § 226(a)(6) after the

23   Court's May 11, 2018 summary judgment order.

24         Wal-Mart employees are paid biweekly, and wage statements are produced biweekly to

25   correspond to the biweekly pay periods. Stipulated Facts at ¶ 10. These biweekly on-cycle wage

26   statements include pay period start and end dates. *Id.* at ¶ 11. When an employee is terminated, the

United States District Court
Northern District of California

Case No. 17-CV-00062-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1    employee immediately receives all wages earned through the date of termination by check. A

2    statement of final pay accompanies the check. *Id.* at ¶ 13. The statements of final pay do not

3    include pay period start or end dates. *Id.* at ¶ 14. After termination, Wal-Mart employees receive

4    one last wage statement, termed a final wage statement. This final wage statement is not issued at

5    the time employees receive their final paycheck or their statement of final pay unless the employee

6    happens to be terminated on the day biweekly wages are paid and a biweekly wage statement is

7    issued. Depending on when an employee is terminated in relation to Wal-Mart's biweekly wage

8    statement cycle, a terminated employee could potentially wait up to 14 days to receive a final

9    wage statement.

10          The Court now discusses the merits of Plaintiffs' § 226(a)(6) claim. Admittedly, there is a

11   dearth of statutory, regulatory, and case law guidance as to the metes and bounds of a good faith

12   dispute as applied to Cal. Lab. Code § 226. *See, e.g.*, *Wright*, 2013 WL 1758815, at *10 ("[T]he

13   legal issue is a close one, and there is no judicial precedence providing clear guidance on the scope

14   of the [good faith] exemption [under § 226] at issue."). However, Cal. Lab. Code § 203's good

15   faith dispute does not face the same lack of interpretive guidance as § 226. § 203's good faith

16   dispute, which applies to § 226's good faith dispute, *see, e.g.*, *Pedroza v. PetSmart, Inc.*, 2012 WL

17   9506073, at *5 n.6 (C.D. Cal. June 14, 2012) (holding that § 203's "'good faith dispute' defense

18   also applies to Labor Code § 226(e)"), has clear and abundant guidance. Both case law and a

19   regulation, Cal. Code Regs. tit. 8 § 13520, set forth the particularities of a good faith dispute under

20   Cal. Lab. Code § 203.

21          Many courts have applied § 203's good faith dispute to § 226. For instance, the *Woods*

22   court noted that courts have interpreted the § 203 "'good faith dispute' rule . . . to apply to

23   California Labor Code Section 226 wage statement penalties." *Woods*, 2015 WL 2453202, at *3;

24   *see also Villalpando*, 2015 WL 5179486, at *37 ("[T]he good faith defense that applies to claims

25   under section 203 also applies to Claims asserted under section 226 . . . ."); *Wright*, 2013 WL

26   1758815, at *9 ("There is no dispute by the parties that there is a comparable good faith defense

27   for § 226 which, similar to § 203, requires knowing and intentional conduct.").

28

Case No. 17-CV-00062-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
Northern District of California

1    As a result, many courts rely on § 203's good faith dispute for guidance on how to

2    interpret § 226's good faith dispute. *See, e.g.*, *Dalton*, 2011 WL 1045107, at *5 (citing Cal. Code

3    Regs. tit. 8 § 13520, the regulation interpreting the § 203 good faith dispute, in considering a good

4    faith dispute under § 226); *Wright*, 2013 WL 1758815, at *9 (same); *Pedroza*, 2012 WL 9506073,

5    at *5 n.6 (C.D. Cal. June 14, 2012) ("Although [Cal. Code Regs. tit. 8] § 13520 only expressly

6    refers to California Labor Code § 203, the 'good faith dispute' defense also applies with respect to

7    Labor Code § 226(e)."); *Woods*, 2015 WL 2453202, at *3 (same). Therefore, this Court will also

8    look to the § 203 good faith dispute for guidance on the application of a good faith dispute under §

9    226.

10    The regulation for a good faith dispute under § 203, Cal. Code Regs. tit. 8 § 13520,

11    provides as follows:

12    > A 'good faith dispute' that any wages are due occurs when an
      > employer presents a defense, based in law or fact which, if successful,
13    > would preclude any recover[y] on the part of the employee. The fact
      > that a defense is ultimately unsuccessful will not preclude a finding
14    > that a good faith dispute did exist. Defenses presented which, under
      > the circumstances, are unsupported by any evidence, are
15    > unreasonable, or are presented in bad faith, will preclude a finding of
      > a 'good faith dispute.'
16
      As interpreted by the case law, a good faith dispute presents in the § 203 context when there is

17    "(1) uncertainty in the law, (2) representations by [an] . . . authority that no further payment [of

18    wages] was required, or (3) the employer's good faith mistaken belief that wages are not owed

19    grounded in a good faith dispute, which exists when the employer presents a defense based in law

20    or fact which, if successful, would preclude any recovery on the part of the employee." *Diaz v.*

21    *Grill Concepts Servs., Inc.*, 23 Cal. App. 5th 859, 868 (2018) (internal citations and quotation

22    marks omitted). Thus, a good faith dispute presents when there is (1) uncertainty in the law; (2)

23    representations by an authority that compliance was not required; or (3) an employer's good faith

24    mistaken belief grounded in a good faith dispute.[2] *Id.*

25

26    _____

27    [2] Courts have interchangeably used a good faith exemption, a good faith defense, and a
      good faith dispute when analyzing claims under Cal. Lab. Code §§ 203 and 226. *See, e.g.*, *Wright*,
      2013 WL 1758815, at *10 ("[Good faith] exemption . . . ."); *id.* at *9 ("[G]ood faith defense . . .

28
Case No. 17-CV-00062-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Wal-Mart relies on prongs (1) and (3) of *Diaz*—that there was uncertainty in the law, and

2 that it had a good faith mistaken belief that the statement of final pay complied with § 226(a).

3    The Court first discusses the guiding principles behind § 226(a). Then, the Court turns to

4 whether Wal-Mart's omission of the pay period start and end dates on the statements of final pay

5 was knowing and intentional before the Court's May 11, 2018 summary judgment order. Lastly,

6 the Court turns to whether Wal-Mart's omission of information on its statements of final pay was

7 knowing and intentional after the Court's May 11, 2018 summary judgment order.

8                    i.    The Principles Behind § 226(a)

9    Cal. Lab. Code § 226(a) governs the information required on "accurate itemized

10 statement[s]" (e.g., wage statements) that an employer issues. Specifically, § 226(a) provides:

11       An employer, semimonthly or at the time of each payment of wages,
         shall furnish to his or her employee, either as a detachable part of the
12       check, draft, or voucher paying the employee's wages, or separately
         if wages are paid by personal check or cash, an accurate itemized
13       statement in writing showing (1) gross wages earned, (2) total hours
         worked by the employee, except as provided in subdivision (j), (3) the
14       number of piece-rate units earned and any applicable piece rate if the
         employee is paid on a piece-rate basis, (4) all deductions, provided
15       that all deductions made on written orders of the employee may be
         aggregated and shown as one item, (5) net wages earned, (6) the
16       inclusive dates of the period for which the employee is paid, (7) the
         name of the employee and only the last four digits of his or her social
17       security number or an employee identification number other than a
         social security number, (8) the name and address of the legal entity
18       that is the employer and, if the employer is a farm labor contractor, as
         defined in subdivision (b) of Section 1682, the name and address of
19       the legal entity that secured the services of the employer, and (9) all
         applicable hourly rates in effect during the pay period and the
20       corresponding number of hours worked at each hourly rate by the
         employee and, beginning July 1, 2013, if the employer is a temporary
21       services employer as defined in Section 201.3, the rate of pay and the
         total hours worked for each temporary services assignment. The
22       deductions made from payment of wages shall be recorded in ink or
         other indelible form, properly dated, showing the month, day, and
23       year, and a copy of the statement and the record of the deductions
         shall be kept on file by the employer for at least three years at the

24

25 ."); *Woods*, 2015 WL 2453202, at *3 ("Good faith dispute . . . ."). All three phrases mean the same

26 thing. As explained above, § 203's good faith dispute is applied to § 226's good faith dispute, and

27 Cal. Code Regs. tit. 8 § 13520 interprets § 203's good faith dispute. This Court chooses to use the
   phrase "good faith dispute" to be consistent with the Regulation.

28
                                          29

place of employment or at a central location within the State of California.

While amending § 226(a), the California Legislature found that "California employers are 'chronic violators of wage and hour, safety, and tax laws.'" California Assembly Committee on Labor & Employment, Bill Analysis, A.B. 2509 (Steinberg), April 12, 2000. Given accurate wage information, employees would be more able to identify any violation of wage and hour laws, so California employers would be less likely to attempt to cheat employees.

The question before this Court is whether Wal-Mart's statements of final pay must comply with § 226(a). Courts have held that it is especially vital that the employee receive an accurate itemized statement in writing at the time of termination to avoid "employee confusion over whether they received all wages owed them, difficulty and expense involved in reconstructing pay records, and forcing employees to make mathematical computations to analyze whether the wages paid in fact compensated them for all hours worked." *Elliot v. Spherion Pac. Work, LLC*, 572 F. Supp. 2d 1169, 1181 (C.D. Cal. 2008).

Moreover, the California Court of Appeal's opinion in *Soto v. Motel 6 Operating, L.P.* also supports the conclusion that Wal-Mart's statement of final pay should comply with § 226. 4 Cal. App. 5th 385, 392 (2016). Specifically, *Soto* supports the notion that the requirements under § 226(a) must be met at the time wages are paid. In *Soto* the plaintiff argued that § 226(a) required vacation pay to be listed on the wage statement for the period in which it was earned, even if the employee did not receive the vacation pay until a later pay period. *Id.* at 390. However, the Court in *Soto* held that employers were required to comply with § 226(a) *when wages were paid* instead of when wages were accrued in order to document "the *paid wages* to ensure the employee is fully informed regarding the calculation of *those wages*." *Id.* at 392 (emphasis in original). Otherwise stated, *Soto* found § 226(a)'s requirements are triggered when wages are paid, as opposed to when wages are earned. Moreover, *Soto* concerns the same statute—§ 226(a)—as the instant claim.

"Where a federal court has jurisdiction by virtue of diversity of citizenship of the parties, the court must follow state law." *Burns v. Int'l Ins. Co.*, 929 F.2d 1422, 1424 (9th Cir. 1991); *see also Hanna*, 380 U.S. at 465 ("[F]ederal courts sitting in diversity cases, when deciding questions

30

Case No. 17-CV-00062-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1   of substantive law, are bound by state court decisions as well as state statutes."). Here, the Court

2   sits in diversity. *Soto* is the only published, extant California case this Court found that discusses

3   when employers must meet the requirements under § 226(a). As *Soto* concluded that employers

4   must comply with § 226(a) at the time wages are paid instead of when wages are accrued, this

5   Court is bound to follow *Soto*'s conclusion.

6          As aforementioned, Wal-Mart employees are paid biweekly with corresponding wage

7   statements issued the same day as payment of their biweekly wages. Stipulated Facts at ¶ 10. An

8   employee's final wage statement is issued on this biweekly pay schedule; it is not issued on the

9   day an employee is terminated and paid final wages unless an employee happens to be terminated

10  on the day biweekly wages are paid and a biweekly wage statement is issued. Thus, Wal-Mart's

11  issuance of a final wage statement could be delayed by up to 14 days after an employee is

12  terminated, paid his or her final wages, and given the statement of final pay (which does not

13  identify the pay period for which the final wages are paid). This exacerbates the problems an

14  employee faces in determining whether or not his or her final wages are correct. These problems

15  an employee faces inform courts' interpretations of California Labor Code provisions such as §

16  226 because the California Supreme Court has held that "the state's labor laws are to be liberally

17  construed in favor of worker protection." *Alvarado*, 4 Cal. 5th at 561-62.

18         Furthermore, because the statement of final pay is issued and given to the employee on the

19  day of termination, it is likely the only chance an employee has to access his or her Wal-Mart

20  supervisor to discuss or dispute, outside of litigation, the accuracy of the wages received. Thus, as

21  per *Alvarado*'s concern for worker protection, it is critical that the statement of final pay identify

22  the paid period for final wages paid to allow an employee to evaluate whether he or she has been

23  correctly paid.

24         Also, Wal-Mart provides computer terminals in its stores for employees to access and print

25  their wage statements. Tr. at 162:15-20. Terminated employees lose access to Wal-Mart's

26  computer terminals. Because the date an employee is terminated does not necessarily fall on the

27  same date the final wage statement is issued, employees could lose access to their final wage

28
                                                    31

United States District Court
Northern District of California

statements. For instance, Magadia testified that after he was terminated, he could not log in to Wal-Mart's computer terminals to look at his wage statements. *Id.* at 117:11-16 ("Q. And after your termination, was your access to Walmart's intranet terminated? A. Yes. Q. So after your access to Walmart's intranet was terminated, were you able to log in to look at your pay stubs at all? A. No."). Moreover, there was testimony indicating that Magadia did not even receive his final wage statement because his Wal-Mart intranet access was terminated. *Id.* at 118:5-8 ("Q. So in other words, if your access to Walmart's intranet was already terminated, you couldn't have logged on to look at this [final wage] statement; correct? A. Yes.").

In sum, Cal. Lab. Code § 226(a) requires: "[a]n employer, semimonthly or *at the time of each payment of wages*, shall furnish to his or her employee . . . an accurate itemized statement in writing . . . ." (emphasis added). The "accurate itemized wage statement" must be compliant with all the requirements of § 226(a). Here, the itemized statement must include the "inclusive dates of the period for which the employee is paid" pursuant to § 226(a)(6). It is undisputed that at the time of termination, a Wal-Mart employee receives by check all wages earned through the date of termination. Stipulated Facts at ¶ 13. Thus, at the time of termination (i.e., a time when wages are paid), a Wal-Mart employee must receive an itemized statement that includes the dates for which the employee is being paid. That itemized statement takes the form of Wal-Mart's statement of final pay. The statement of final pay, as discussed above, does not contain the dates for which the employee is being paid. Therefore, in view of the principles behind § 226(a), the Court's May 11, 2018 summary judgment order held that Wal-Mart's statement of final pay must comply with § 226(a)(6) by disclosing the dates for which the employee is being paid. Critically, the summary judgment order is consistent with the California Supreme Court's statement that "the state's labor laws are to be liberally construed in favor of worker protection." *Alvarado*, 4 Cal. 5th at 561-62.

ii. Whether Wal-Mart Knowingly and Intentionally Violated § 226(a)(6) Regarding the Statement of Final Pay Prior to the May 11, 2018 Summary Judgment Order

As aforementioned, Wal-Mart argues that there was a good faith dispute because there was uncertainty in the law. Wal-Mart contends that its final wage statement, not the statement of final

pay, must comply with § 226(a)(6). ECF No. 86 at 5. The Court finds that under *Diaz*, there was uncertainty in the law allowing Wal-Mart to claim there was a good faith dispute prior to the Court's May 11, 2018 summary judgment order. 23 Cal. App. 5th at 868. § 226(a) provides: "[a]n employer, semimonthly *or* at the time of each payment of wages, shall furnish to his or her employee . . . an accurate itemized statement in writing . . . ." (emphasis added). The statute uses the disjunctive "or," implying that the provision of "an accurate itemized statement" could take place *either* semimonthly *or* at the time wages were paid. By using the disjunctive "or," § 226(a) implied that employers could be in compliance with the law so long as a compliant wage statement was issued semimonthly, and not necessarily at the time of the payment of any wages. Wal-Mart did issue such a semimonthly pay statement in the form of the final wage statement after the employee's termination and receipt of his or her statement of final pay.

Before this Court issued its May 11, 2018 summary judgment order, ECF No. 121, there was no case law holding that Wal-Mart's statements of final pay must comply with § 226(a). There was also no case law holding that the statute required issuance of a statement of final pay compliant with § 226(a)(6) regardless of whether a compliant semimonthly wage statement was also issued. Thus, Wal-Mart's mistaken belief that its statements of final pay were not wage statements that needed to comply with § 226(a) was in good faith because Wal-Mart issued a terminated employee a final wage statement on Wal-Mart's semimonthly on-cycle pay period schedule in compliance with § 226(a)(6).

Therefore, Wal-Mart designed a payment system that, under Wal-Mart's interpretation, was in compliance with § 226(a)(6). The Court finds that Wal-Mart, owing to its good faith belief, did not knowingly and intentionally violate § 226(a)(6) by issuing deficient statements of final pay before the Court's May 11, 2018 summary judgment order.

        iii.  Whether Wal-Mart Knowingly and Intentionally Violated § 226(a)(6) Regarding the Statement of Final Pay After the May 11, 2018 Summary Judgment Order

The Court next addresses whether Wal-Mart had a good faith belief that Wal-Mart was in compliance with § 226(a)(6) after the Court's May 11, 2018 summary judgment order.

Case No. 17-CV-00062-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1    First, the May 11, 2018 summary judgment order stated in no uncertain terms: "the Court

2    finds that the Statement of Final Pay violates § 226(a)(6) because it does not include the pay

3    period start and end dates." ECF No. 121 at 16. Wal-Mart could no longer have a good faith belief

4    undergirded by uncertainty in the law because at that point, the law of the case was clear: Wal-

5    Mart's statements of final pay needed to comply with *all* the requirements of § 226(a). Thus, Wal-

6    Mart should have taken immediate steps to fix the deficient statements of final pay. Yet, Wal-Mart

7    did nothing.

8    Wal-Mart is still issuing deficient statements of final pay, Stipulated Facts at ¶ 14, and

9    belatedly began to inquire about solutions to the problem sometime during the week before

10   Thanksgiving, on the eve of the November 30, 2018 trial, *see* Tr. at 389:16-391:2 ("A. The payroll

11   information systems department was asked to estimate what kind of effort they thought it might be

12   with what they knew about the ask [to fix Wal-Mart's deficient statements of final pay and wage

13   statements]. The Court: And what was the date of that request? . . . . A. I believe the week before

14   Thanksgiving."). Although fact discovery closed on May 1, 2018, ECF No. 27 at 2, Plaintiffs did

15   not object to Wal-Mart's trial testimony about Wal-Mart's belated remedial inquires to comply

16   with this Court's May 11, 2018 summary judgment order on the eve of the November 30, 2018

17   trial.

18   Despite the Court's May 11, 2018 summary judgment order, Wal-Mart has not asked any

19   employee to change Wal-Mart's deficient statements of final pay. Moreover, Michael Baran, Wal-

20   Mart's technical expert in the people systems payroll area, testified that no change has been made

21   to Wal-Mart's statements of final pay:

22        Q. Okay. And in Mr. Winn's cross-examination of you, you testified
          that you were asked by Walmart to make a change as to Walmart's
23        wage statements regarding the OVERTIME/INCT and statements of
          final pay. Do you recall that testimony? .     .     .     .
24        A. I was asked about the change. I wasn't asked to make the change.
          Q. Do you know who was asked to make the change at Walmart?
25        A. *I don't believe any single individual that I'm aware of*.
          Q. Do you know if, if any department was asked to implement the
26        changes you testified to during your cross-examination by Mr. Winn?
          A. *No one has started to implement anything as you said* . . . . The
27        payroll information systems department was asked to *estimate* what

28                                           34

United States District Court
Northern District of California

1

kind of effort they thought it might be with what they knew about the ask.

2

*Id.* at 389:16-390:14 (emphasis added). The payroll information systems department was merely

3

asked to "estimate" the effort needed to make changes. *Id.* So, for 6 months after the Court's May

4

11, 2018 summary judgment order issued, Wal-Mart took no steps to remedy the problem. Wal-

5

Mart's belated and half-hearted remedial inquiries on the eve of trial appeared to be motivated by

6

a desire to create evidence for trial rather than a sincere effort to correct the deficient statements of

7

final pay.

8

Second, Wal-Mart did not have a good faith mistaken belief that its statement of final pay

9

complied with § 226(a)(6). The two pieces of evidence of good faith upon which Wal-Mart relies

10

are that Wal-Mart's statement of final pay identifies the date on which the statement is issued, and

11

that Wal-Mart conducts exit interviews. However, the fact that the statement of final pay includes

12

its issuance date does not demonstrate that Wal-Mart attempted in good faith to comply with §

13

226(a)(6). After the Court's May 11, 2018 summary judgment order, Wal-Mart knew that its

14

statement of final pay violated § 226(a)(6), but Wal-Mart still failed to add the pay period start and

15

end dates for final wages paid to the statement of final pay. Wal-Mart's inaction despite being on

16

notice of the illegality of its practice of omitting the pay period dates from its statement of final

17

pay belies Wal-Mart's purported good faith mistaken belief that Wal-Mart was in compliance with

18

§ 226(a)(6).

19

Moreover, Wal-Mart's "evidence" of good faith actually acknowledges that Wal-Mart *fails*

20

to comply with § 226(a)(6). Wal-Mart is essentially saying that employees might be able to get the

21

information required under § 226(a)(6) from their exit interview. However, the California Labor

22

Code does not excuse a violation of § 226(a)(6) simply because an employee might get the

23

information required under § 226(a)(6) from other sources. Thus, there is no evidence, factually or

24

legally, of a good faith mistaken belief.

25

Therefore, the Court finds Wal-Mart liable for violating § 226(a)(6) after May 11, 2018

26

because it knowingly and intentionally issued deficient statements of final pay without a good

27

faith dispute.

28

35

United States District Court
Northern District of California

### b. Whether Wal-Mart Knowingly and Intentionally Violated § 226(a)(9) Regarding the OVERTIME/INCT Line Item

Cal. Lab. Code § 226(a)(9) requires wage statements to contain "all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee." Plaintiffs have met their burden of showing that Wal-Mart knowingly and intentionally failed to include the applicable hourly rates and corresponding hours worked for the OVERTIME/INCT line item. Like for Plaintiffs' § 226(a)(6) claim above, Wal-Mart admits that "it is aware of the law." ECF No. 215 at 9. Yet, Wal-Mart issued and continues to issue deficient wage statements omitting the required hours and hourly rate for the OVERTIME/INCT line item. Plaintiffs argue that so long as an employer such as Wal-Mart issues a deficient wage statement not due to a clerical error or inadvertent mistake, the employer is liable. ECF No. 214 at 8-9. Wal-Mart argues that a good faith dispute excuses any liability under § 226(a)(9). ECF No. 215 at 9-10.

As aforementioned, the § 226 good faith inquiry mirrors the § 203 good faith inquiry. *See, e.g.*, *Woods*, 2015 WL 2453202, at *4 ("The similarity between 'knowing and intentionally' under Section 226 and 'willfully' under Section 203 with respect to their incorporation of a good faith dispute defense is consistent with the Labor Code generally . . . ."). Also as discussed above, a good faith dispute presents when there is (1) uncertainty in the law; (2) representations by an authority that compliance was not required; or (3) an employer's good faith mistaken belief grounded in a good faith dispute. *Diaz*, 23 Cal. App. 5th at 868.

Here, Wal-Mart relies upon the first and third prongs of a good faith dispute because Wal-Mart argues that there is uncertainty in the law, and that Wal-Mart's actions taken with respect to informing associates about how the MyShare Incentive Awards are included in the regular rate of pay excuse Wal-Mart's failure to comply with § 226(a)(9). ECF No. 215 at 10.

First, Wal-Mart argues that the California Court of Appeal's partially unpublished decision in *Fabio Canales v. Wells Fargo Bank, N.A.*, Case No. B276127 (2018), issued on May 30, 2018 and judicially noticed by the Court at ECF No. 157 at 4 n.1, supports Wal-Mart's position that § 226(a)(9) does not apply to "additional wages that were earned as overtime pay based on nondiscretionary bonuses being spread over the hours worked during the bonus period." ECF No.

United States District Court
Northern District of California

1  131-1 at 12-13.[3] *Canales* could not have provided support for Wal-Mart's practice of issuing

2  deficient wage statements. Wal-Mart relies on the *unpublished* portion of *Canales*, and pursuant to

3  Civil Local Rule 3-4(e), "[a]ny order or opinion that is designated" as unpublished "may not be

4  cited to this Court, either in written submissions or oral argument, except when relevant under the

5  doctrines of law of the case, res judicata, or collateral estoppel."

6       Moreover, Wal-Mart could not have relied on *Canales* in issuing deficient wage statements

7  that lacked the hours worked or applicable hourly rates for the OVERTIME/INCT line item.

8  *Canales* issued on May 30, 2018, *after* this Court's May 11, 2018 summary judgment order

9  finding that "Wal-Mart's wage statements violate § 226(a)(9)," ECF No. 121 at 14. Thus, by the

10  time *Canales* issued, the law of the case was well-established: Wal-Mart's wage statements

11  needed to comply with § 226(a)(9).

12       Moreover, Wal-Mart has *always* omitted the rate or hours worked for the

13  OVERTIME/INCT line item information from its pay statements. Tr. at 137:20-22 ("Q. As far as

14  you know, has Walmart ever identified the rate or hours on the wage statement for the

15  OVERTIME/INCT line item? A. I'm not aware of that."). Thus, *Canales*—issued on May 30,

16  2018—postdates Wal-Mart's practice of issuing deficient wage statements. As *Canales* postdates

17  Wal-Mart's practice of issuing deficient wage statements, *Canales* could not have provided

18  support for Wal-Mart's practice of issuing deficient wage statements. In addition, the relevant

19  portion of *Canales* is unpublished, and pursuant to Civil Local Rule 3-4(e), "[a]ny order or

20  opinion that is designated" as unpublished "may not be cited to this Court, either in written

21  submissions or oral argument, except when relevant under the doctrines of law of the case, res

22  judicata, or collateral estoppel."

23       Additionally, there is an earlier *published* California Court of Appeal case, *Soto*, with

24  which *Canales* conflicts, a conflict *Canales* itself acknowledged but never reconciled. ECF No.

25

26

27  _____

[3] Because the unpublished portion of *Canales* is available neither on Westlaw nor LexisNexis, the Court relies on the document Wal-Mart submitted in its request for judicial notice, ECF No. 131-1, which was granted, ECF No. 157 at 4 n.1.

28

Case No. 17-CV-00062-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
Northern District of California

131-1 at 13. As aforementioned, in *Soto*, the plaintiff argued that § 226(a) required vacation pay to be listed on the wage statement for the period in which it was earned, even if the employee did not receive the vacation pay until a later pay period. 4 Cal. App. 5th at 390. The *Soto* defendant, like Plaintiffs here, argued instead that vacation pay had to be listed in the employee's wage statement when the employee actually received it. *Id. Soto* held that employers were required to comply with § 226(a) when wages were paid instead of when wages were accrued in order to document "the *paid wages* to ensure the employee is fully informed regarding the calculation of *those wages*." *Id.* at 392 (emphasis in original).

Also, as the Court held in its order denying Wal-Mart's motion for partial summary judgment, ECF No. 157, *Canales* is also at odds with the purpose behind § 226(a)(9). Courts have described the purpose of § 226(a)(9) as "requiring more information and disclosure to employees." *See, e.g.*, *York*, 2009 WL 8617536, at *10. Moreover, a reading of a statute that would exempt employers from any obligation to disclose hours and rates for a category of overtime, as *Canales* holds, is difficult to reconcile with a California labor statute whose avowed goal is to "insure that employees are adequately informed of compensation received and are not shortchanged by their employers." *Soto*, 4 Cal. App. 5th at 393 (quoting Cal. Assembly Comm. on Labor and Employment Analysis of Sen. Bill No. 1255 (2011-2012 Reg. Sess.)).

In sum, *Canales* does not create any uncertainty in California labor laws, which as the California Supreme Court has held, "are to be liberally construed in favor of worker protection." *Alvarado*, 4 Cal. 5th at 561-62. Thus, there was no good-faith reliance on *Canales* by Wal-Mart.

Moreover, as aforementioned, the Court's May 11, 2018 summary judgment order placed Wal-Mart on notice that its wage statements were noncompliant with § 226(a)(9). ECF No. 121 at 14. Yet Wal-Mart is still issuing deficient wage statements and belatedly began to inquire about solutions to the problem sometime during the week before Thanksgiving, on the eve of the November 30, 2018 trial. *See* Tr. at 369:14-19; *id.* at 389:16-391:2. Michael Baran, Wal-Mart's technical expert in the people systems payroll area, testified that no change has been made to Wal-Mart's wage statements regarding the OVERTIME/INCT line item and that Wal-Mart has not

Case No. 17-CV-00062-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1   requested anyone at Wal-Mart to make any such change:

2   > Q. Okay. And in Mr. Winn's cross-examination of you, you testified
3   > that you were asked by Walmart to make a change as to Walmart's
    > wage statements regarding the OVERTIME/INCT and statements of
    > final pay. Do you recall that testimony? . . . .
4   > A. I was asked about the change. I wasn't asked to make the change.
    > Q. Do you know who was asked to make the change at Walmart?
5   > A. *I don't believe any single individual that I'm aware of.*
    > Q. Do you know if, if any department was asked to implement the
6   > changes you testified to during your cross-examination by Mr. Winn?
    > A. *No one has started to implement anything as you said* . . . . The
7   > payroll information systems department was asked to *estimate* what
    > kind of effort they thought it might be with what they knew about the
8   > ask.

9   *Id.* at 389:16-390:14 (emphasis added). Michael Baran also testified that Wal-Mart has not figured

10  out what change to make: "Q. Has Walmart been looking into whether to modify its wage

11  statements to display rates and hours that correspond to the overtime incentive payment? A. Yes.

12  Q. Has it figured out how to do that yet? A. No, we have not." Tr. at 369:14-19. So, for 6 months

13  after the Court's May 11, 2018 summary judgment order issued, Wal-Mart took no steps to

14  remedy the problem. Wal-Mart's belated and half-hearted remedial inquiries on the eve of trial

15  appeared to be motivated by a desire to create evidence for trial rather than a sincere effort to

16  correct the deficient statements of final pay.

17        Second, Wal-Mart has not demonstrated a good faith mistaken belief that it complied with

18  § 226(a)(9) under the third prong of the good faith analysis (an employer's good faith mistaken

19  belief grounded in a good faith dispute). § 226(a)(9) requires that wage statements contain "all

20  applicable hourly rates in effect during the pay period and the corresponding number of hours

21  worked at each hourly rate by the employee." Wal-Mart's argument that as evidence of its good

22  faith, it informed associates that "[e]arned MyShare Incentive Awards will be included in the

23  regular rate of pay when calculating overtime for the incentive quarter" and "flags this for

24  associates in its written MyShare Quarterly Incentive Plan Program," Ex. 125-7; ECF No. 215 at

25  10, is unpersuasive and does not implicate a good faith dispute. Wal-Mart's MyShare Quarterly

26  Incentive Plan Program (Exhibit 125) states that "[q]ualifying participants employed in an eligible

27  facility may receive a MyShare incentive award." This statement is emblematic of the very high

28

*United States District Court*
*Northern District of California*

39

1   level of generality the MyShare Quarterly Incentive Plan Program describes how the

2   OVERTIME/INCT line item is calculated. In other words, Wal-Mart's MyShare Quarterly

3   Incentive Plan Program fails to disclose employees' hourly rates and corresponding hours worked

4   for the OVERTIME/INCT line item, as required by § 226(a)(9). The purpose behind enforcing §

5   226(a)(9) is so "that employees are adequately informed of compensation received and are not

6   shortchanged by their employers." *Soto*, 4 Cal. App. 5th at 393. Yet, Wal-Mart's MyShare

7   Quarterly Incentive Plan Program does not come close to satisfying the purpose of § 226(a)(9),

8   which is to give employees *more* information about line items in wage statements so that

9   employees have sufficient information to identify potential issues with the paid wages.

10          Therefore, the Court concludes that Wal-Mart is liable for violating § 226(a)(9) because it

11   knowingly and intentionally issued wage statements with the OVERTIME/INCT line item.

12          Having found that Wal-Mart knowingly and intentionally violated both § 226(a)(6)

13   (regarding the statement of final pay claim) after the Court's May 11, 2018 summary judgment

14   order, and § 226(a)(9) (regarding the OVERTIME/INCT claim), the Court turns to the third prong

15   of the inquiry: whether the Plaintiffs suffered injury.

### 2.  Whether Plaintiffs Suffered Injury from Wal-Mart's Omissions from the Statement of Final Pay and the OVERTIME/INCT Line Item

17          First, the Court discusses whether Plaintiffs suffered any injury because Wal-Mart omitted:

18   (1) the pay period dates from the statement of final pay, and (2) the hours worked and rate paid

19   from the OVERTIME/INCT line item. Then, the Court turns to whether Magadia has Article III

20   standing to bring his claims for violations of Cal. Lab. Code §§ 226(a)(6) (regarding the statement

21   of final pay claim) and 226(a)(9) (regarding the OVERTIME/INCT claim).

22          Wal-Mart contends that Magadia suffered no injury because he admitted as such in his

23   testimony: "Q. Have you been injured in any way because of the pay stubs you received? A. Oh.

24   No." Tr. at 99:17-19. Magadia also admitted that he did not know of anyone else who was

25   confused by any of Wal-Mart's pay statements: "Q. Are you aware of any associate who has been

26   confused by any statement of pay that they've received from Walmart? A. No." *Id.* at 98:18-20.

40

1     On the other hand, Plaintiffs argue that because Plaintiffs cannot readily determine from the face

2     of the final statement of pay or their wage statements the information required under § 226(a),

3     they have suffered injury.

4           Injury under § 226 is statutorily defined by the California Labor Code:

5                  An employee is deemed to suffer injury for purposes of this
                   subdivision if the employer fails to provide accurate and complete
6                  information [on its wage statements] as required by any one or more
                   of items (1) to (9), inclusive, of subdivision (a) and the employee
7                  cannot promptly and easily determine from the wage statement alone
                   . . . any of the other information required to be provided on the
8                  itemized wage statement pursuant to items . . . (6) and (9) of
                   subdivision (a)."
9
      Cal. Lab. Code § 226(e)(2)(B). The California Labor Code statutorily defines injury as the
10
      inability to "promptly and easily determine from the wage statement alone" items required to be
11
      disclosed on a wage statement pursuant to other portions of the statute (i.e., the hours worked and
12
      hourly rate paid). *Id.* "Promptly and easily determine" is further defined as whether "a reasonable
13
      person would be able to readily ascertain the information without reference to other documents or
14
      information." Cal. Lab. Code § 226(e)(2)(C).
15
            Here, Magadia testified that he could not determine the start and end dates from the
16
      statement of final pay (relating to Plaintiffs' § 226(a)(6) claim). Tr. at 102:12-22. Todd Stokes,
17
      Wal-Mart's divisional human resources director, conceded this fact in his testimony: "Q. Looking
18
      at the statement of final pay itself, without using any other wage statements or any calendar or
19
      anything else, can an employee determine what pay period he or she is being paid for on the
20
      statement of final pay? A. They cannot determine the pay period specifically off this document."
21
      *Id.* at 140:16-21
22
            Moreover, Magadia testified that he cannot determine the rate and hours for the
23
      OVERTIME/INCT line item (relating to Plaintiffs' § 226(a)(9) claim). *Id.* at 95:8-10. Stokes
24
      conceded that employees could not determine the rate paid and hours worked for the
25
      OVERTIME/INCT line item as well: "Q. If you look at an OVERTIME/INCT line item on a
26
      particular pay stub, is an employee able to tell how the OVERTIME/INCT is calculated without
27

28

41

United States District Court
Northern District of California

1    looking at anything else? . . . . A. I would say no." *Id.* at 137:14-19.

2        As such, the Court finds that Magadia's testimony establishes that he has suffered injury

3    for his claims under § 226(a)(6) (regarding the statement of final pay) and § 226(a)(9) (regarding

4    the OVERTIME/INCT line item). Magadia's testimony is corroborated by the testimony of

5    Stokes, Wal-Mart's divisional human resources director. Next, the Court discusses Wal-Mart's

6    contention that Magadia does not have Article III standing.

7            a.   Whether Magadia Possesses Article III Standing

8        Wal-Mart contends that Magadia does not have Article III standing pursuant to *Spokeo,*

9    *Inc. v. Robins*, 136 S. Ct. 1540 (2016), a case that deals with the injury in fact requirement of

10   Article III standing. In *Spokeo*, the United States Supreme Court reiterated two longstanding

11   principles governing the injury in fact analysis. First, the Supreme Court confirmed that for an

12   injury to be "concrete," it must be "*de facto*," meaning that it is "real," and not "abstract." *Spokeo*,

13   136 S. Ct. at 1548. However, an injury need not be "tangible" in order to be "concrete," and

14   intangible injuries may constitute injury in fact. *Id.* at 1549.

15       Second, the *Spokeo* Court reaffirmed that the legislature may "elevat[e]" injuries

16   "previously inadequate in law" to legally cognizable "concrete" injuries. *Id.* at 1549 (quoting

17   *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 578 (1992)); *see also Lujan*, 504 U.S. at 580

18   (Kennedy, J., concurring) ("Congress has the power to define injuries and articulate chains of

19   causation that will give rise to a case or controversy where none existed before."). In other words,

20   the violation of a right granted by statute may be sufficient to constitute injury in fact, without

21   alleging "any *additional* harm beyond the one Congress has identified." *Spokeo*, 136 S. Ct. at

22   1549; *see also Warth v. Seldin*, 422 U.S. 490, 500 (1975) (stating that the "actual or threatened

23   injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion

24   of which creates standing" (internal quotation marks omitted)). Justice Thomas, concurring in

25   *Spokeo*, put the principle plainly: "Congress can create new private rights and authorize private

26   plaintiffs to sue based simply on the violation of those private rights," such that "[a] plaintiff

27   seeking to vindicate a statutorily created private right need not allege actual harm beyond the

28

Case No. 17-CV-00062-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1    invasion of that private right." *Spokeo*, 136 S. Ct. at 1553 (Thomas, J., concurring).

2    The Ninth Circuit, in interpreting *Spokeo*, has held that in evaluating a claim of harm, there

3    are two inquiries. "(1) [W]hether the statutory provisions at issue were established to protect []

4    concrete interests (as opposed to purely procedural rights), and if so, (2) whether the specific

5    procedural violations alleged in this case actually harm, or present a material risk of harm to, such

6    interests." *Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1113 (9th Cir. 2017) (hereinafter *Spokeo II*). The

7    Court addresses each inquiry in turn.

8    First, the statutory provisions were established to protect the concrete interests of

9    employees who have a legitimate right of access to their pay information to protect their interests.

10   These are real rights, rather than purely legal or procedural rights. As an example, in amending §

11   226(a) to include § 226(a)(9), the provision implicated by Plaintiffs' claim regarding the

12   OVERTIME/INCT line item, the California Senate bill analysis incorporated comments that

13   employees "are often provided little information about their wages," and that "this bill will remedy

14   that problem." *York v. Starbucks Corp.*, 2009 WL 8617536, at *10 (C.D. Cal. Dec. 3, 2009)

15   (quoting California Senate Judiciary Committee, Bill Analysis, A.B. 2509 (Steinberg), August 8,

16   2000). The *York* court described the purpose behind the addition of § 226(a)(9) as "requiring more

17   information and disclosure to employees, not less" to avoid employers cheating their employees

18   out of legitimately-earned wages. *Id.* Analogously, the same can be said of § 226(a)(6), implicated

19   by Plaintiffs' statement of final pay claim, which requires more information disclosed to

20   employees, not less.

21   In sum, it seems the animating purpose behind § 226(a), with all its provisions regarding

22   what must be disclosed on wage statements, is employee protection. Intertwined with this purpose

23   is an element of deterrence, as "California employers are 'chronic violators of wage and hour,

24   safety, and tax laws.'" *Id.* (quoting California Assembly Committee on Labor & Employment, Bill

25   Analysis, A.B. 2509 (Steinberg), April 12, 2000). Similar sentiments were echoed when the

26   California Legislature amended § 226(a) to require "accurate" itemized wage statements: "During

27   oversight hearings conducted by the Assembly Committee on Labor and Employment in 2001, the

28

1   Committee learned that labor law violations are rampant in the underground economy, and that

2   state labor law enforcement is minimal." California Assembly Committee on Labor &

3   Employment, Bill Analysis, A.B. 276 (Koretz), March 13, 2003. Given more wage information,

4   employees would be more able to identify any violation of wage and hour laws, so California

5   employers would be less likely to attempt to cheat employees. In this context, it makes sense that

6   the California legislature might protect against such harms without requiring a higher threshold

7   showing of injury to the employee.

8       Analogously, in *Spokeo II*, the Fair Credit Reporting Act's ("FCRA") provisions were at

9   issue. 867 F.3d at 1114. The Ninth Circuit had "little difficulty" concluding that the interests

10  protected by the FCRA were "real, rather than purely legal creations." *Id.* This is because

11  inaccurate credit reports posed a "threat to a consumer's livelihood. . . . Congress could have seen

12  fit to guard against that threat . . . especially in light of the difficulty the consumer might have in

13  learning exactly who has accessed (or who will access) his credit report." *Id.* The logic behind

14  *Spokeo II* sounds very similar to the logic espoused by the California legislature in amending §

15  226(a). Both the FCRA and Cal. Lab. Code § 226(a) are concerned with protecting a group of

16  people whose livelihoods would be threatened by inaccurate information and would otherwise

17  have difficulty accessing such information.

18      Second, the specific procedural violations alleged in this case—violations of § 226(a)(6)

19  (regarding the statement of final pay claim) and § 226(a)(9) (regarding the OVERTIME/INCT

20  claim)—actually harm the concrete interests of employees in having access to their wage

21  information. In *Spokeo II*, the Ninth Circuit noted that the plaintiff's credit report "falsely reported

22  that he is married with children, that he is in his 50s, that he is employed in a professional or

23  technical field, that he has a graduate degree, and that his wealth level is higher than it is." 867

24  F.3d at 1117. It was "clear" to the *Spokeo II* court that these facts "are substantially more likely to

25  harm [plaintiff's] concrete interests than the Supreme Court's example of an incorrect zip code."

26  *Id.* Likewise, omissions of pay period dates and the number of hours worked and at what rates, as

27  is the case here, strike at the heart of the intent behind the California Legislature's efforts to

28

44

protect employees. The Court first discusses the harm to Plaintiffs' concrete interests under § 226(a)(6) (regarding the statement of final pay claim), then under § 226(a)(9) (regarding the OVERTIME/INCT claim).

   i.   Harm to Plaintiffs' Concrete Interests under § 226(a)(6) (regarding the statement of final pay claim)

In relation to Plaintiffs' claim under § 226(a)(6), it is critical that the statement of final pay contain accurate information regarding "the inclusive dates of the period for which the employee is paid" because the statement is issued on the day the employee is terminated. Cal. Lab. Code § 226(a)(6). The omission of the dates from the statements of final pay may make it more difficult for employees to determine the accuracy of the information presented. Other such injuries might include "employee confusion over whether they received all wages owed them, difficulty and expense involved in reconstructing pay records, and forcing employees to make mathematical computations to analyze whether the wages paid in fact compensated them for all hours worked." *Elliot*, 572 F. Supp. 2d at 1181. Moreover, after employees are terminated, it presumably becomes more difficult for employees to correct incorrect information on their wage statements or challenge their final wages outside the context of litigation. Thus, it is important that the dates of pay appear on the statement of final pay, so employees can raise any issues during their exit interviews or with their supervisor on the employees' last day of employment.

Even Wal-Mart's own witness, Todd Stokes, concedes that Wal-Mart employees suffer the statutorily-defined injury by being unable to determine from the face of the statement of final pay the pay period for which employees are being paid. The California Labor Code statutorily defines injury as the inability to "promptly and easily determine from the wage statement alone" items required to be disclosed on a wage statement. Cal. Lab. Code § 226(e)(2)(B). Stokes testified: "Q. Looking at the statement of final pay itself, without using any other wage statements or any calendar or anything else, can an employee determine what pay period he or she is being paid for on the statement of final pay? A. They cannot determine the pay period specifically off this document." Tr. at 140:16-21. Magadia also testified as to his confusion stemming from his

45

United States District Court
Northern District of California

1  inability to determine the start and end dates from the statement of final pay. Magadia stated: "Q.

2  Okay. So you cannot tell me what the dates of your pay period are [on the statement of final pay];

3  is that correct? A. Yes." *Id.* at 82:23-25.

ii. Harm to Plaintiffs' Concrete Interests under § 226(a)(9) (regarding the OVERTIME/INCT claim)

5  In relation to Plaintiffs' claim under § 226(a)(9), without sufficient information on their

6  wage statements, Plaintiffs would not be able to tell if they are owed additional money from their

7  employer and if there are mistakes on their wage statements. This is especially important given

8  that Wal-Mart employees' OVERTIME/INCT line item is calculated over a *quarterly* basis,

9  meaning that many months elapse until employees are able to see the line item on their wage

10  statements. Without the requisite "applicable hourly rates in effect . . . and the corresponding

11  number of hours worked at each hourly rate by the employee," it is especially difficult for

12  employees to assess whether they have been paid correctly. Cal. Lab. Code § 226(a)(9).

13  Stokes also concedes that Wal-Mart employees suffer the statutorily-defined injury by

14  being unable to determine from the wage statement alone the hours worked and rate paid for the

15  OVERTIME/INCT line item (regarding Plaintiffs' claim under § 226(a)(9)). Stokes testified: "Q.

16  If you look at an OVERTIME/INCT line item on a particular pay stub, is an employee able to tell

17  how the OVERTIME/INCT is calculated without looking at anything else? . . . . A. I would say

18  no." Tr. at 137:14-19. Furthermore, Magadia testified as to his confusion stemming from his

19  inability to determine the rate and hours for the OVERTIME/INCT line item. Magadia testified:

20  "Q. Are you confused by the way those, either of those two items are displayed on the wage

21  statement? A. Yes, sir. Q. What is confusing about them? A. Because I don't see the, for

22  OVERTIME/INCT, I don't see the rate and hours." *Id.* at 95:5-10.

23  The cases Wal-Mart cites in its post-trial briefing are inapposite. In support of Wal-Mart's

24  claim that Plaintiffs must allege monetary damages to allege injury, Wal-Mart cites *Suarez v. Bank*

25  *of Am. Corp.*, which held that a plaintiff's allegation of monetary damages due to a violation of §

26  226 passed Rule 12(b)(6) muster. 2018 WL 3659302, at *12 (N.D. Cal. Aug. 2, 2018). However,

United States District Court
Northern District of California

46

the United States Supreme Court was clear that an injury need not be "tangible" in order to be "concrete," and intangible injuries may constitute injury in fact. *Spokeo*, 136 S. Ct. at 1549. In the instant case, Plaintiffs do not claim they suffer monetary damages, but that does not mean they have therefore alleged an intangible injury that deprives them of Article III standing.

In addition, Wal-Mart cites *Mie Yang v. Francesca's Collections, Inc.*, where a § 226 claim was dismissed at the pleadings stage because the "injury requirement cannot be satisfied simply because one of the nine itemized requirements in in section 226(a) is missing from a wage statement." 2018 WL 984637, at *7 (N.D. Cal. Feb. 20, 2018) (internal quotation marks omitted). Wal-Mart's representation of what *Mie Yang* holds is mistaken. *Mie Yang* states that "the deprivation of that information [that is required under § 226(a)], *standing alone*[,] is not a cognizable injury." *Id.* (emphasis added). Here, Plaintiffs are not arguing that the deprivation of information required to be disclosed on a wage statement pursuant to § 226(a) is the sole injury they have suffered. Plaintiffs have demonstrated that they suffer from the statutorily-defined injury of the inability to "promptly and easily determine from the wage statement alone" items required to be disclosed on a wage statement. Cal. Lab. Code § 226(e)(2)(B). Here, Magadia testified that he could not determine the start and end dates of the pay period for which he was being paid from the statement of final pay (relating to Plaintiffs' § 226(a)(6) claim). Tr. at 102:12-22. Moreover, Magadia testified that he cannot determine the rate and hours for the OVERTIME/INCT line item (relating to Plaintiffs' § 226(a)(9) claim). *Id.* at 95:8-10.

In addition, other courts have held that so long as a plaintiff suffers from the statutorily-defined injury, that is sufficient to state a claim for damages under § 226(e). *Brewer v. General Nutrition Corp.*, 2015 WL 5072039, at *8-9 (N.D. Cal. Aug. 27, 2015) (holding that satisfying the statutorily-defined injury requirement is sufficient to show injury); *Willner v. Manpower Inc.*, 35 F. Supp. 3d 1116, 1136 (N.D. Cal. 2014) ("The Court concludes that, based on the wage statements submitted by Manpower, an employee cannot determine from the wage statements alone either the start date of the pay period or Manpower's address, as discussed above. Accordingly, the evidence before the Court establishes that Willner suffered injury within the

Case No. 17-CV-00062-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
Northern District of California

1    meaning of Section 226(e).").

2         As discussed above, Magadia's confusion meets the requirements of injury in fact under

3    *Spokeo* and is a sufficient showing of injury under Cal. Lab. Code § 226(e) relating to Plaintiffs'

4    claims under both § 226(a)(6) (regarding the statement of final pay) and § 226(a)(9) (regarding the

5    OVERTIME/INCT line item).

6         In sum, Plaintiffs have standing to pursue both claims under both § 226(a)(6) and §

7    226(a)(9) because they have suffered the statutorily-defined injury under § 226(e)(2)(B). *Spokeo*

8    poses no obstacle to the Plaintiffs' standing here.

9         **3.   Summary**

10             a.   § 226(a)(6) (regarding the statement of final pay claim)

11        The Court finds that (1) Wal-Mart failed to provide compliant wage statements under Cal.

12   Lab. Code § 226(a)(6), (2) Wal-Mart's failure to do so was "knowing and intentional" only after

13   May 11, 2018, and (3) Plaintiffs were injured as a result. Thus, Wal-Mart is liable for statutory

14   damages under Cal. Lab. Code § 226(e) after May 11, 2018, and PAGA penalties, discussed

15   below.

16             b.   § 226(a)(9) (regarding the OVERTIME/INCT claim)

17        The Court finds that (1) Wal-Mart failed to provide compliant wage statements under Cal.

18   Lab. Code § 226(a)(9), (2) Wal-Mart's failure to do so was "knowing and intentional" after

19   December 2, 2015,[4] and (3) Plaintiffs were injured as a result. Thus, Wal-Mart is liable for

20   statutory damages under Cal. Lab. Code § 226(e) and PAGA penalties, discussed below.

21        **4.   Damages**

22        Plaintiffs request § 226(e) statutory damages as well as PAGA penalties for Wal-Mart's

23   violation of § 226. First, the Court discusses § 226(e) statutory damages and PAGA penalties for

24   Wal-Mart's violations of § 226(a)(9), Plaintiffs' OVERTIME/INCT claim. Second, the Court

25   discusses § 226(e) statutory damages and PAGA penalties for Wal-Mart's violations of §

26

27   _____

28   [4] December 2, 2015 is the statute of limitations date for Plaintiffs' actions brought under § 226.

Case No. 17-CV-00062-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
Northern District of California

1   226(a)(6), Plaintiffs' statement of final pay claim. After a discussion of the damages, the Court

2   addresses Wal-Mart's arguments for why Plaintiffs' recovery here should be reduced or

3   eliminated.

4           a.   Damages for Violation of § 226(a)(9) (regarding the OVERTIME/INCT claim)

5          The Court first discusses § 226(e) statutory damages for Wal-Mart's violation of §

6   226(a)(9), Plaintiffs' OVERTIME/INCT claim, then turns to PAGA penalties.

7             i.   § 226(e) Statutory Damages

8          Dr. Kriegler calculated § 226(e) statutory damages for Wal-Mart's violation of § 226(a)(9)

9   (regarding the OVERTIME/INCT line item) to total $48,046,000. The Court found Wal-Mart

10   liable for violating § 226(a)(9) after the statute of limitations date of December 2, 2015. Therefore,

11   the Court awards the OVERTIME/INCT Wage Statement class $48,046,000 in § 226(e) statutory

12   damages for Wal-Mart's violation of § 226(a)(9).

13          Next, the Court addresses the award of PAGA penalties.

14            ii.   PAGA Penalties

15          Plaintiffs request $131,427,750 in PAGA penalties for the OVERTIME/INCT Wage

16   Statement Class for Wal-Mart's violation of § 226(a)(9). Ex. 201-7.

17          Wal-Mart argues that if the Court were to award any PAGA penalties, they should be

18   reduced from the maximum amount requested so that the penalties are not unjust, arbitrary, and

19   oppressive. ECF No. 215 at 15. Moreover, Wal-Mart argues that any PAGA award should be

20   proportional to actual damages and any non-PAGA penalties awarded, and take into consideration

21   whether Wal-Mart acted willfully or in good faith. *Id.* The Court believes that Wal-Mart's

22   arguments have some merit.

23          The California Labor Code grants courts discretion to reduce a PAGA penalty if, "based on

24   the facts and circumstances of the particular case, to do otherwise would result in an award that is

25   unjust, arbitrary and oppressive, or confiscatory." Cal. Lab. Code § 2699(e)(2); *see also Romo v.*

26   *GMRI, Inc.*, 2014 WL 11320647, at *7 (C.D. Cal. Feb. 18, 2014) ("The court retains discretion

27   over awards under a PAGA claim . . . ."); *Cardenas v. McLane Foodservice, Inc.*, 2011 WL

28    

Case No. 17-CV-00062-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
Northern District of California

1   379413, at *4 (C.D. Cal. Jan. 31, 2011) ("The PAGA text also provides the Court with the

2   discretion to limit the amount Plaintiffs may recover from the employer."); *Bright v. 99c Only*

3   *Stores*, 189 Cal. App. 4th 1472, 1480 n.8 (2010) ("The trial court has discretion to award less than

4   the maximum amount of the civil penalty . . . ."). Thus, the Court has broad discretion to award

5   PAGA penalties as the Court sees fit.

6       Here, the Court finds that awarding the maximum amount of the requested PAGA

7   penalties would be unjust and oppressive, as explained below. As such, the Court awards

8   $48,046,000 in PAGA penalties to the OVERTIME/INCT Wage Statement class for Wal-Mart's

9   violation of § 226(a)(9). The amount of PAGA penalties awarded to the OVERTIME/INCT Wage

10  Statement class would therefore match 100% the amount of § 226(e) statutory damages awarded,

11  and is approximately 36% of the original amount of PAGA penalties Plaintiffs requested. The law

12  supports the Court's decision to reduce the PAGA penalties.

13      In *Aguirre v. Genesis Logistics*, the defendant was potentially liable up to $500,000 in §

14  226(e) statutory damages for violating § 226. The *Aguirre* court reduced PAGA penalties from

15  $1.8 million to $500,000 (approximately 28% of the original amount requested) "[g]iven that the

16  potential PAGA penalty is substantially greater than the penalty under Section 226." 2013 WL

17  10936035, at *3 (C.D. Cal. Dec. 30, 2013). Thus, like in the instant case, the PAGA penalties

18  match 100% the amount of § 226(e) statutory damages awarded.

19      In *Fleming v. Covidien Inc.*, the court found that awarding the maximum PAGA penalty of

20  $2.8 million would be unjust because "Defendants were not aware that the wage statements

21  violated the law and took prompt steps to correct all violations once notified." 2011 WL 7563047,

22  at *4 (C.D. Cal. Aug. 12, 2011). Thus, the *Fleming* court awarded only $500,000 in PAGA

23  penalties, *id.* at *1, approximately 18% of the maximum amount requested.

24      In *Thurman v. Bayshore Transit Management, Inc.*, the California Court of Appeal

25  affirmed a 30% reduction of the maximum PAGA penalties requested because it would be unjust

26  to award the maximum penalty amount when "defendants took their obligations under Wage

27  Order No. 9 seriously and attempted to comply with the law." 203 Cal. App. 4th 1112, 1136

28

Case No. 17-CV-00062-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
Northern District of California

1   (2012). Thus, the *Thurman* court awarded $358,588.22 in PAGA penalties. *Id.* at 1119.

2          As mentioned above, Plaintiffs request $131,427,750 in PAGA penalties for the

3   OVERTIME/INCT Wage Statement Class for Wal-Mart's violation of § 226(a)(9). If Plaintiffs

4   were to recover the maximum PAGA penalties available to the OVERTIME/INCT Wage

5   Statement class, then the PAGA penalty for the OVERTIME/INCT Wage Statement class would

6   be 273% greater than Plaintiffs' § 226(e) statutory damages of $48,046,000. The Court has not

7   found any case that awards such a disproportionate PAGA penalty relative to statutory damages.

8   The amount of PAGA penalties awarded and the amount of statutory penalties awarded for the

9   underlying Labor Code violation should not be too disparate. *Aguirre*, 2013 WL 10936035, at *3

10  (reducing the amount of PAGA penalties awarded so that the PAGA penalties are not

11  "substantially greater than the penalty under Section 226"). Guided by the *Aguirre* court's logic in

12  reducing the PAGA penalties, this Court reduces the PAGA penalties awarded to the

13  OVERTIME/INCT Wage Statement class to $48,046,000, which matches 100% the amount

14  awarded in § 226(e) statutory damages awarded for Wal-Mart's underlying statutory violation.

15  This also is the exact ratio of PAGA penalties to statutory damages the *Aguirre* court awarded. *Id.*

16  at *4.

17         Here, the Court is awarding $48,046,000 in PAGA penalties out of a total requested of

18  $131,427,750. The Court has not found any case awarding a PAGA penalty as high as

19  $131,427,750. PAGA penalties are paid 75% to the California Labor and Workforce Development

20  Agency and 25% to aggrieved employees. Thus, in wage and hour class action cases that settle,

21  which are the overwhelming majority of such cases, very little of the total settlement is paid to

22  PAGA penalties in order to maximize payments to class members. *See, e.g.*, *Ceja-Corona v. CVS*

23  *Pharmacy, Inc.*, 2015 WL 222500, at *2-3 (E.D. Cal. Jan. 14, 2015) (preliminarily approving

24  $10,000 in PAGA penalties out of a total settlement amount of $900,000), *report and*

25  *recommendation adopted*, 2015 WL 925598 (E.D. Cal. Mar. 3, 2015); *Nen Thio v. Genji, LLC*, 14

26  F. Supp. 3d 1324, 1330 (N.D. Cal. 2014) (preliminarily approving $10,000 in PAGA penalties out

27  of a total settlement amount of $1,250,000); *Franco v. Ruiz Food Prods., Inc.*, 2012 WL 5941801,

28

51

at *14 (E.D. Cal. Nov. 27, 2012) (granting final approval of $10,000 in PAGA penalties out of a

total settlement amount of $2,500,000); *Garcia v. Gordon Trucking, Inc.*, 2012 WL 5364575, at

*3 (E.D. Cal. Oct. 31, 2012) (granting final approval of $10,000 in PAGA penalties out of a total

settlement amount of $3,700,000); *Chu v. Wells Fargo Investments, LLC*, 2011 WL 672645, at *1

(N.D. Cal. Feb. 16, 2011) (granting final approval of $10,000 in PAGA penalties out of a total

settlement amount of $6,900,000). In these settlements, the parties generally maximize statutory

penalties and minimize PAGA penalties. *See, e.g.*, *Franco*, 2012 WL 5941801, at *2, *14

(approving a $10,000 PAGA award out of a total settlement amount of $2,500,000). Thus, it is

highly unusual to see a statutory damages claim of $48,046,000 and PAGA penalties request of

$131,427,750, which is 273% greater than the statutory damages claim.

In all the wage and hour class action settlements the Court found, the amount of statutory

damages awarded far exceeded the amount of PAGA penalties awarded, like in *Franco*. For

instance, the *Chu* court approved the allocation of $10,000 in PAGA penalties out of a total

settlement fund of $6,900,000. 2011 WL 672645, at *1. Additionally, in *Brown v. CVS Pharmacy,*

*Inc.*, the same Plaintiffs' attorneys as in the instant case agreed to allocate $20,000 for PAGA

penalties out of a gross settlement amount of $3,000,000 for violations of § 226(a). 2017 WL

3494297, at *1 (C.D. Cal. Apr. 24, 2017). In another wage and hour settlement, the same

Plaintiffs' attorneys as in the instant case agreed to a PAGA award of $50,000 out of a gross

settlement amount of $11,000,000. *Dynabursky v. Alliedbarton Sec. Servs., LP*, 2016 WL

8921915, at *2 (C.D. Cal. Aug. 15, 2016). Similarly, in another wage and hour action that

included claims under § 226(a), the same Plaintiffs' attorneys as in the instant case entered into a

settlement where $66,666.67 was allocated to PAGA penalties out of a gross settlement amount of

$9,225,000. *Villegas v. J.P. Morgan Chase & Co.*, Case No. 09-CV-00261-SBA (N.D. Cal.), ECF

Nos. 164 at 3, 183 at 3.

Moreover, the OVERTIME/INCT line item is predicated on the award of Wal-Mart's

discretionary MyShare bonus. The Court recognizes that Wal-Mart had no duty to pay employees

any bonuses in the first instance. To penalize Wal-Mart so disproportionately relative to statutory

Case No. 17-CV-00062-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1   damages by awarding the maximum PAGA penalty of $131,427,750 for conduct that ultimately

2   results in a net positive for employees—the award of discretionary bonuses—would not make

3   sense in the overall scheme of California's Labor Code, which "should be interpreted broadly to

4   protect workers." *Johnson v. Serenity Trans., Inc.*, 2017 WL 2242784, at *3 (N.D. Cal. May 23,

5   2017); *Alvarado*, 4 Cal. 5th at 561-62 ("[T]he state's labor laws are to be liberally construed in

6   favor of worker protection."). A highly disproportionate PAGA penalty relative to statutory

7   damages may deter employers from paying discretionary bonuses to employees.

8        Additionally, the Court recognizes the difficulty in calculating the OVERTIME/INCT line

9   item. As aforementioned, the OVERTIME/INCT line item is predicated on the award of a

10   MyShare discretionary bonus, which is awarded quarterly. Once the quarterly MyShare bonus is

11   awarded, Tr. at 158:4-7, Wal-Mart adjusts the base rate of pay as well as any overtime accrued

12   *over the entire quarter* by the employee to account for the additional MyShare bonus that has been

13   paid, *id*. at 158:11-17. In essence, the OVERTIME/INCT line item is "an additional amount of

14   overtime dollars that [employees have] earned based on the fact that the regular rate of pay needs

15   to be adjusted up" to take into account the MyShare discretionary bonus award. *Id.* at 158:18-21.

16        However, as discussed above, Wal-Mart's on-cycle wage statements are biweekly, and

17   every time an employee accrues overtime, the overtime is listed on the employee's biweekly wage

18   statement. *Id.* at 159:2-3. Thus, in order for Wal-Mart to calculate the OVERTIME/INCT line

19   item, Wal-Mart must add together all the hours of overtime an employee worked over the quarter

20   that the MyShare bonus is paid, prorate the MyShare bonus to account for the number of overtime

21   hours worked in the quarter, then adjust the overtime hourly rate for overtime already paid upward

22   based on the prorated amount of the MyShare bonus. *Id.* at 394:14-25. Admittedly, the Court has

23   difficulty in understanding how this calculation works, as it was not explained in any amount of

24   detail at trial or in any evidence. Thus, this calculation is not a simple matter of multiplying an

25   hourly wage by the number of hours worked. However, this also underscores the importance of

26   Wal-Mart providing the hours and rate on the wage statements. As discussed above, employees

27   cannot calculate the hours and rate from the face of the wage statements, which makes challenging

28

United States District Court
Northern District of California

53

Case No. 17-CV-00062-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1    the accuracy of the wage statements difficult.

2        Because the Court recognizes the challenges Wal-Mart faces in calculating and displaying

3    the OVERTIME/INCT line item, the Court believes that a decrease in the amount of PAGA

4    penalties awarded for Wal-Mart's failure to display the hours worked and rate paid for the

5    OVERTIME/INCT line item is warranted. However, that does not excuse Wal-Mart's failure to

6    comply with the Labor Code. Wal-Mart admits that the OVERTIME/INCT line item is

7    representable by an hourly rate multiplied by the hours worked. Tr. at 395:16-18.

8            b.   Damages for Violation of § 226(a)(6) (regarding the statement of final pay
                  claim)

9
10       Plaintiffs request § 226(e) statutory damages as well as PAGA penalties for Wal-Mart's

11   violation of § 226(a)(6), Plaintiffs' statement of final pay claim. "It is within the sound discretion

12   of the trier of fact to select the formula most appropriate to compensate the injured party. The law

13   requires only that some reasonable basis of computation of damages be used, and the damages

14   may be computed even if the result reached is an approximation." *Marsu, B.V. v. Walt Disney Co.*,

15   185 F.3d 932, 938-39 (9th Cir. 1999). The Court first discusses § 226(e) damages, then PAGA

16   penalties.

17            i.   § 226(e) Statutory Damages

18       First, the Court notes that Wal-Mart was found liable to the Final Wage Statement Class

19   for violations of § 226(a)(6) occurring after May 11, 2018, the date the Court issued its summary

20   judgment order giving notice to Wal-Mart that its statements of final pay were out of compliance

21   with the Labor Code. ECF No. 121. However, Plaintiffs have not provided any § 226(e) statutory

22   damages calculations for the period after May 11, 2018. Plaintiffs' request of $5,823,900 in §

23   226(e) statutory damages for Wal-Mart's violations of § 226(a)(6) is calculated from a start date of

24   December 2, 2015, not May 11, 2018. Ex. 201-7. Thus, Plaintiffs' monetary request is

25   inapplicable here because the Court does not find liability until May 11, 2018.

26       "It is 'one of the most basic propositions of law . . . that the plaintiff bears the burden of

27   proving his case, *including the amount of damages*.'" *Tourgeman v. Nelson & Kennard*, 900 F.3d

28
                                            54

United States District Court
Northern District of California

1105, 1109 (9th Cir. 2018) (emphasis added); *see also Aloe Vera of America, Inc. v. United States*, 686 Fed. App'x 451, 452 (9th Cir. 2017) ("Because Plaintiffs failed to meet their burden of proving actual damages, the district court awarded only statutory damages . . . ."). Here, Plaintiffs have failed to meet their burden of proof because Plaintiffs have not calculated § 226(e) statutory damages for Wal-Mart's violations of § 226(a)(6) from a start date of May 11, 2018. Instead, Plaintiffs present evidence on § 226(e) statutory damages for Wal-Mart's violations of § 226(a)(6) beginning on the statute of limitations date of December 2, 2015. Ex. 201-7. Because Plaintiffs have not met their burden of proof in calculating the amount of § 226(e) statutory damages accumulated after May 11, 2018, the Court awards no § 226(e) statutory damages for Wal-Mart's violation of § 226(a)(6). *See, e.g.*, *Faria v. M/V Louise*, 945 F.2d 1142, 1143 (9th Cir. 1991) ("[T]he plaintiff bears the burden of proving his case, including the amount of damages.") (citing *Webb v. Utah Tour Brokers Ass'n*, 568 F.2d 670, 677 (10th Cir. 1977)). This is akin to the situation in *Webb*, where the court held that the plaintiffs had failed to provide evidence supporting the claimed amount of damages, noting that "[t]he court is not justified in rendering a judgment based on possibility or speculation." *Webb*, 568 F.2d at 677.

### ii. PAGA Penalties

Second, Plaintiffs request $28,928,500 in PAGA penalties for the Final Wage Statement Class. Ex. 201-7. The Court notes that the award of any PAGA penalties here is *not* limited to the period of time after May 11, 2018. Because a PAGA claim seeks penalties on the LWDA's behalf, plaintiffs "seeking civil penalties under PAGA for a violation of section 226(a) do[] not have to satisfy the 'injury' and 'knowing and intentional' requirements of section 226(e)(1)." *Lopez v. Friant & Assocs., LLC*, 15 Cal. App. 5th 773, 788 (2017), *review denied*; *McKenzie v. Fed. Exp. Corp.*, 765 F. Supp. 2d 1222, 1232 (C.D. Cal. 2011) (plaintiffs "need only prove a violation of Section 226(a), and need not establish a Section 226(e) injury"); *Willner*, 35 F. Supp. 3d at 1136 ("Willner is not required to establish injury in order to obtain judgment on this [PAGA] claim. All she needs to establish is a violation of section 226(a)"). Therefore, per California labor law, PAGA penalties here are not limited to the period of time when Wal-Mart's violations are knowing and

Case No. 17-CV-00062-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
Northern District of California

1   intentional.

2          However, as the Court discussed above, the court has discretion to reduce the amount of

3   PAGA penalties awarded if, "based on the facts and circumstances of the particular case, to do

4   otherwise would result in an award that is unjust, arbitrary and oppressive, or confiscatory." Cal.

5   Lab. Code § 2699(e)(2). For the following two reasons, the Court reduces the amount of PAGA

6   penalties awarded the Final Wage Statement Class to 20% of Plaintiffs' original request of

7   $28,928,500 in PAGA penalties. Thus, the Court awards $5,785,700 in PAGA penalties to the

8   Final Wage Statement Class for Wal-Mart's violations of § 226(a)(6).

9          First, the Court found there was uncertainty in the law allowing Wal-Mart to claim there

10  was a good faith dispute from December 2, 2015 to the Court's May 11, 2018 summary judgment

11  order. Specifically, § 226(a)(6) provides: "[a]n employer, semimonthly *or* at the time of each

12  payment of wages, shall furnish to his or her employee . . . an accurate itemized statement in

13  writing . . . ." (emphasis added). The statute uses the disjunctive "or," implying that the provision

14  of "an accurate itemized statement" could take place *either* semimonthly *or* at the time wages

15  were paid. By using the disjunctive "or," § 226(a)(6) implied that employers could be in

16  compliance with the law so long as a compliant wage statement was issued semimonthly, and not

17  necessarily at the time of the payment of any wages. Thus, Wal-Mart had a good faith belief that

18  its final wage statements complied with § 226(a)(6) from December 2, 2015, to May 11, 2018,

19  approximately two and a half years. Wal-Mart did not have a good faith belief of its compliance

20  with § 226(a)(6) only from the May 11, 2018 summary judgment order to the November 30, 2018

21  trial, which is approximately 6 months. Because Wal-Mart had a good faith belief for such an

22  extended period of time, the Court finds that awarding the full $28,928,500 in PAGA penalties

23  requested by the Plaintiffs would be unjust and oppressive, and that a significant reduction is

24  appropriate. California courts have held that a defendant's attempt to comply with the law is a

25  basis for reduction in a PAGA penalties award. *Thurman*, 203 Cal. App. 4th at 1136

26  ("[D]efendants took their obligations under Wage Order No. 9 seriously and attempted to comply

27  with the law.").

28
                                            56

1

Second, as the Court discussed above, the *Aguirre*, *Fleming*, and *Thurman* courts all

2

exercised their broad discretion under California law in reducing the amount of PAGA penalties

3

awarded. For instance, the *Aguirre* court reduced PAGA penalties from $1.8 million to $500,000

4

so that the PAGA penalty would be proportional to the amount of § 226(e) statutory damages

5

awarded. 2013 WL 10936035, at *3. Here, no statutory damages are being awarded. Thus, a

6

$28,928,500 PAGA penalties award would be unjust and oppressive, and a significant reduction is

7

appropriate.

8

Accordingly, the Court awards $5,785,700 in PAGA penalties to the Final Wage Statement

9

Class for Wal-Mart's violations of § 226(a)(6).

10

    c.  Wal-Mart's Additional Arguments for Why Recovery Should be Reduced or Eliminated

11

12

Additionally, Wal-Mart advances six main arguments for why any recovery should be

13

reduced or eliminated. First, Wal-Mart claimed at trial that damages should terminate at the date

14

of class certification. *Id.* at 58:23-59:10. Second, Wal-Mart argues that recovery under PAGA

15

along with § 226(e) penalties would constitute impermissible double recovery of the same

16

underlying violations. ECF No. 215 at 15. Third, Wal-Mart asserts that awarding PAGA penalties

17

here would violate due process and the Excessive Fines Clause. *Id.* at 16. Fourth, Wal-Mart claims

18

that PAGA penalties should be limited to past Labor Code violations for which the California

19

Labor and Workforce Development Agency ("LWDA") has been provided notice. *Id.* Fifth, Wal-

20

Mart believes that PAGA's "default" civil penalties are applicable here as opposed to the penalties

21

under Cal. Lab. Code § 226.3. ECF No. 198 at 15. Finally, Wal-Mart argues that Dr. Kriegler's

calculations are unreliable. ECF No. 215 at 16-18. The Court addresses each argument in turn.

22

23

    i.  Whether Damages Terminate at the Date of Class Certification

24

Wal-Mart provides no support for its assertion that damages must terminate at the date of

25

class certification. In fact, no less an authority than the United States Supreme Court has held this

26

is not so. The United States Supreme Court has upheld the legality of "front pay" in the context of

27

labor actions under Title VII of the Civil Rights Act of 1964. *Pollard v. E.I. du Pont de Nemours*

28

Case No. 17-CV-00062-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
Northern District of California

1   *& Co.*, 532 U.S. 843, 845, 854 (2001). "[F]ront pay is simply money awarded for lost

2   compensation during the period between judgment and reinstatement [of a job] or in lieu of

3   reinstatement." *Id.* at 846. So in essence, front pay is an award for damages *after* judgment has

4   been entered. The United States Supreme Court has also held that "full relief under Title VII may

5   be awarded on a class basis." *United Airlines, Inc. v. McDonald*, 432 U.S. 385, 389 n.6 (1977)

6   (internal quotation mark omitted). Combining the decision in *United Airlines* with the holding in

7   *Pollard*, the United States Supreme Court has therefore upheld the legality of a post-judgment

8   award of damages in a class action setting. Thus, damages in a class action do not have to

9   terminate at the date of class certification. *See also Pitre v. Western Electric Co.*, 843 F.2d 1262,

10  1279 (10th Cir. 1988) (allowing the district court discretion to "determin[e] the appropriate

11  amount of back and front pay to which the class is entitled").

12          ii.  Whether Awarding PAGA Penalties and § 226(e) Damages Constitutes
                Impermissible Double Recovery

13         Awarding both PAGA damages and § 226(e) penalties would not constitute impermissible

14  double recovery. The California Court of Appeal has held that for violations of § 226(a), "[t]here

15  are three different potential remedies available . . . (1) actual damages or statutory penalties; (2)

16  injunctive relief; *and* (3) *civil penalties*." *Raines v. Coastal Pac. Food Distribs., Inc.*, 23 Cal. App.

17  5th 667, 673 (2018) (emphasis added). The California Supreme Court has held that PAGA

18  damages are awarded as civil penalties. *Iskanian v. CLS Transp. Los Angeles, LLC*, 59 Cal. 4th

19  348, 381 (2014). Thus, because PAGA damages are civil penalties and are of a different nature

20  than the statutory penalties provided for in § 226(e), recovering both civil penalties and statutory

21  penalties would not constitute impermissible double recovery for the same underlying violation of

22  the California Labor Code.

23         This interpretation of California law is reinforced by PAGA's statutory text, which

24  provides that "nothing in this part shall operate to limit an employee's right to pursue or recover

25  other remedies available under state or federal law, either separately or concurrently with an action

26  taken under this part." Cal. Lab. Code § 2699(g)(1). Moreover, recent courts have allowed

27

28

Case No. 17-CV-00062-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

*United States District Court*
*Northern District of California*

1    recovery of PAGA penalties in addition to other statutory violations of the California Labor Code.

2    *See, e.g.*, *Robinson v. Open Top Sightseeing San Francisco, LLC*, 2018 WL 895572, at *7 (N.D.

3    Cal. Feb. 14, 2018) (holding that recovery under PAGA and additional violations of the Labor

4    Code are not duplicative); *Diaz v. A&R Logistics, Inc.*, 2015 WL 11237469, at *5 (S.D. Cal. Sept.

5    16, 2015) (same); *Stoddart v. Express Servs., Inc.*, 2015 WL 5522142, at *8-9 (E.D. Cal. Sept. 16,

6    2015) (same); *Denton v. G4S Secure Solutions (USA) Inc.*, 2015 WL 2185293, at *4 (E.D. Cal.

7    May 8, 2015) (citing *Thurman v. Bayshore Transit Mgmt., Inc.*, 203 Cal. App. 4th 1112, 1144-48

8    (2012)) (same).

9          The Court acknowledges, and Wal-Mart points out, that there is countervailing authority

10   that stands for the proposition that recovery under both PAGA and additional Labor Code sections

11   would be impermissible. *See, e.g.*, *Guifu Li v. A Perfect Day Franchise, Inc.*, 2012 WL 2236752,

12   at *17 (N.D. Cal. June 15, 2012) ("[G]ranting PAGA penalties for failure to provide accurate

13   wage statements would be duplicative recovery. Plaintiffs have provided no authority, and the

14   Court is aware of no authority, that would permit double recovery of essentially the same

15   penalties."); *Tran v. Companion Med Trans, LLC*, 2016 WL 8925146, at *9 (C.D. Cal. Jan. 25,

16   2016) (same). Nevertheless, these cases are not persuasive as they do not acknowledge PAGA's

17   statutory language, which provides that PAGA shall not limit an employee's ability to seek other

18   remedies available under state law. Cal. Lab. Code § 2699(g)(1). Moreover, the recent California

19   Court of Appeal *Raines* case makes it clear that for violations of § 226(a), Plaintiffs have the

20   option of seeking both civil penalties (i.e., under PAGA) and statutory penalties (i.e., under §

21   226(e)). 23 Cal. App. 5th at 673. As this Court is sitting in diversity, the California courts'

22   enunciation of the law is binding. Therefore, awarding damages under both PAGA and § 226 does

23   not constitute duplicative recovery.

24              iii.  Whether Awarding PAGA Penalties Would Violate Due Process and the
                      Excessive Fines Clause
25

26         Wal-Mart claims that awarding PAGA penalties would first, violate the Eighth

27   Amendment's Excessive Fines Clause, and second, violate due process. First, the Court finds that

28                                            59

1    under current law, the Eight Amendment's Excessive Fines Clause is inapplicable here. The

2    United States Supreme Court has held: "[w]hile we agree with petitioners that punitive damages

3    advance the interests of punishment and deterrence, which are also among the interests advanced

4    by the criminal law, *we fail to see how this overlap requires us to apply the Excessive Fines*

5    *Clause in a case between private parties*." *Browning-Ferris Indus. of Vermont, Inc. v. Kelco*

6    *Disposal, Inc.*, 492 U.S. 257, 275 (1989) (emphasis added).

7          In the instant case, there are two private parties litigating civil penalties. Admittedly, 75%

8    of the PAGA award goes to the State of California by statute. Cal. Lab. Code § 2699(i).

9    Nonetheless, it is not the State of California that is prosecuting this case against Wal-Mart. It is

10   Magadia and the class he represents. In fact, the State's LWDA has to explicitly *decline* to initiate

11   an investigation into an employer before an employee can bring a private PAGA action. Cal. Lab.

12   Code § 2699.3(a)(2)(A); *see also Arias v. Superior Court*, 46 Cal.4th 969, 980 (2009) ("[I]t was

13   therefore in the public interest to allow *aggrieved employees*, acting as *private* attorneys general,

14   to recover civil penalties for Labor Code violations . . . ." (emphasis added).); *Thomas v. Aetna*

15   *Health of California, Inc.*, 2011 WL 2173715, at *18 (E.D. Cal. June 2, 2011) ("While the LWDA

16   may be interested in the outcome of a *private civil action* for PAGA penalties, *it is not a party to*

17   *the suit*" (emphasis added).); *Machado v. M.A.T. & Sons Landscape, Inc.*, 2009 WL 2230788, at

18   *3 (E.D. Cal. July 23, 2009) ("[N]umerous courts have found that individuals have a private right

19   of action through PAGA . . . .").

20         Second, the award of PAGA penalties does not violate due process. Wal-Mart plucks a

21   quote out from the United States Supreme Court's decision in *State Farm* that states that the

22   penalty must have "a nexus to the specific harm suffered." *State Farm Mutual Auto. Ins. Co. v.*

23   *Campbell*, 538 U.S. 408, 422 (2003).[5] Wal-Mart argues that the PAGA penalty does not have a

24   nexus to the specific harm suffered by Magadia. ECF No. 215 at 16. The Court rejects this

25

26   _____

27   [5] For context, the full quote is: "Lawful out-of-state conduct may be probative when it
     demonstrates the deliberateness and culpability of the defendant's action in the State where it is
     tortious, but that conduct must have a nexus to the specific harm suffered by the plaintiff." *Id.*

28

Case No. 17-CV-00062-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1    argument. PAGA is expressly premised on punishing employers for underlying violations of the

2    California Labor Code. *See, e.g.*, Cal. Lab. Code § 2699.3(a)(1)(A) ("The aggrieved employee

3    shall give written notice . . . of the specific provisions of this code alleged to have been violated,

4    including the facts and theories to support the alleged violation."). To claim that there is not a

5    nexus between a PAGA penalty and the harm suffered via an underlying violation of the Labor

6    Code is simply not a facially valid argument. PAGA penalties only apply when there is an

7    underlying violation of the California Labor Code.

8            In sum, the Eighth Amendment's Excessive Fines Clause does not apply here because the

9    instant case only involves private parties. Moreover, there is a nexus between PAGA penalties

10   awarded and the harm suffered via an underlying violation of the Labor Code because a PAGA

11   cause of action is available for litigants to vindicate their rights under the Labor Code. Thus,

12   awarding PAGA penalties does not violate due process.

                    iv.  Whether PAGA Penalties Should be Limited to Past Labor Code Violations for
13                       which the LWDA has been Provided Notice

14           California law requires that an aggrieved employee first give notice to the LWDA

15   identifying the Labor Code provisions alleged to have been violated by an employer. *Id.* If and

16   only if the LWDA provides notice that it does not intend to investigate the alleged Labor Code

17   violation does a private right of action under PAGA arise. Cal. Lab. Code § 2699.3(a)(2)(A). Wal-

18   Mart cites no authority, and the Court has found none, that stands for the proposition that PAGA

19   penalties are limited to redressing past violations of the California Labor Code for which the

20   LWDA has been provided notice. Wal-Mart claims that PAGA penalties for continuing violations

21   of the Labor Code are available only after additional letters to the LWDA are sent notifying the

22   LWDA of these continuing violations. Tr. at 59:14-21. In essence, Wal-Mart argues that LWDA

23   notification letters are retroactive and only permit the retroactive award of damages stopping on

24   the date of the letter.

25           The Court has found case law supporting the proposition that Labor Code violations taking

26   place *after* the LWDA notice can be the foundation for PAGA penalties. In *Fleming v. Covidien*

27

28
                                                     61

United States District Court
Northern District of California

1    *Inc.*, the court awarded PAGA penalties for a period of time after the LWDA letter was sent; in

2    other words, the *Fleming* court did not cut off PAGA penalties at the date of the LWDA letter. The

3    LWDA was provided notice on July 29, 2010 that the wage statements an employer was issuing

4    violated § 226. 2011 WL 7563047, at *2. Nevertheless, the *Fleming* court awarded PAGA

5    penalties for the period between July 29, 2009 and September 1, 2010. *Id.* at *2-3. Under

6    California law, a PAGA claim is subject to a 1-year statute of limitations. Cal. Civ. Proc. Code §

7    340(a). Because the LWDA letter in *Fleming* was sent on July 29, 2010, the *Fleming* court

8    interpreted the statute of limitations as restricting PAGA penalties to the period after July 29,

9    2009. 2011 WL 7563047, at *2. Moreover, the *Fleming* court stopped calculating PAGA damages

10   on September 1, 2010 because that was the end date of the certified class period. *Id.* at *1.

11         Additionally, the *Schiller v. David's Bridal, Inc.* court considered post-LWDA letter

12   PAGA penalties as well. There, the court estimated PAGA penalties for the purpose of calculating

13   the amount in controversy. 2010 WL 2793650, at *7 (E.D. Cal. July 14, 2010). Even though the

14   LWDA notice was allegedly sent on January 14, 2010, *Schiller v. David's Bridal, Inc.*, No. 10-cv-

15   616, ECF No. 1-1 at Ex. A p. 8, the *Schiller* court calculated PAGA penalties from January 15,

16   2009 to April 2010. 2010 WL 2793650, at *7. The *Schiller* court differed from the *Fleming* court

17   in interpreting the PAGA statute of limitations. The *Schiller* court interpreted the 1-year statute of

18   limitations as beginning on when the complaint was filed, instead of when the LWDA letter was

19   submitted as in *Fleming*. *Id.* at *6. Nonetheless, the *Schiller* court calculated PAGA penalties to

20   April 2010, past the LWDA letter's mailing date of January 14, 2010, because April 2010 was

21   when the defendant filed its notice of removal (and the *Schiller* court was trying to determine

22   whether the amount in controversy was enough to remove the case to federal court). *Id.*

23         The Court's interpretation of the PAGA statute is also supported by the legislative history.

24   In allowing for the private right of action if the LWDA declined to investigate an alleged violation

25   of the Labor Code, the bill sponsors noted that "private actions to enforce the Labor Code are

26   needed because [the] LWDA simply does not have the resources to pursue all of the labor

27   violations occurring in the garment industry, agriculture, and other industries." California

28

Case No. 17-CV-00062-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
Northern District of California

Assembly Committee on Judiciary, Bill Analysis, S.B. 796 (Dunn), June 26, 2003; *see also Arias*, 46 Cal. 4th at 986 ("The act's declared purpose is to supplement enforcement actions by public agencies, which lack adequate resources to bring all such actions themselves. . . . In a lawsuit brought under the act, the employee plaintiff represents the same legal right and interest as state labor law enforcement agencies . . . ."). As exemplified by the *Fleming* and *Schiller* cases above, Labor Code violations do not simply cease once an LWDA letter has been filed; rather, an employer may continue to flagrantly violate the law. In order for the PAGA statute to have any teeth, litigants should be able to seek relief for violations after an LWDA notice letter has been sent because as the bill sponsors mentioned, the LWDA simply does not have the resources to pursue all violations of the Labor Code. Once the LWDA declines to pursue an alleged violation, it is up to the aggrieved employee to take action. It makes no sense to require an aggrieved litigant to repeatedly submit letters to the LWDA once the LWDA has already declined to investigate an alleged Labor Code violation. To impose such a requirement would be contrary to the legislative intent embodied in PAGA, which is to allow private actions to remedy Labor Code violations once the LWDA is unable or unwilling to pursue an alleged violation.

Wal-Mart argues that the statutory text supports its argument that PAGA is limited to only redressing violations of the Labor Code prior to the LWDA notice letter. PAGA requires that an aggrieved employee provide notice to the LWDA for "specific provisions of this code *alleged to have been violated.*" Cal. Lab. Code § 2699.3(a)(1)(A) (emphasis added). However, the statute does not preclude a private litigant from suing to redress violations of the Labor Code after the LWDA notice letter is sent. Obviously, the LWDA notice letter can only include provisions of the Labor Code *alleged* to have been violated because the aggrieved employee does not know at the time whether the employer will continue to violate the Labor Code after the LWDA notice letter is sent. If an employer continues to violate the Labor Code after the LWDA notice letter date, nothing in the statute precludes the aggrieved employee from seeking redress for those continuing violations.

In sum, the Court holds that PAGA penalties are not limited to redressing past violations of

63

United States District Court
Northern District of California

the California Labor Code for which the LWDA has been provided notice. Rather, parties may seek to recover PAGA penalties on continuing violations of the Labor Code even after the LWDA notice letter is sent. This conclusion is buttressed by prior case law and legislative intent, which indicate that the LWDA does not have the capacity to pursue all violations of the Labor Code, so PAGA empowers employee plaintiffs to seek redress.

    v.   Whether PAGA's Default Civil Penalties or those Penalties under Cal. Lab.
         Code § 226.3 are Applicable

Under PAGA, the "default" penalty is $100 per each aggrieved employee per pay period for the initial violation and $200 per pay period for a subsequent violation. Cal. Lab. Code § 2699(f)(2). The default penalty is "provided . . . for violations of Labor Code sections that did not have their own [civil] penalty." *Diaz*, 2015 WL 11237469, at *3. However, Cal. Lab. Code § 226.3 provides that "[a]ny employer who violates subdivision (a) of Section 226 shall be subject to a civil penalty in the amount of two hundred fifty dollars ($250) per employee per violation in an initial citation . . . for which the employer fails to provide the employee a wage deduction statement or fails to keep the records required in subdivision (a) of Section 226." Wal-Mart argues that only a failure to provide an itemized wage statement and failure to keep records implicate the penalties in § 226.3. However, the Court finds that Cal. Lab. Code § 226.3 penalties are applicable as the appropriate measure of civil penalties under PAGA.

The only non-federal, California state court case interpreting the interplay between PAGA and § 226 the Court has found, and the parties have cited, is *Raines*. In *Raines*, the California Court of Appeal held:

> Some courts have read section 226.3 to limit civil penalties [under PAGA] to only those instances where the employer failed to provide any wage statement or keep records. . . . We find more persuasive a decision that found section 226.3 sets out a civil penalty for all violations of section 226 (*Culley v. Lincare, Inc.* (E.D. Cal. 2017) 236 F. Supp. 3d 1184, 1194). . . . Section 226(a) is intended to require employers to provide an adequate wage statement, itemizing the information to be included, to assist the employee in determining whether he or she has been compensated properly. Section 226.3 provides the civil penalty for failure to comply.

23 Cal. App. 5th at 675 (internal quotation marks omitted). The *Raines* court held that Cal. Lab.

1    Code § 226.3 sets out a civil penalty for violations of Cal. Lab. Code § 226. *Id.*

2          "[F]ederal courts sitting in diversity cases, when deciding questions of substantive law, are

3    bound by state court decisions as well as state statutes." *Hanna*, 380 U.S. at 465 (internal

4    quotation marks omitted). The Court finds that it is bound by the decision in *Raines*, the only

5    extant state court decision interpreting the applicability of § 226.3 penalties to PAGA. Thus, the

6    correct measure of PAGA penalties is found under Cal. Lab. Code § 226.3, which provides that an

7    initial violation of § 226(a) be assessed a civil penalty of $250.

8                    vi.  Whether Dr. Kriegler's Damages Calculations are Reliable

9          Wal-Mart asserts that because Dr. Kriegler "failed to show his work," his damages

10   calculations should not be trusted. ECF No. 215 at 16-17. The Court disagrees. "[I]f an expert

11   reliably applies the appropriate legal formula to determine damages in a particular case, then that

12   expert's methodology is reliable." *Nationwide Trans. Fin. v. Cass Info. Sys., Inc.*, 2006 WL

13   5242377, at *3 (D. Nev. Mar. 6, 2006). Dr. Kriegler testified at length as to how his computational

14   code was programmed to arrive at his damages calculations. This code was also provided to Wal-

15   Mart, who did not call its own rebuttal damages expert. All the methods used by Dr. Kriegler were

16   in line with what the related statutory provisions require. Wal-Mart cites no case law, and the

17   Court finds none, that requires that the expert disclose in his expert report all his coding and work

18   to render the expert's damages calculations valid. Here, Dr. Kriegler has sufficiently demonstrated

19   the reliability of his calculations through his testimony despite omitting such numbers as the

20   number of violations of employees included in the damages calculations.

21        **C.  Judicial Notice**

22          Wal-Mart has filed a request that the Court take judicial notice of the California Labor

23   Commissioner's Memorandum of Points and Authorities re New Trial and the California Labor

24   Commissioner's Memorandum of Points and Authorities In Opposition to Petition For Writ of

25   Mandate in an action entitled *Bodega Latina Corp. v. Labor Commissioner of the State of*

26   *California*, Los Angeles Superior Court, Case No. BS162695. ECF No. 215-1. Both of these

27   documents are briefs submitted in the *Bodega* case that argue that the *Bodega* court should allow

28
Case No. 17-CV-00062-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
Northern District of California

1    the LWDA to investigate Labor Code violations years after the LWDA first declined to investigate

2    them. Plaintiffs object to this request for judicial notice because "the materials attached thereto

3    were never submitted at trial to permit Plaintiff to object and/or question witnesses about said

4    documents." ECF No. 216 at 3. Plaintiffs' argument is not well-taken and is beside the point. A

5    court "may take notice of proceedings in other courts, both within and without the federal judicial

6    system, if those proceedings have a direct relation to matters at issue." *United States ex rel.*

7    *Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992). A court

8    may also take judicial notice of the existence of matters of public record, such as a prior order or

9    decision, but not the truth of the disputed facts cited therein. *Lee v. City of Los Angeles*, 250 F.3d

10   668, 689-90 (9th Cir. 2001). Because the documents Wal-Mart supplied bear on the question of

11   the retroactivity of the LWDA notice, the Court GRANTS Wal-Mart's request for judicial notice.

12        In response to Wal-Mart's request for judicial notice, Plaintiffs submit a request to address

13   the documents Wal-Mart provided. ECF No. 216 at 3. This request is DENIED. Also in response

14   to Wal-Mart's request for judicial notice, Plaintiffs submit their own request for judicial notice of

15   the settlement in *Brown v. Wal-Mart Store, Inc.*, No. 09-cv-3339-EJD, "which further supports

16   Defendants' ability to pay the PAGA penalties." ECF No. 216 at 3. The proceedings in *Brown* do

17   not have a direct relation to matters at issue in this case as required under *Robinson Rancheria*

18   *Citizens Council*—the question of Wal-Mart's *ability* to pay any PAGA penalties has never been

19   litigated in the instant case—so Plaintiffs' request for judicial notice is DENIED.

## III.    CONCLUSION

21        For the foregoing reasons, the Court decertifies the Meal Period Regular Rate Class, and

22   denies Magadia's individual claim for Wal-Mart's violation of Cal. Lab. Code § 226.7.

23   Nevertheless, the Court finds that Wal-Mart violated Cal. Lab. Code § 226.7 for failure to pay

24   adequate compensation for missed meal breaks, and awards $70,000 in PAGA penalties to Wal-

25   Mart employees who had meal exceptions coded in the EMS system under codes 5 or 12 since

26   October 4, 2015. Thus, the total award for Plaintiffs' § 226.7 claim is $70,000.

27        Moreover, the Court awards Plaintiffs statutory damages under Cal. Lab. Code § 226(e) to

28   
                                                                66

Case No. 17-CV-00062-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
Northern District of California

the OVERTIME/INCT Wage Statement Class for Wal-Mart's violations of Cal. Lab. Code § 226(a)(9) in the amount of $48,046,000. In addition, the Court awards $48,046,000 in PAGA penalties to the OVERTIME/INCT Wage Statement Class. Thus, the total award for Plaintiffs' § 226(a)(9) claim is $96,092,000.

As aforementioned, Plaintiffs did not calculate the damages amount for Wal-Mart's violations of § 226(a)(6) (regarding the statement of final pay claim) occurring after May 11, 2018, and thus did not meet their burden of proof on damages for the statement of final pay claim. Therefore, the Court does not award § 226(e) statutory damages to the Final Wage Statement Class. However, the Court awards $5,785,700 in PAGA penalties to the Final Wage Statement Class for Wal-Mart's violations of § 226(a)(6).

Thus, Plaintiffs are awarded $48,046,000 in total § 226(e) statutory damages, and $53,901,700 in total PAGA penalties for an overall total of $101,947,700.

**IT IS SO ORDERED.**

Dated: May 31, 2019

LUCY H. KOH
United States District Judge

Case No. 17-CV-00062-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW