FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| RODERICK MAGADIA, individually and on behalf of all those similarly situated,<br><br>*Plaintiff-Appellee,*<br><br>v.<br><br>WAL-MART ASSOCIATES, INC., a Delaware corporation; WALMART INC., a Delaware corporation,<br>*Defendants-Appellants.* | No. 19-16184<br><br>D.C. No.<br>5:17-cv-00062-LHK<br><br>OPINION |

Appeal from the United States District Court
for the Northern District of California
Lucy H. Koh, District Judge, Presiding

Argued and Submitted November 19, 2020
Pasadena, California

Filed May 28, 2021

Before: Consuelo M. Callahan and Patrick J. Bumatay,
Circuit Judges, and Gregory A. Presnell,* District Judge.

Opinion by Judge Bumatay

---

* The Honorable Gregory A. Presnell, United States District Judge for the Middle District of Florida, sitting by designation.

## SUMMARY**

### Article III Standing / California Labor Law

In a class action suit brought by Roderick Magadia, a former Walmart employee, alleging violations of California Labor Code's meal-break and wage-statement requirements, the panel: (1) vacated the district court's judgment and award of damages on a Cal. Labor Code § 226.7 claim for meal-break violations and remanded with instructions to further remand the claim to state court; and (2) reversed the judgment and award of damages on two Cal. Labor Code § 226(a) claims for wage-statement violations and remanded with instructions to enter judgment for Walmart.

The panel held that Magadia lacked Article III standing to bring a California Private Attorney General Act ("PAGA") claim for Walmart's meal-break violations since he himself did not suffer injury. Specifically, the panel noted that *qui tam* actions are a well-established exception to the traditional Article III analysis, but held that PAGA's features diverged from *Vermont Agency of Nat. Res. V. U.S. ex rel. Stevens*, 529 U.S. 765 (2000)'s assignment theory of *qui tam* injury. The panel also held that PAGA's features departed from the traditional criteria of *qui tam* statutes.

The panel next considered whether Magadia had standing to bring his two wage-statement claims under Cal. Labor Code § 226(a), which requires employers to accurately furnish certain itemized information on its

---

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

employees' wage statements.  The panel held that a violation of § 226(a) created a cognizable Article III injury here.  To determine whether the violation of a statute constituted a concrete harm, the panel conducted a two-part inquiry.  First, the panel held that § 226(a) protected employees' concrete interest in receiving accurate information about their wages in their pay statements; and Walmart's failure to disclose statutorily required information on Magadia's wage documents, if true, violated a "concrete interest."  Second, Magadia sufficiently alleged that Walmart's § 226(a) violation – depriving him of accurate itemized wage statements – presented a material risk of harm to his interest in the statutorily guaranteed information.  The panel also concluded that other class members who could establish § 226(a) injuries had standing to collect damages.

Finally, the panel considered the merits of Magadia's two claims under Cal. Labor Code § 226(a).  First, the panel held that the wage statement law did not require Walmart to list the rate of the MyShare overtime adjustment on employees' wage statements, and the district court erred in holding otherwise.  Because Walmart must retroactively calculate the MyShare overtime adjustment based on work from six prior periods, the panel did not consider it an hourly rate "in effect" during the pay period for purposes of § 226(a)(9), and Walmart complied with the wage statement law here.  Second, the panel held that Walmart's Statement of Final Pay did not violate the wage statement statute.  Namely, Walmart complied with Cal. Labor Code § 226(a)(6) when it furnished the required pay-period dates to Magadia and other terminated employees in their final wage statements at the end of the next semimonthly pay period.

## COUNSEL

Theane Evangelis (argued), Julian W. Poon, Bradley J. Hamburger, and Joseph Tartakovsky, Gibson Dunn & Crutcher LLP, Los Angeles, California, for Defendants-Appellants.

Jonathan E. Taylor (argued), Deepak Gupta, Gregory A. Beck, and Daniel Wilf-Townsend, Gupta Wessler PLLC, Washington, D.C.; Larry W. Lee, Kwanporn Tulyathan, and Max Gavron, Diversity Law Group PC, Los Angeles, California; Dennis S. Hyun, Hyun Legal APC, Los Angeles, California; for Plaintiff-Appellee.

Thomas R. Kaufman, Sheppard Mullin Richter & Hampton LLP, Los Angeles, California, for Amici Curiae Employers Group and California Employment Law Council.

Matthew B. Gunter, Assistant General Counsel, RCN Capital LLC, South Windsor, Connecticut, for Amicus Curiae RCN Capital LLC.

Deanna M. Rice, O'Melveny & Myers LLP, Washington, D.C.; Anton Metlitsky, O'Melveny & Myers LLP, New York, New York; Steven P. Lehotsky and Jonathan D. Urick, U.S. Chamber Litigation Center, Washington, D.C.; Stephanie Martz, National Retail Federation, Washington, D.C.; Deborah R. White, Retail Litigation Center Inc., Arlington, Virginia; for Amici Curiae Chamber of Commerce of the United States of America, National Retail Federation, and Retail Litigation Center Inc.

Henry Hewitt and Sairah Budhwani, Legal Aid at Work, San Francisco, California, for Amicus Curiae Legal Aid at Work.

**OPINION**

BUMATAY, Circuit Judge:

Roderick Magadia worked sales for Walmart for eight years. After the company let him go, Magadia filed a class action suit against Wal-Mart Associates, Inc., and Walmart, Inc., (collectively, "Walmart"), alleging three violations of California Labor Code's wage-statement and meal-break requirements. First, Magadia alleged that Walmart didn't provide adequate pay rate information on its wage statements. *See* Cal. Lab. Code § 226(a)(9). Next, he claimed that Walmart failed to furnish the pay-period dates with his last paycheck. *See id.* § 226(a)(6). Finally, he asserted that Walmart didn't pay adequate compensation for missed meal breaks. *See id.* § 226.7(c). Magadia sought penalties for these claims under California's Private Attorneys General Act ("PAGA"), which authorizes an aggrieved employee to recover penalties for Labor Code violations on behalf of the government and other employees. *See id.* § 2699.

The district court at first certified classes corresponding to each of Magadia's three claims. After summary judgment and a bench trial, the district court found that Magadia in fact suffered no meal-break violation and decertified that class. Even so, the district court allowed Magadia to still seek PAGA penalties on that claim based on violations incurred by other Walmart employees. The district court then ruled against Walmart on the three claims and awarded Magadia and the two remaining classes over $100 million in damages and penalties.

On appeal, we hold that Magadia lacked standing to bring the meal-break claim because he did not suffer injury himself. As for the two wage-statement claims, we hold that

Magadia had standing but conclude that Walmart did not breach California law.

## I.

Walmart pays its employees and issues wage statements every two weeks. Walmart also voluntarily offers quarterly "MyShare" bonuses to high-performing employees. Walmart reports these quarterly bonuses on qualifying employees' wage statements as "MYSHARE INCT."

Besides the bonus itself, California law requires Walmart to adjust the rate of overtime pay it awards employees to account for these bonuses. *See* Cal. Lab. Code § 510. That's because California considers an employee's bonus to be part of the employee's "regular rate of pay" when calculating overtime rates. *See Alvarado v. Dart Container Corp. of Cal.*, 4 Cal. 5th 542, 554 (2018). Thus, if a Walmart employee receives a MyShare bonus and worked overtime during that quarter, the employee must receive an adjusted overtime pay because of that MyShare bonus. Walmart calculates this adjusted overtime pay using a formula that includes the number of hours the employee worked each pay period of the quarter and the employee's overtime rate.[1] Walmart lists this adjusted overtime pay on its employee's wage statement as "OVERTIME/INCT." Walmart's OVERTIME/INCT item appears as a lump sum on the wage statement issued at the end of the quarter, with no corresponding "hourly rate" or "hours worked."

---

[1] In particular, to calculate the adjusted overtime pay, Walmart adds together all the overtime hours an employee worked over the quarter, prorates the MyShare bonus to account for the total overtime hours worked that quarter, and then adjusts upward the overtime hourly rate for overtime already paid based on the prorated MyShare bonus.

California law separately provides that when "an employer discharges an employee," the employee's wages are due "immediately." Cal. Lab. Code § 201(a). In compliance with the law, Walmart issues a final paycheck at the time of an employee's termination, along with a "Statement of Final Pay." The Statement of Final Pay does not include the "dates of the period for which the employee is paid." *See id.* § 226(a)(6). But Walmart separately provides the employee a final wage statement at the end of the semimonthly pay period that lists the required dates.

California law also requires employers to provide employees "a meal period of not less than 30 minutes" every five hours. *Id.* § 512(a). If employers fail to provide this meal break, they must pay their employees "one additional hour of pay at the employee's regular rate of compensation." *Id.* § 226.7(c). Walmart paid its employees whenever it failed to provide them with a compliant meal break. But when calculating its employees' "regular rate of compensation" for meal-break violations, Walmart relied on the employees' hourly rate and did not factor in the MyShare adjustment to overtime rates.

Magadia worked as a sales associate at Walmart from 2008 to 2016. In late 2016, Walmart fired Magadia and provided him with his final paycheck and a Statement of Final Pay. At the end of his last pay period with the company, Walmart also provided Magadia with his final wage statement. Magadia then filed a putative class action against Walmart in state court, alleging three California Labor Code violations: (1) that Walmart's wage statements violated Labor Code § 226(a)(9) because its adjusted overtime pay does not include hourly rates of pay or hours worked; (2) that Walmart violated § 226(a)(6) by failing to list the pay-period start and end dates in its Statements of

Final Pay; and (3) that Walmart's meal-break payments violated § 226.7 because it did not account for MyShare bonuses when compensating employees.  Magadia also sought penalties for all three claims under PAGA. *See* Cal. Lab. Code § 2698 *et seq*.  Walmart removed the case to federal court. *See* 28 U.S.C. § 1332(d)(2).

After removal, the district court certified a class for each of Magadia's three claims.  The district court later granted Magadia partial summary judgment on his two wage-statement claims and held a three-day bench trial on all three claims.  The district court ultimately ruled for Magadia on his two wage-statement claims, holding that Walmart violated both § 226(a)(9) and § 226(a)(6).  On the remaining meal-break claim, the district court found that Magadia did not establish that he personally suffered any meal-break violation.  The district court held that, since Magadia failed to show that Walmart denied him meal breaks required under California law, his claims were not typical of the claims or defenses of the class. *See* Fed. R. Civ. P. 23(a)(3).  As a result, the district court decertified the class based on that claim and denied Magadia's individual claim under § 226.7.  Still, the district court permitted Magadia to recover PAGA penalties on the claim because Magadia had established that *other* Walmart employees had sustained meal-break violations.

The district court then awarded Magadia $101,947,700 for the three claims:  $96 million award for the adjusted-overtime-rate claim ($48 million in statutory damages and another $48 million in PAGA penalties); $5.8 million in PAGA penalties for the final-wage-statement claim; and $70,000 in PAGA penalties for the meal-break claim.

On appeal, we review findings of fact for clear error and conclusions of law de novo. *OneBeacon Ins. Co. v. Haas Indus., Inc.*, 634 F.3d 1092, 1096 (9th Cir. 2011).

## II.

Before we turn to the merits of his claims, we must ensure that Magadia has Article III standing. To meet the "irreducible constitutional minimum" of standing, a plaintiff must have (1) suffered an "injury in fact," (2) that is "fairly traceable" to the challenged conduct, and (3) will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To show an injury in fact, the plaintiff "'must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan*, 504 U.S. at 560). For an injury to be concrete, it "must actually exist." *Id.* Standing must "persist throughout all stages of [the] litigation." *Hollingsworth v. Perry*, 570 U.S. 693, 705 (2013).

## A.

### 1.

We start by considering whether Magadia has standing to bring a PAGA claim for the meal-break violations. Although the district court found that he did not suffer a meal-break injury himself, Magadia insists he has standing to pursue this claim because PAGA is a *qui tam* statute. Of course, with no individualized harm, Magadia cannot establish traditional Article III standing. *See Lujan*, 504 U.S. at 560 & n.1.

But *qui tam* actions are a "well-established exception" to the traditional Article III analysis. *Spokeo*, 136 S. Ct. at 1552 n.* (Thomas, J., concurring) (simplified); *see Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 769 n.1, 774–76 (2000) (discussing *qui tam*'s historical pedigree and concluding that the False Claims Act ("FCA") was a *qui tam* statute). *Qui tam* is short for "*qui tam pro domino rege quam pro se ipso in hac parte sequitur*," meaning he "who pursues this action on our Lord the King's behalf as well as his own." *Vermont Agency*, 529 U.S. at 768 n.1. A *qui tam* statute permits private plaintiffs, known as relators, "to sue in the government's name for the violation of a public right." *Spokeo*, 136 S. Ct. at 1552 n.* (Thomas, J., concurring).

*Qui tam* standing for uninjured plaintiffs flows from an assignment theory. *Vermont Agency*, 529 U.S. at 773–74. The Court has recognized that an "adequate basis for the relator's suit for his bounty is to be found in the doctrine that the assignee of a claim has standing to assert the injury in fact suffered by the assignor." *Id.* at 773. In a *qui tam* action, the government partially assigns its claims to the relator, "who then may sue based upon [the government's] injury." *U.S. ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 748 (9th Cir. 1993). In other words, a "*qui tam* action is for a redress" of the government's injury, and "it is the government's injury that confers standing upon the private person." *Stalley v. Methodist Healthcare*, 517 F.3d 911, 917 (6th Cir. 2008). Thus, the Court has concluded that a non-injured relator has standing when the statute "effect[ed] a partial assignment of the Government's damages claim." *Vermont Agency*, 529 U.S. at 773.

Outside the narrow "exception" of *qui tam* actions, however, the Supreme Court has expressed skepticism that "mere authorization to represent a third party's interests is

sufficient to confer Article III standing on private parties with no injury of their own." *Hollingsworth*, 570 U.S. at 710. After all, States "have no power directly to enlarge or contract federal jurisdiction." *Fiedler v. Clark*, 714 F.2d 77, 80 (9th Cir. 1983) (per curiam) (simplified). Ultimately, "standing in federal court is a question of federal law, not state law." *Hollingsworth*, 570 U.S. at 715.

Though the California Supreme Court has categorized PAGA as "a type of *qui tam* action," *Iskanian v. CLS Transp. Los Angeles, LLC*, 59 Cal. 4th 348, 360 (2014), we must look beyond the mere label attached to the statute and scrutinize the nature of the claim itself. Historically, common-law courts have required an individualized showing of injury before permitting a private plaintiff to vindicate "public rights"—rights involving duties owed "to the whole community, considered as a community, in its social aggregate capacity." *Spokeo*, 136 S. Ct. at 1553 (Thomas, J., concurring) (quoting 4 William Blackstone, Commentaries *5). And in the modern era, the Court has rejected several attempts by States to bypass the individualized-injury requirement of Article III by authorizing private plaintiffs to represent the States' interests. *See, e.g.*, *Hollingsworth*, 570 U.S. at 707–13.

With that in mind, we examine "historical practice" to determine whether a harm "has traditionally been regarded as a basis for a lawsuit." *Spokeo*, 136 S. Ct. at 1549. A purported *qui tam* statute must hew closely to the traditional scope of a *qui tam* action for an uninjured plaintiff to maintain suit under Article III. *Cf. Vermont Agency*, 529 U.S. at 774 ("[T]he Constitution established that judicial power could come into play only in matters that were the traditional concern of the courts at Westminster[.]" (simplified)). So long as PAGA claims satisfy the traditional

criteria for a *qui tam* action, Magadia may pursue his meal-break claim.

## 2.

On close inspection, PAGA has several features consistent with traditional *qui tam* actions—yet many that are not. Foremost among the similarities, PAGA operates as an assignment from California to a relator-type plaintiff. A PAGA plaintiff serves as a "proxy or agent of the state's labor law enforcements agencies" and represents the "same legal right and interest as state labor law enforcement agencies." *Iskanian*, 59 Cal. 4th at 380 (simplified). As part of that assignment, PAGA authorizes an aggrieved employee to recover a "civil penalty" that could have otherwise been "assessed and collected by" California's Labor & Workforce Development Agency ("LWDA"). Cal. Lab. Code § 2699(a).

Also consistent with traditional *qui tam* actions, PAGA requires private-party plaintiffs to "share a monetary judgment with the government[,] . . . with the government receiving the lion's share." *Methodist Healthcare*, 517 F.3d at 918. The FCA, for example, designates 25% of the judgment to the relator, with the rest remitted to the Federal government. 31 U.S.C. § 3730(d)(1), (2). Similarly, a PAGA plaintiff must give the "lion's share" (75%) of the civil penalties recovered to the LWDA with the remainder distributed among "aggrieved employees." Cal. Lab. Code § 2699(i).

And just like *qui tam* statutes, PAGA permits the government to dictate whether a private plaintiff may bring a claim in the first place. For example, FCA relators must first present the government with their proposed complaint and related materials before they can start an action against

a defendant; at that point the government may consider whether to "intervene and proceed with the action" in the relator's place. 31 U.S.C. § 3730(b)(1)–(3). If the government elects to intervene, it will "take over the action," and the prosecution of the case will "be conducted by the Government," not the would-be plaintiff. *Id.* § 3730(b)(4). Likewise, a putative PAGA plaintiff must give written notice of the alleged Labor Code violation to the LWDA before suing. *See* Cal. Lab. Code § 2699.3(a). A PAGA suit can begin only after the LWDA provides notice that "it does not intend to investigate the alleged violation" in the plaintiff's notice or if the LWDA doesn't respond within 65 days. Cal. Lab. Code § 2699.3(a)(2)(A). But if, after investigating the violation, the LWDA decides to issue a citation to the employer, "the employee may not commence" a civil action under PAGA. *Id.* § 2699.3(b)(2)(A)(i).

Despite these similarities, however, PAGA differs in significant respects from traditional *qui tam* statutes. First, PAGA explicitly involves the interests of others besides California and the plaintiff employee—it also implicates the interests of nonparty aggrieved employees. By its text, PAGA authorizes an "aggrieved employee" to bring a civil action "on behalf of himself or herself and *other current or former employees.*" Cal. Lab. Code § 2699(a) (emphasis added).[2] And PAGA requires that "a portion of the penalty goes not only to the citizen bringing the suit but *to all employees affected* by the Labor Code violation." *Iskanian*, 59 Cal. 4th at 382 (emphasis added); *see* Cal Lab. Code

---

[2] By contrast, an FCA relator must sue in the name of the United States, *see* 31 U.S.C. § 3730(b)(1), which designates that the government is *the* real party in interest, *Methodist Healthcare*, 517 F.3d at 918.

§ 2699(i).[3]    Finally, a judgment under PAGA binds California, the plaintiff, *and* the nonparty employees from seeking additional penalties under the statute. *Iskanian*, 59 Cal. 4th at 381.[4] PAGA therefore creates an interest in penalties, not only for California and the plaintiff employee, but for nonparty employees as well.

This feature is atypical (if not wholly unique) for *qui tam* statutes.[5] It conflicts with *qui tam*'s underlying assignment theory—that the real interest is the government's, which the government assigns to a private citizen to prosecute on its behalf. *Cf. Stalley v. Catholic Health Initiatives*, 509 F.3d 517, 522 (8th Cir. 2007) ("A 'private' right is different from

---

[3] *See also Canela v. Costco Wholesale Corp.*, 971 F.3d 845, 852 n.3 (9th Cir. 2020) (PAGA's monetary judgment "is not awarded exclusively to the employee who files the suit" but is rather "allocated among the aggrieved employees."); *Williams v. Superior Court*, 3 Cal. 5th 531, 545 (2017) (PAGA "deputiz[es] employees harmed by labor violations to sue on behalf of the state and collect penalties, to be shared with the state and other affected employees."); *Arias v. Superior Court*, 46 Cal. 4th 969, 986 (2009) ("[T]here remain situations in which nonparty aggrieved employees may profit from a judgment in an action brought under [PAGA].").

[4] The PAGA action, however, does not prevent nonparty aggrieved employees from seeking "other remedies under state or federal law." *Baumann v. Chase Inv. Servs. Corp.*, 747 F.3d 1117, 1123 (9th Cir. 2014).

[5] For example, none of the other modern *qui tam* statutes mentioned in *Vermont Agency* authorize suits on behalf of non-parties or involve payments to non-parties. *See* 529 U.S. at 769 n.1 (citing 25 U.S.C. § 81, 26 U.S.C. § 201, 35 U.S.C. § 292(b)); *see also* Harold J. Krent, *Executive Control over Criminal Law Enforcement: Some Lessons from History*, 38 Am. U. L. Rev. 275, 296–97 & n. 105–06 (1989) (listing early American *qui tam* statutes, which limited recovery to the relator and the government).

a public right and *qui tam* cases exist to vindicate public rights." (simplified)).  And it conflicts with Article III's core principle that each plaintiff "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975).  Indeed, California courts have themselves recognized that PAGA's peculiar feature makes it an "except[ion]" to the "traditional criteria" of *qui tam* actions. *Iskanian*, 59 Cal. 4th at 382; *see also Moorer v. Noble L.A. Events, Inc.*, 32 Cal. App. 5th 736, 742 (2019) (rejecting plaintiff's argument that, since PAGA is a type of *qui tam* action, the entire 25% of the civil penalties not allocated to the government should go to the aggrieved employee who brings the PAGA suit).  While California may be *a* "real party in interest," *Iskanian*, 59 Cal. 4th at 387, a PAGA suit also implicates the interests of other third parties.

Second, a traditional *qui tam* action acts only as "a *partial* assignment" of the Government's claim.  *Vermont Agency*, 529 U.S. at 773 (emphasis added).  The government remains the real party in interest throughout the litigation and "may take complete control of the case if it wishes." *U.S. ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032, 1041 (6th Cir. 1994).  Under the FCA, for instance, the federal government can intervene in a suit, can settle over the objections of the relator, and must give its consent before a relator can have the case dismissed.  31 U.S.C. § 3730(b)–(f).  These "significant procedural controls" ensure that the government maintains "substantial authority over the action." *Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1234 (11th Cir. 2008).  So even if the government partially assigns a claim to a relator, "it retains a significant role in the way the action is conducted." *Methodist Healthcare*, 517 F.3d at 918.

In contrast, PAGA represents a permanent, *full* assignment of California's interest to the aggrieved employee. True enough, PAGA gives California the right of first refusal in a PAGA action. An aggrieved employee can only sue if California declines to investigate or penalize an alleged violation; and California's issuance of a citation precludes any employees from bringing a PAGA action for the same violation. Cal. Lab. Code §§ 2699(h), 2699.3(b)(2)(A)(i). But once California elects not to issue a citation, the State has no authority under PAGA to intervene in a case brought by an aggrieved employee. *See Iskanian*, 59 Cal. 4th at 389–90 (acknowledging that PAGA "authoriz[es] financially interested private citizens to prosecute claims on the state's behalf without governmental supervision"). PAGA thus lacks the "procedural controls" necessary to ensure that California—not the aggrieved employee (the named party in PAGA suits)—retains "substantial authority" over the case. *See Orlando Reg'l Healthcare*, 524 F.3d at 1234.

Consistent with a *full* assignment, an aggrieved employee's PAGA judgment precludes California from citing the employer for the same violation. *See Iskanian*, 59 Cal. 4th at 381. In that way, PAGA prevents California from intervening in a suit brought by the aggrieved employee, yet still binds the State to whatever judgment results. A complete assignment to this degree—an anomaly among modern *qui tam* statutes—undermines the notion that the aggrieved employee is solely stepping into the shoes of the State rather than also vindicating the interests of other aggrieved employees.

### 3.

Our precedent also shows the lack of standing here. We have ruled that an uninjured party has no Article III standing

to sue under another California private attorney general statute involving unfair business practices. *See Lee v. Am. Nat'l Ins. Co.*, 260 F.3d 997, 1002 (9th Cir. 2001) (citing Cal. Bus. & Prof. Code § 17204). In *Lee*, we held that the statute did not confer standing on a party who had not "actually been injured by the defendant's challenged conduct," even though the law permitted any person to sue on behalf of California. *Id.* at 1001–02; *see also Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1022 (9th Cir. 2004) ("Even if Cal. Bus. & Prof. Code § 17204 permits a plaintiff to pursue injunctive relief in California state courts as a private attorney general even though he or she currently suffers no individualized injury as a result of a defendant's conduct," the plaintiff must show the requisite injury to establish Article III standing.); *Fiedler*, 714 F.2d at 79–80 (rejecting Article III standing when uninjured plaintiff claimed to be "suing as a private Attorney General on behalf of citizens of Hawaii rather than as a private citizen").[6]

Several circuit courts have likewise concluded that comparable statutes are not *qui tam* for purposes of Article III, based on the same features we identify in PAGA. *See, e.g., Orlando Reg'l Healthcare*, 524 F.3d at 1233–34 (holding that the Medicare Secondary Payer Act "differs

---

[6] Although we have acknowledged that PAGA is a "type" or "form" of *qui tam*, we have never decided whether it confers Article III standing on uninjured employees. *See, e.g., Porter v. Nabors Drilling USA, L.P.*, 854 F.3d 1057, 1061 (9th Cir. 2017) (holding that PAGA is a "type of *qui tam*" for purposes of an automatic stay in bankruptcy); *Sakkab v. Luxottica Retail N. Am., Inc.*, 803 F.3d 425, 439 (9th Cir. 2015) (holding that the Federal Arbitration Act did not preempt PAGA because it is a "form of *qui tam*" action); *Baumann*, 747 F.3d at 1124 (holding that PAGA is not a class action but "a civil enforcement action filed on behalf of and for the benefit of the state").

materially" from a *qui tam* action partly because it "provides to the government none of the procedural safeguards to manage or direct an action" traditionally afforded); *Methodist Healthcare*, 517 F.3d at 918 (same); *United Seniors Ass'n, Inc. v. Philip Morris USA*, 500 F.3d 19, 24 (1st Cir. 2007) (same); *Woods*, 574 F.3d at 97–98 (same); *Brintley v. Aeroquip Credit Union*, 936 F.3d 489, 494–95 (6th Cir. 2019) (holding that a "private attorneys general" suit is not necessarily "entitled to special solicitude in an Article III standing analysis").

***

Altogether, PAGA's features diverge from *Vermont Agency*'s assignment theory of *qui tam* injury, and they depart from the traditional criteria of *qui tam* statutes. As a result, we hold that Magadia lacks standing to bring a PAGA claim for Walmart's meal-break violations since he himself did not suffer injury.[7]  We remand Magadia's meal-break claim to the district court with instructions to return it to state court. *See Lee*, 260 F.3d at 1008.

B.

Next, we consider whether Magadia has standing to bring his two wage-statement claims under Labor Code § 226(a).  That provision requires employers to accurately furnish certain itemized information on its employees' wage statements. Cal. Lab. Code § 226(a). Walmart disputes that a violation of § 226(a) creates a cognizable Article III injury here.  We hold that it does.

---

[7] Because Magadia doesn't having standing to bring a PAGA action on behalf of employees who personally suffered a meal-break injury, we do not decide whether Walmart violated § 226.7(c).

The hallmark of an Article III injury is that it is concrete and particularized. Although we often think of "tangible" injuries as the basis of this jurisdictional requirement, the Supreme Court has confirmed that "intangible injuries can nevertheless be concrete." *Spokeo*, 136 S. Ct. at 1549. The omission of statutorily required information can constitute a distinct, concrete injury.[8] At the same time, not "every minor inaccuracy reported in violation of [a statute] will 'cause real harm or present any material risk of real harm.'" *Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1116 (9th Cir. 2017) ("*Spokeo II*") (quoting *Spokeo*, 136 S. Ct. at 1550) (simplified).

To determine whether the violation of a statute constitutes a concrete harm, we engage in a two-part inquiry. We first consider "whether the statutory provisions at issue were established to protect . . . concrete interests (as opposed to purely procedural rights)." *Id.* at 1113. If so, we then assess "whether the specific procedural violations alleged in this case actually harm, or present a material risk of harm to, such interests." *Id.*

First, we believe § 226(a) protects employees' concrete interest in receiving accurate information about their wages in their pay statements. An employer violates the statute if it "fails to provide accurate and complete information"

---

[8] *See FEC v. Akins*, 524 U.S. 11, 21 (1998) ("[A] plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute."); *Env't Def. Fund v. EPA*, 922 F.3d 446, 452 (D.C. Cir. 2019) ("The law is settled that a denial of access to information qualifies as an injury in fact" when disclosure of that information is required by statute.); *Hajro v. U.S. Citizenship & Immigr. Servs.*, 811 F.3d 1086, 1102–05 (9th Cir. 2016) (holding that informational injuries under FOIA satisfy Article III's "injury-in-fact" requirement).

required by § 226(a), and if "the employee cannot promptly and easily determine [that information] from the wage statement alone." Cal. Lab. Code § 226(e)(2)(B). Section 226(a)'s procedural guarantees therefore protect an employee's non-abstract interest in being "adequately informed of [the] compensation received" during the pay period. *Soto v. Motel 6 Operating, L.P.*, 4 Cal. App. 5th 385, 392 (2016) (simplified). As a result, Walmart's failure to disclose statutorily required information on Magadia's wage documents, if true, violates a "concrete interest." *Spokeo II*, 67 F.3d at 1113 (simplified).

Second, Magadia sufficiently alleges that Walmart's § 226(a) violations—depriving him of accurate itemized wage statements—presented a "material risk of harm" to his "interest" in the statutorily guaranteed information. *See Spokeo II*, 867 F.3d at 1113. Even when a statute "has accorded procedural rights to protect a concrete interest, a plaintiff may fail to demonstrate concrete injury where violation of the procedure at issue presents no material risk of harm to that underlying interest." *Strubel v. Comenity Bank*, 842 F.3d 181, 190 (2d Cir. 2016). That is because a "procedural violation of an informational entitlement does not by itself suffice to keep a claim in federal court." *Brintley*, 936 F.3d at 493. The plaintiff must further "allege at least that the information had some relevance to *her*." *Id.*

While Walmart claims that Magadia was not harmed because it did not underpay him, the lack of the required information runs the risk of leaving him and other employees unable to determine whether that is true. As Walmart's own witnesses confirmed, without the mandated information, employees could not tell from their wage statements how the company calculated their wages or which dates the paystub covered—precisely the sort of "real harm[]" that § 226(a) is

"designed to prevent." *See Spokeo II*, 867 F.3d at 1115; Cal. Lab. Code § 226(e)(2)(B). Even if Walmart pays its employees every penny owed, those employees suffer a real risk of harm if they cannot access the information required by § 226(a). *See Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1135 (9th Cir. 2016) ("[I]nformational injury need not result in direct pecuniary loss.").[9]

We therefore hold that Magadia has standing to bring his two claims under Labor Code § 226(a). For the same reason, we also conclude that other class members who can establish § 226(a) injuries have standing to collect damages. *See Ramirez v. TransUnion LLC*, 951 F.3d 1008, 1017 (9th Cir. 2020) (holding that all class members "must satisfy the requirements of Article III standing at the final stage of a money damages suit when class members are to be awarded individual monetary damages").

### III.

We turn, finally, to the merits of Magadia's two claims under California's wage statement statute. Cal. Lab. Code § 226(a). To recover damages under the law, Magadia must prove that he "suffer[ed] injury as a result of a knowing and intentional failure by an employer to comply with the

---

[9] Walmart alternatively argues that California, unlike Congress, cannot confer Article III standing based on a procedural violation. Again, we disagree. A legislature "has the power to create new interests, the invasion of which may confer standing" so long as "the requirements of Art. III [are] met." *Diamond v. Charles*, 476 U.S. 54, 66 n.17 (1986). Walmart seeks to distinguish between injuries born of state law and those born of federal law. But we have held that "state law can create interests that support standing in federal courts." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 599 (9th Cir. 2020) (quoting *Cantrell v. City of Long Beach*, 241 F.3d 674, 684 (9th Cir. 2001)).

statute." *Price v. Starbucks Corp.*, 192 Cal. App. 4th 1136, 1142 (2011) (citing Cal. Lab. Code § 226(a), (e)). The district court determined that Magadia proved that Walmart violated the statute. We disagree.

## A.

First, we conclude that the wage statement law did not require Walmart to list the "rate" of the MyShare overtime adjustment on employees' wage statements. The law requires an itemized statement with "all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee." Cal. Lab. Code § 226(a)(9). The district court held that the wage statements didn't comply with the law because they didn't include the "hourly rates" and "hours worked" associated with the MyShare overtime adjustment. This was error.

Walmart did not violate the wage statement law because there was no "hourly rate[] in effect during the pay period" for the MyShare overtime adjustment. Walmart paid its employees every two weeks and provided a paystub at the end of each semimonthly pay period. At the end of a quarter (encompassing six pay periods), Walmart awarded a MyShare bonus to its employees based on performance, sales, profits, and store standards *from the entire quarter*. California law considers that bonus part of the employees' base rate of pay, which in turn requires Walmart to make an after-the-fact adjustment to overtime pay. *See* Cal. Lab. Code § 510 (requiring employers to pay 1.5 times the "regular rate of pay" for overtime). To do so, Walmart must retroactively calculate the difference between the employees' overtime pay rate over the quarter and the employees' overtime rate as if the MyShare bonus had been paid as part of the base rate of pay. After calculating the

required overtime pay adjustment, Walmart reported both the MyShare bonus and the adjusted overtime pay as lump sums on the wage statements at the end of each quarter.

Under these facts, the MyShare overtime adjustment is no ordinary overtime pay with a corresponding hourly rate. It is a non-discretionary, after-the-fact adjustment to compensation based on the overtime hours worked and the average of overtime rates[10] over a quarter (or six pay periods). As a recent California court recognized with a similar bonus scheme, the supposed "hourly rate" for the adjusted overtime pay "is a fictional hourly rate calculated after the pay period closes in order to comply with the Labor Code section on overtime"—"[i]t appears as part of the calculation for an overtime bonus and then disappears, perhaps never to be seen again." *Morales v. Bridgestone Retail Operations, LLC*, No. G057043, 2020 WL 1164120, at *1 (Cal. Ct. App. Mar. 11, 2020) (unpublished); *see also Canales v. Wells Fargo Bank, N.A.*, 23 Cal. App. 5th 1262 (2018) (unpublished)[11] (Because "[t]he OverTimePay Override was an adjustment to the overtime payment due to an employee, based on bonuses earned by the employee for work performed during prior pay period . . . there were no

---

[10] Since an employee's overtime pay rate may fluctuate throughout a quarter, Walmart needed to consider the average overtime rate in calculating the overtime adjustment. That Walmart must base the overtime adjustment on an *average* of overtime rates from the quarter is more evidence that the adjustment is not an "hourly rate[] in effect during the pay period."

[11]    Available    at:    https://caselaw.findlaw.com/ca-court-of-appeal/1896937.html.

applicable hourly rates in effect during the pay period which defendant was required to include in the wage statement.").[12]

As a result, we do not consider the calculation to be an "hourly rate in effect during the pay period." Cal. Lab. Code § 226(a)(9). The term "in effect" is defined as "[t]he state or fact of being operative or in force."[13] And the word "during" means "[t]hroughout the whole continuance of," or "in the time of."[14] So to be "in effect during the pay period," the hourly rate must have been "operative" or "in force" "throughout the whole continuance of" or "in the time of" the pay period in the wage statement. It does not apply to an artificial, after-the-fact rate calculated based on overtime hours and rates from preceding pay periods that did not even exist during the time of the pay period covered by the wage statement. *See Morales*, 2020 WL 1164120, at *5 ("The hourly rate for the overtime premium is not in effect during the pay period."); *Canales*, 23 Cal. App. 5th 1262 (same).

This reading is confirmed by § 226(a)(9)'s second requirement: that the employer must list the "corresponding number of hours worked at each hourly rate." During the last two-week pay period of the quarter, but before Walmart generates the MyShare bonus, an employee works under his or her ordinary overtime hourly rate, which must be reported

---

[12] Although these decisions are unpublished with no precedential value, we may still consider them to interpret California law. *See Emps. Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n.8 (9th Cir. 2003).

[13] *In Effect*, Oxford English Dictionary Online, tinyurl.com/4f6t8ppt.

[14] *During*, Oxford English Dictionary Online, tinyurl.com/tw6mvf3s.

in the employee's paystub.  At the end of the quarter, if the employee receives a MyShare bonus and its required overtime adjustment, then Walmart must also calculate the overtime adjustment rate.  But at no time during the preceding two-week pay period did the employee work under that overtime rate because it's calculated *after* the close of the pay period based on the *preceding six pay periods* of work.  For example, Magadia's overtime adjustment "rate" was apparently about $.20 per hour.  Yet there was no pay period in which Magadia ever worked overtime at an hourly rate of $.20.  As this illustrates, Magadia's reading of the statute would lead to the anomalous result of having a wage statement listing an "hourly rate" but with zero "number of hours worked" at that rate.

In sum, because Walmart must retroactively calculate the MyShare overtime adjustment based on work from six prior periods, we do not consider it an hourly rate "in effect" during the pay period for purposes of § 226(a)(9).  Walmart complied with the wage statement law here.

**B.**

Next, we hold that Walmart's Statements of Final Pay do not violate the wage statement statute.  The law requires employers to furnish employees "semimonthly *or* at the time of each payment of wages" with "an accurate itemized statement in writing showing . . . the inclusive dates of the period for which the employee is paid."  Cal. Lab. Code § 226(a)(6) (emphasis added). Section 226(a)(6)'s use of the disjunctive affords employers the option of furnishing the pay statement *either* semimonthly *or* at the time of each wage payment.  Employers are thus authorized to issue a pay statement at either time of their choosing.  *See Canales*, 23 Cal. App. 5th at 1271–72 (published) ("The plain

meaning of the statute indicates the Legislature specifically intended a choice for employers as to when to furnish the wage statement."). So long as "an employer furnishes an employee's wage statement before or by the semimonthly deadline, the employer is in compliance" with § 226(a)(6). *Id.* at 1271. Walmart complied with this provision.

Magadia insists that Walmart violated the law by not including the "dates of the period for which the employee is paid" on his Statement of Final Pay, which he received along with his final paycheck when he was terminated in the middle of a pay period. But Walmart furnished the required pay-period dates to Magadia and other terminated employees in their final wage statements at the end of the next semimonthly pay period. By the plain meaning of the statute, Walmart had the option of furnishing the required wage statement in this way and thus Walmart complied with the law.[15]

## IV.

For these reasons, we **VACATE** the district court's judgment and award of damages on the Labor Code § 226.7 claim and **REMAND** with instructions to further remand it to state court. We also **REVERSE** the judgment and award of damages on the Labor Code § 226(a) claims and **REMAND** with instructions to enter judgment for Walmart.

---

[15] Since we conclude that Walmart didn't violate § 226(a), we do not decide whether Magadia satisfied the other elements of his claim. We likewise do not decide whether the district court awarded excessive penalties under PAGA.

≡

...

# CANALES v. WELLS FARGO BANK

Print                                            Font size:  A   A   Reset

## Fabio CANALES et al., Plaintiffs and Appellants, v. WELLS FARGO BANK, N.A., Defendant and Respondent.

## B276127

## Decided: May 30, 2018

Law Offices of Sherry Jung and Larry W. Lee, Los Angeles; Hyun Legal, Dennis S. Hyun, Los Angeles for Plaintiffs and Appellants. Kading Briggs, Glenn L. Briggs, Theresa A. Kading, Irvine, and Nisha Verma, for Defendant and Respondent.

I.   INTRODUCTION

Plaintiffs Fabio Canales and Andy Cortes, on behalf of themselves and class members, appeal from a summary judgment. Plaintiffs were former or current non-exempt employees of defendant Wells Fargo Bank, N.A. Plaintiffs alleged that their wage statements failed to include information required under Labor Code [1] section 226, subdivision (a)(9). Specifically, plaintiffs argued that a line on the wage statement, "OverTimePay-Override," should, but did not, include hourly rates and hours worked. Plaintiffs also alleged defendant violated section 226 by failing to provide a wage statement concurrently with the terminated employees' final wages paid in-store. Plaintiffs moved for summary adjudication on the section 226 cause of action.

Defendant in its summary judgment motion argued that OverTimePay-Override reflected additional overtime pay that was owed for work performed on a previous pay period, but could not be calculated because it was based on a nondiscretionary bonus not yet earned. Under subdivision (a)(9), defendant contended OverTimePay-Override did not have corresponding hourly rates or hours worked for the current pay period. As to plaintiffs' second theory, defendant asserted it complied with the statute by furnishing the wage statement by mail. The trial court found in favor of defendant and against plaintiffs.

Plaintiffs contend the trial court erred by denying their summary adjudication motion and by granting defendant's motion. We affirm.

II.   BACKGROUND

A.   Factual Background [2]

Plaintiffs are current or former non-exempt California employees of defendant. Defendant would in some instances issue a paycheck and wage statement that contained nondiscretionary incentive compensation [3] (the bonus) to employees who worked during the period covered by the

Magadia v. Wal-Mart Associates
cited in g-16-1134 archived on May 24, 2021

incentive compensation. These bonus periods would be monthly, quarterly, or annually. For employees who worked overtime during those bonus periods, the wage statements contained a line item called "OverTimePay-Override," formerly called "OT-Flat." OverTimePay-Override listed incremental additional overtime paid to the employee for overtime hours worked during the bonus period under the "Earnings" column.[4] For the OverTimePay-Override line on the wage statements, no hourly rates or hours worked was identified.

In certain situations, defendant issued final wages to employees at the time of their termination through "in-store payments" made by cashier's check. Defendant's payroll department would then create the wage statement either the same day or the next day and mail it to the terminated employee by United States mail.[5] During their employment, employees had online access to their itemized wage statements. Employees lost such online access the day after termination.

B.   First Amended Complaint

Plaintiffs filed their first amended complaint, the operative pleading, on June 20, 2013. Plaintiffs sued on behalf of themselves and a class composed of (1) current or former non-exempt California employees of defendant who received OverTimePay-Override from March 13, 2012 to present and (2) all former California employees of defendant who were terminated from March 13, 2012 to present and were paid their final wages through the "in-store payment" procedure. In their first cause of action, plaintiffs alleged defendant violated section 226 [6] by failing to identify the hourly rates and the hours worked that corresponded to OverTimePay-Override. Plaintiffs also alleged defendant violated section 226 by failing to provide terminated employees with wage statements immediately upon termination. Plaintiffs alleged a second cause of action pursuant to the Private Attorneys General Act (§ 2698 et seq.) (PAGA) for violation of section 226.[7]

C.   Summary Adjudication/Judgment Motions

On December 15, 2015, plaintiffs moved for summary adjudication.[8] Much like the allegations in their amended complaint, plaintiffs argued that defendant violated section 226, subdivision (a) (9) by failing to specify the hourly rates and number of hours worked for the OverTimePay-Override adjustment on the itemized wage statements. Plaintiffs also argued defendant violated section 226 by failing to provide to terminated employees an itemized wage statement concurrently with their final wages that were paid in-store by cashier's check.

Defendant filed its own summary judgment motion on December 15, 2015. Defendant asserted it did not violate section 226, subdivision (a)(9) because OverTimePay-Override represented an increase in overtime pay, based on a periodic bonus, for overtime hours worked in previous pay periods. Defendant argued there were no "applicable hourly rates in effect during the pay period" that corresponded to OverTimePay-Override and thus defendant did not have to provide such information on the wage statement. As to plaintiffs' second theory, defendant contended it furnished the itemized statement as required under section 226 by mailing it to the terminated employee's last known address either the same day or the next day. Finally, defendant argued plaintiffs' PAGA cause of action failed because it was wholly derivative of a violation based on section 226 and because plaintiffs failed to exhaust administrative remedies. Plaintiffs do not dispute their PAGA cause of action is derivative of the section 226 claims.

On May 26, 2016, the trial court issued its order granting defendant's motion and denying that of plaintiffs. As to defendant's first argument, the trial court agreed that section 226, subdivision (a) (9) did not apply to OverTimePay-Override because there was no applicable hourly rate for the

cited in Magadia v. Wal-Mart Associates
No. 19-16184 archived on May 24, 2021

pay period reflected in the wage statement. For defendant's second argument, the trial court
found that defendant complied with the "furnish" requirement under section 226 by mailing the
wage statement.

## III.   DISCUSSION

### A.   Standard of Review

"[F]rom commencement to conclusion, the party moving for summary judgment bears the
burden of persuasion that there is no triable issue of material fact and that he is entitled to
judgment as a matter of law. That is because of the general principle that a party who seeks a
court's action in his favor bears the burden of persuasion thereon. [Citation.] There is a triable
issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the
underlying fact in favor of the party opposing the motion in accordance with the applicable
standard of proof. . [¶] [T]he party moving for summary judgment bears an initial burden of
production to make a prima facie showing of the nonexistence of any triable issue of material
fact; if he carries his burden of production, he causes a shift, and the opposing party is then
subjected to a burden of production of his own to make a prima facie showing of the existence
of a triable issue of material fact. . A prima facie showing is one that is sufficient to support the
position of the party in question. [Fns. omitted.]" (Aguilar v. Atlantic Richfield Co. (2001) 25
Cal.4th 826, 850-851, 107 Cal.Rptr.2d 841, 24 P.3d 493.)

We review an order granting summary judgment de novo. (Coral Construction, Inc. v. City and
County of San Francisco (2010) 50 Cal.4th 315, 336, 113 Cal.Rptr.3d 279, 235 P.3d 947.) The trial
court's stated reasons for granting summary judgment are not binding because we review its
ruling not its rationale. (Ibid.) In addition, a summary judgment motion is directed to the issues
framed by the pleadings. (Turner v. Anheuser-Busch, Inc. (1994) 7 Cal.4th 1238, 1252, 32
Cal.Rptr.2d 223, 876 P.2d 1022.) These are the only issues a motion for summary judgment must
address. (Conroy v. Regents of University of California (2009) 45 Cal.4th 1244, 1250, 91
Cal.Rptr.3d 532, 203 P.3d 1127.)

This appeal solely involves statutory interpretation. "The proper interpretation of a statute, and
its application to undisputed facts, presents a question of law that is . subject to de novo review."
(Morgan v. United Retail Inc. (2010) 186 Cal.App.4th 1136, 1142, 113 Cal.Rptr.3d 10 (Morgan).)
" 'As in any case involving statutory interpretation, our fundamental task here is to determine the
Legislature's intent so as to effectuate the law's purpose.' [Citation.] The well-established rules
for performing this task require us to begin by examining the statutory language, giving it a plain
and commonsense meaning. [Citation.] We do not, however, consider the statutory language in
isolation; rather, we look to the statute's entire substance in order to determine its scope and
purposes. [Citation.] That is, we construe the words in question in context, keeping in mind the
statute's nature and obvious purposes. [Citation.] We must harmonize the statute's various parts
by considering it in the context of the statutory framework as a whole. [Citation.] If the statutory
language is unambiguous, then its plain meaning controls. If, however, the language supports
more than one reasonable construction, then we may look to extrinsic aids, including the
ostensible objects to be achieved and the legislative history." (Los Angeles County Metropolitan
Transportation Authority v. Alameda Produce Market, LLC (2011) 52 Cal.4th 1100, 1106-1107,
133 Cal.Rptr.3d 738, 264 P.3d 579; Morgan, supra, 186 Cal.App.4th at pp. 1142-1143, 113
Cal.Rptr.3d 10.)

B.-C.***

We first discuss the nature of nondiscretionary bonuses and how they relate to overtime pay under the Labor Code. Pursuant to section 510, subdivision (a), an employer must pay one and a half times an employee's "regular rate of pay" if he or she works more than 40 hours per week or more than 8 hours per day. Nondiscretionary bonuses are considered part of the "regular rate of pay." (Marin v. Costco Wholesale Corp. (2008) 169 Cal.App.4th 804, 807, 87 Cal.Rptr.3d 161 (Marin); see 29 C.F.R. § 778.209 (2012) [federal method of explaining regular rate of pay calculation for bonuses].)

In order to calculate overtime pay for an employee paid at an hourly rate, an employer must allocate the bonus over the period in which it was earned. (Marin, supra, 169 Cal.App.4th at p. 807, 87 Cal.Rptr.3d 161; Chin et al., Cal. Practice Guide: Employment Litigation (The Rutter Group 2017) ¶ 11:906 ["A bonus or prize paid in cash is allocated over the period during which it was earned to determine the increase in the average hourly rate for each week of the period"].) To explain this using an example, take a hypothetical employee wage statement for the period of January 7 to January 20, 2018.[9] This hypothetical wage statement would include an hourly regular rate, the number of regular hours worked during the pay period of January 7 to January 20, the hourly overtime rate, and the number of overtime hours worked during the pay period of January 7 to January 20. The hypothetical employee earned a $360 monthly bonus for work performed during the previous month of December, from December 1 to December 31, 2017. This bonus would be reflected on the January 7 to January 20, 2018 wage statement.[10] To calculate the OverTimePay-Override line, the hours worked in December 2017 would be used because that is the time period in which the bonus was earned. In this hypothetical, the employee had worked 160 regular hours and 20 overtime hours in December 2017, for a total of 180 hours. First, divide $360 by 180, which results in $2. This number represents the increase to the regular hourly rate. Multiply $2 by 0.5 and the result, $1, represents the increase to the overtime hourly rate. Then, take $1 and multiply it by 20, the overtime hours worked during December 2017, and the result, $20, is the overtime pay adjustment, which would be identified as the OverTimePay-Override line on the wage statement. This allocation, at least for production or piecework bonuses, is calculated by using the method described above in footnote 4.

C.   Section 226, Subdivision (a)(9) Does Not Require Hourly Rate and Hours Worked to be Identified For OverTimePay-Override

The Court of Appeal in Morgan discussed the purpose of section 226, subdivision (a)(9): "The 2000 amendment [which added subdivision (a)(9)] . expanded the scope of information to be included by employers in the itemized wage statements furnished to employees. Following the amendment, an employer that previously listed the total hours worked by an employee in a single category [as required under subdivision (a)(2)] was now required to list both the total regular hours worked and the total overtime hours worked, along with the corresponding hourly rates. It appears that by adding this more specific requirement, the statute made it easier for employees to determine whether they were being paid for all hours worked at the appropriate rates of pay." (Morgan, supra, 186 Cal.App.4th at p. 1148, 113 Cal.Rptr.3d 10.)

Subdivision (a)(6) requires that the wage statement show "the inclusive dates of the period for which the employee is paid." Applying the standards of statutory construction, in the context of section 226 as a whole, the "pay period" discussed in subdivision (a)(9), which requires that the wage statement include "all applicable hourly rates in effect during the pay period," refers to the period described in subdivision (a)(6). In our hypothetical wage statement above, we interpret the pay period to refer to the two-week period covered by the wage statement, January 7 to January 20, 2018.

Defendant argues it was not required to provide on the wage statement hourly rates or hours worked related to OverTimePay-Override. Defendant has met its initial burden of production. (Code Civ. Proc., § 437c, subd. (p)(2).) Based on the above statutory construction and the method by which OverTimePay-Override was calculated, there were no "applicable hourly rates in effect during the pay period" that corresponded to OverTimePay-Override. Accordingly, there was also no "corresponding number of hours worked at each hourly rate by the employee" for the pay period that applied to OverTimePay-Override. As discussed above, OverTimePay-Override represented additional wages that were earned as overtime pay based on nondiscretionary bonuses being spread over the hours worked during the bonus period. Moreover, based on how OverTimePay-Override was calculated, the overtime hours were worked in previous pay periods for which employees had already received their standard overtime pay. The itemized wage statement issued by an employer need only provide the applicable hourly rates and the corresponding number of hours worked "in effect during the pay period." In other words, the employer need only identify on the wage statement the hourly rate in effect during the pay period for which the employee was currently being paid, and the corresponding hours worked.

Plaintiffs argue to the contrary, but have failed to meet their burden. (Code Civ. Proc., § 437c, subd. (p)(2).) "[S]ection 226, subdivision (a) is highly detailed, containing nine separate categories that must be included on wage statements . When a statute omits a particular category from a more generalized list, a court can reasonably infer a legislative intent not to include that category within the statute's mandate." (Soto v. Motel 6 Operating, L.P. (2016) 4 Cal.App.5th 385, 391, 208 Cal.Rptr.3d 618.) The purpose of spreading the bonus over the hours worked during the bonus period is to calculate the "regular rate of pay" for overtime under section 510. Defendant's wage statements included the regular rate of pay, the overtime rate of pay, and the hours worked at each rate. Each of these was "in effect during the pay period," January 7 to January 20 in our example. The OverTimePay-Override was an adjustment to the overtime payment due to an employee, based on bonuses earned by the employee for work performed during prior pay periods. Accordingly, there were no applicable hourly rates in effect during the pay period which defendant was required to include in the wage statement.

Plaintiffs contend a federal district court case, Ontiveros v. Safelite Fulfillment, Inc. (C.D.Cal. 2017) 231 F.Supp.3d 531 (Ontiveros) is directly on-point and supports their position. In Ontiveros, the district court found that the employer's wage statements were deficient for failing to report overtime wages associated with an installation bonus. (Id. at pp. 540-541.) The district court reasoned: "It is undisputed that Plaintiff earned additional overtime wages if he worked overtime during the same period that an installation bonus was earned, as this bonus would lead to an increase in his regular rate under 29 C.F.R. § 778.109. It is also undisputed that when Plaintiff earned installation bonuses, his wage statements reflected both the underlying bonus earned and the additional overtime wages owed as a single line item. . Finally, it is undisputed that the wage statement does not have information from which Plaintiff could calculate the additional overtime owed as a result of participation in the installation bonus program. . The Court concludes that the 'regular rate' is an 'applicable hourly rate.' As such, the law requires that the regular rate appear on the face of the wage statement or else be ascertainable from the information included therein. Because it was not possible to promptly and easily determine the regular rate from the wage statements when an employee was enrolled in the installation bonus program, the statements were deficient. [Fn. omitted.]" (Ibid.)

Ontiveros is distinguishable. Ontiveros involved a piece-rate compensation, paid weekly. (231 F.Supp.3d at p. 535.) Additionally, the bonus earned and additional overtime wages were reflected on the wage statement on one line, rather than being separated. (Id. at p. 540.) Finally,

Case: 19-16184 05/28/2021 ID: 12127693 DktEntry: 73-2

the bonus was based on work performed during the pay period reflected in the wage statement. (See id. at p. 534.)

Plaintiffs also cite a May 17, 2002 opinion letter from the Division of Labor Standards Enforcement (DLSE). That letter concerned a unique situation in which an employer continually listed 86.67 hours as the hours worked by its employees during each pay period, regardless of whether it was true. The DLSE was concerned with an employer's failure to list all hours worked during the pay period, including overtime. To the extent the DLSE determined an employer must comply with section 226 when making additional overtime payments for work performed in prior pay periods, we conclude the DLSE opinion letter is not applicable. Accordingly, we find defendant should prevail as a matter of law on this theory.

D.    No Violation for not Providing an Itemized Statement at Time of Termination

Defendant argues it is in compliance with section 226, subdivision (a) because it "furnished" the wage statement to the discharged employee by United States mail. As noted, section 226, subdivision (a) provided, "[e]very employer shall, semimonthly or at the time of each payment of wages, furnish each of his or her employees, either as a detachable part of the check, draft, or voucher paying the employee's wages, or separately when wages are paid by personal check or cash, an accurate itemized statement in writing ." It is undisputed defendant provided some discharged employees with their last wages in-store by cashier's check, in compliance with the Labor Code. (See §§ 201, subd. (a) ["[i]f an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately"], 208 ["[e]very employee who is discharged shall be paid at the place of discharge"].) "Furnish" means to "provide with what is needed," or to "supply" or "give." (Merriam-Webster's Collegiate Dict. (10th ed. 1993) p. 474, col. 1.) Section 226 provides that an employer must furnish the wage statement as either "a detachable part of the check, draft, or voucher paying the employee's wages," or separately when the wages are paid by personal check or cash. Other than that one provision, section 226 describes no other specific means by which an employer is to furnish the itemized statement to an employee. Thus, mailing the wage statement is a viable means to "furnish." Defendant could also furnish the wage statement separately because paying discharged employees by cashier's check was the equivalent of paying them by cash.[11] However, the Legislature also provided for when an employer was to furnish the wage statement to the employee: "semimonthly or at the time of each payment of wages."

We first find that for purposes of the Labor Code, "at the time of each payment of wages" for discharged employees means "immediately." As noted, a discharged employee's unpaid earned wages are due and payable "immediately." (§ 201, subd. (a).) When construing section 226 in relation to the Labor Code, the most logical construction of "at the time of each payment of wages" in section 226 for discharged employees is whenever the discharged employee receives his or her unpaid earned wages, which is "immediately." Because defendant in some instances did not provide wage statements immediately to discharged employees, but rather mailed the statement to the employee's last known address the same day or the next day, defendant did not furnish the wage statement to these discharged employees "at the time of each payment of wages."

However, by the plain meaning of the statute, defendant also had the option of furnishing the wage statement semimonthly. (§ 226, subd. (a).) Additionally, nothing in section 226 suggests that an employer cannot furnish the wage statement prior to the semimonthly date. For example, suppose an employer furnishes wage statements on the first and the fifteenth of each month. The employer discharges an employee on the second of the month. Per the statute's plain language, if an employer pays the final wages by personal check or cash, it has the option of

furnishing the discharged employee with the wage statement on the fifteenth. We find it illogical to conclude an employer violates section 226 by furnishing a wage statement before the semimonthly date has been reached. If the employer furnishes the wage statement to the discharged employee on the fifth of the month, the employer has complied with the requirement that it furnish the wage statement to the employee "semimonthly" because the employee would have ostensibly been furnished with the wage statement by the semimonthly date.

For purposes of section 226, if an employer furnishes an employee's wage statement before or by the semimonthly deadline, the employer is in compliance. Thus, we interpret "semimonthly or at the time of each payment of wages" as representing the outermost deadlines by which an employer is required to furnish the wage statement. Since defendant mailed the wage statement to certain discharged employees paid in-store by the same day as or the next day after termination, defendant was in compliance with section 226 because the employee was "furnished" with the wage statement semimonthly. Defendant has met its initial burden of production. (Code Civ. Proc., § 437c, subd. (p)(2).)

Plaintiffs contend the wage statement must be furnished immediately for a discharged employee. Plaintiffs cite the DLSE Policies and Interpretations Manual (DLSE Manual), section 14.1.1, which provides, "[a] California employer must furnish a statement showing the following information to each employee at the time of payment of wages (or at least semimonthly, whichever occurs first)," and section 14.1.2, which provides, "[s]ection 226 . sets out the employer's responsibilities in connection with the wage statement which must accompany the check or cash payment to the employee."

Plaintiffs have not met their burden. (Code Civ. Proc., § 437c, subd. (p)(2).) There is no evidence in the record that the DLSE adopted this interpretation in accordance with the Administrative Procedure Act (Gov. Code, § 11340 et seq.). Thus, it is the equivalent of a void underground regulation. (Tidewater Marine Western, Inc. v. Bradshaw (1996) 14 Cal.4th 557, 576-577, 59 Cal.Rptr.2d 186, 927 P.2d 296.) As our Supreme Court held, "when an agency like the DLSE sets forth an interpretive policy in a void underground regulation, the deference that the agency's interpretation would normally enjoy is absent, but in its place the agency has its power to persuade." (Alvarado, supra, 4 Cal.5th 542, 559, 229 Cal.Rptr.3d 347, 411 P.3d 528.)

The DLSE's interpretation is not persuasive. The term "whichever occurs first" is not in section 226. The plain meaning of the statute indicates the Legislature specifically intended a choice for employers as to when to furnish the wage statement. There is also no requirement in section 226 that the wage statement "must accompany" the personal check or cash payment to the employee. As noted, the wage statement must be a detachable part of the check, draft, or voucher, unless payment is by personal check or cash; in such instance the wage statement may be furnished separately. (§ 226, subd. (a).) Accordingly, we decline to follow the DLSE's interpretation.

Plaintiffs cite several cases that purportedly determined that section 226, subdivision (a) requires employers to furnish a wage statement to each employee "at the time wages are paid." (See Zavala v. Scott Brothers Dairy, Inc. (2006) 143 Cal.App.4th 585, 591, 49 Cal.Rptr.3d 503 (Zavala); Reinhardt v. Gemini Motor Transport (E.D.Cal. 2012) 879 F.Supp.2d 1138, 1141 (Reinhardt); In re Bimbo Bakeries USA FLSA Actions (N.D.Cal. Oct. 24, 2008, No. C 05-00829 JW) 2008 WL 10850153, at *7, 2008 U.S. Dist. Lexis 125068 (Bimbo Bakeries).) Such statements were dicta as the cases concerned issues unrelated to the one here. (Zavala, supra, 143 Cal.App.4th at pp. 592-593, 49 Cal.Rptr.3d 503 [whether collective bargaining agreement required arbitration of Labor Code claims]; Reinhardt, supra, 879 F.Supp.2d at pp. 1141-1142 [whether plaintiffs sufficiently alleged Labor Code violations were " 'knowing and intentional' " for recovery

under § 226, subd. (e).) Simko Bakeries, supra, 2008 WL 1083153, at *7, 2008 U.S. Dist. Lexis 125068 [whether defendant's violation was "knowing and intentional" for summary judgment purposes].) They are thus unpersuasive.

Defendant should prevail on this theory. Because there are no triable issues of material fact and defendant is entitled to judgment as a matter of law, summary judgment was properly granted in its favor.

## IV.   DISPOSITION

The judgment is affirmed. Defendant Wells Fargo Bank, N.A. is entitled to recover its costs on appeal from plaintiffs Fabio Canales and Andy Cortes.

## FOOTNOTES

FOOTNOTE.

1.   Further statutory references are to the Labor Code unless otherwise indicated.

2.   All facts are considered undisputed for purposes of summary judgment.

3.   Teresa Swanson, defendant's person most knowledgeable, stated that a nondiscretionary bonus was "given to a team member, based on some sort of preset work definition, goal, something that they have to meet. And then they earn that bonus." It appears this bonus was a production or piecework bonus.

4.   To calculate the amount to be entered on the OverTimePay-Override line: (1) take the bonus earned during the bonus period, whether it be by year, quarter, or month; (2) divide the bonus by the total number of hours worked during the bonus period; (3) multiply the resulting number by 0.5; (4) multiply the resulting number by the total number of overtime hours worked during the bonus period. Our Supreme Court in a recent decision concerning flat sum bonuses under California law decided that the proper method for calculating the rate of overtime pay when an employee receives both an hourly wage and a flat sum bonus is to divide the bonus by the number of nonovertime hours actually worked during the bonus period. (Alvarado v. Dart Container Corp. of California (2018) 4 Cal.5th 542, 562, 229 Cal.Rptr.3d 347, 411 P.3d 528 (Alvarado).) The Supreme Court specifically excluded production or piecework bonuses or a commission from its holding. (Id. at p. 561, fn. 6, 229 Cal.Rptr.3d 347, 411 P.3d 528.)

5.   Plaintiffs asserted in their opening brief, without citation to the record, that they never received their wage statements. We will disregard such assertions as meritless. (Susag v. City of Lake Forest (2002) 94 Cal.App.4th 1401, 1416, 115 Cal.Rptr.2d 269.)

6.   At the time of the alleged offenses, section 226, subdivision (a)(9) provided in pertinent part: "(a) Every employer shall, semimonthly or at the time of each payment of wages, furnish each of his or her employees, either as a detachable part of the check, draft, or voucher paying the employee's wages, or separately when wages are paid by personal check or cash, an accurate itemized statement in writing showing . (9) all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee ." (Stats. 2012, ch. 844, § 1.7.) Subdivision (a)(9) was added by the Legislature in 2000. (Stats. 2000, ch. 876, § 6.)Section 226, subdivision (a) was amended by the Legislature in 2016 to read in pertinent part: "An employer, semimonthly or at the time of each payment of wages, shall furnish to his or her employee, either as a detachable part of the check, draft, or voucher paying the employee's wages, or separately if wages are paid by personal check or cash,

an accurate itemized statement in writing . . . (Stats. 2016, ch. 772, § 2, eff. Jan. 1, 2017.)
Subdivision (a)(2) was also amended, and subdivision (j) was added. (Ibid.) The 2016
amendment does not substantively affect our opinion.

7.    A third plaintiff, Luciano Gonzales, was initially part of this action. However, Gonzales was
not named as a class representative in plaintiffs' motion for class certification and is not an
appellant. The class was certified on March 20, 2015.

8.    Though plaintiffs categorized their motion as one for summary judgment or in the
alternative, summary adjudication, plaintiffs sought only summary adjudication as to their first
cause of action for violation of section 226.

FOOTNOTE.  See footnote *, ante.

9.    We have provided these dates, but defendant used the hours and bonus figures in their
respondent's brief as an illustration to calculate OverTimePay-Override. Plaintiffs have not
disputed the accuracy of defendant's method.

10.    Section 204, subdivision (b)(1) provides, "all wages earned for labor in excess of the
normal work period shall be paid no later than the payday for the next regular payroll period."
Plaintiffs contend that pursuant to Peabody v. Time Warner Cable, Inc. (2014) 59 Cal.4th 662,
669, 174 Cal.Rptr.3d 287, 328 P.3d 1028, defendant was prevented from paying OverTimePay-
Override for wages earned in prior pay periods. Peabody v. Time Warner Cable, Inc., is inapposite.
In that case, our Supreme Court held an employer could not attribute wages paid in one period to
a prior pay period in order to meet an exemption for minimum wages. (Ibid.) It has no application
to the OverTimePay-Override line at issue here.

11.    As argued by defendant, a cashier's check was the equivalent of paying by cash. (See
Gray1 CPB, LLC v. SCC Acquisitions, Inc. (2015) 233 Cal.App.4th 882, 893-894, 896, 182
Cal.Rptr.3d 654 [citing U. Com. Code, § 3310, cashier's check taken for obligation has same
effect as cash].) Plaintiffs argue for the first time in their reply brief that a cashier's check is not
the equivalent of a personal check or cash for purposes of section 226. This issue was not
raised in the opening brief nor before the trial court and is therefore waived and forfeited. (Tellez
v. Rich Voss Trucking, Inc. (2015) 240 Cal.App.4th 1052, 1066, 193 Cal.Rptr.3d 403; SCI California
Funeral Services, Inc. v. Five Bridges Foundation (2012) 203 Cal.App.4th 549, 573, fn. 18, 137
Cal.Rptr.3d 693; Greenwich S.F., LLC v. Wong (2010) 190 Cal.App.4th 739, 767, 118 Cal.Rptr.3d
531.)

KIM, J.** FN** Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant
to article VI, section 6 of the California Constitution.

We concur: KRIEGLER, Acting P.J. BAKER, J.

BACK TO TOP

**Research**

Cases & Codes (https://caselaw.findlaw.com/)

Opinion Summaries (https://caselaw.findlaw.com/summary.html)

**Social**

Facebook (https://www.facebook.com/FindLawConsumers)

YouTube (https://www.youtube.com/watch?v=WQiNbzazOhw)

Sample Business Contracts (https://corporate.findlaw.com/contracts/)

Research An Attorney or Law Firm (https://lawyers.findlaw.com/)

Forms (https://forms.lp.findlaw.com/)

Reference (https://reference.findlaw.com/)

Legal Commentary (https://supreme.findlaw.com/legal-commentary.html)

### Practice

Law Technology (https://technology.findlaw.com/)

Law Practice Management (https://practice.findlaw.com/)

Law Firm Marketing Services (https://www.lawyermarketing.com)

Corporate Counsel (https://corporate.findlaw.com/)

JusticeMail (http://www.justice.com)

Jobs & Careers (https://careers.findlaw.com/)

### About Us

Company History (https://www.findlaw.com/company/company-history/findlaw-corporate-information-press-company-background.html)

Who We Are (https://www.findlaw.com/company/company-history/findlaw-com-about-us.html)

Privacy (https://www.thomsonreuters.com/en/privacy-statement.html)

Terms (https://www.findlaw.com/company/findlaw-terms-of-service.html)

Disclaimer (https://www.findlaw.com/company/disclaimer.html)

Advertising (https://www.findlaw.com/company/media-kit.html)

Jobs (https://www.findlaw.com/company/employment/employment.html)

Cookies (//info.evidon.com/pub_info/15540?v=1&nt=0&nw=false)

Do Not Sell My Info (https://privacyportal-cdn.onetrust.com/dsarwebform/dbf5a683-0a6a-4f4b-b523-7f94d0de6bbc/5dc91c0f-f1b7-4b6e-9d42-76043acaf72d.html)

Twitter (https://twitter.com/findlawconsumer)

Pinterest (https://pinterest.com/findlawconsumer/)

Newsletters (https://newsletters.findlaw.com/)

### Law Firm Marketing

Attorney Websites (https://www.lawyermarketing.com/services/mobile-friendly-websites/?ct_primary_campaign_source=701130000027LuU&ct_source=Website&ct_source

Online Advertising (https://www.lawyermarketing.com/services/integrated-marketing-solutions/?ct_primary_campaign_source=701130000027LuU&ct_source=Website&ct_source

Buy a Directory Profile (https://store.lawyermarketing.com)

### Marketing Resources

On-Demand Webcasts (https://www.lawyermarketing.com/webcasts/?ct_primary_campaign_source=701130000027LuU&ct_source=Website&ct_source

White Papers (https://www.lawyermarketing.com/white-papers/?ct_primary_campaign_source=701130000027LuU&ct_source=Website&ct_source

Cited in Magadia v. Wal-Mart Associates No. 4:0060184 archived on May 24, 2021

FindLaw

THOMSON REUTERS

Copyright © 2021, Thomson Reuters. All rights reserved.

### United States Court of Appeals for the Ninth Circuit

**Office of the Clerk**
95 Seventh Street
San Francisco, CA 94103

### Information Regarding Judgment and Post-Judgment Proceedings

**Judgment**
- This Court has filed and entered the attached judgment in your case. Fed. R. App. P. 36.  Please note the filed date on the attached decision because all of the dates described below run from that date, not from the date you receive this notice.

**Mandate (Fed. R. App. P. 41; 9th Cir. R. 41-1 & -2)**
- The mandate will issue 7 days after the expiration of the time for filing a petition for rehearing or 7 days from the denial of a petition for rehearing, unless the Court directs otherwise.  To file a motion to stay the mandate, file it electronically via the appellate ECF system or, if you are a pro se litigant or an attorney with an exemption from using appellate ECF, file one original motion on paper.

**Petition for Panel Rehearing  (Fed. R. App. P. 40; 9th Cir. R. 40-1)**
**Petition for Rehearing En Banc (Fed. R. App. P. 35; 9th Cir. R. 35-1 to -3)**

**(1)    A.    Purpose (Panel Rehearing):**
- A party should seek panel rehearing only if one or more of the following grounds exist:
  - ▶ A material point of fact or law was overlooked in the decision;
  - ▶ A change in the law occurred after the case was submitted which appears to have been overlooked by the panel; or
  - ▶ An apparent conflict with another decision of the Court was not addressed in the opinion.
- Do not file a petition for panel rehearing merely to reargue the case.

**B.    Purpose (Rehearing En Banc)**
- A party should seek en banc rehearing only if one or more of the following grounds exist:

> ► Consideration by the full Court is necessary to secure or maintain uniformity of the Court's decisions; or
> ► The proceeding involves a question of exceptional importance; or
> ► The opinion directly conflicts with an existing opinion by another court of appeals or the Supreme Court and substantially affects a rule of national application in which there is an overriding need for national uniformity.

**(2)**   **Deadlines for Filing:**
- A petition for rehearing may be filed within 14 days after entry of judgment.  Fed. R. App. P. 40(a)(1).
- If the United States or an agency or officer thereof is a party in a civil case, the time for filing a petition for rehearing is 45 days after entry of judgment. Fed. R. App. P. 40(a)(1).
- If the mandate has issued, the petition for rehearing should be accompanied by a motion to recall the mandate.
- *See* Advisory Note to 9th Cir. R. 40-1 (petitions must be received on the due date).
- An order to publish a previously unpublished memorandum disposition extends the time to file a petition for rehearing to 14 days after the date of the order of publication or, in all civil cases in which the United States or an agency or officer thereof is a party, 45 days after the date of the order of publication.  9th Cir. R. 40-2.

**(3)**   **Statement of Counsel**
- A petition should contain an introduction stating that, in counsel's judgment, one or more of the situations described in the "purpose" section above exist.  The points to be raised must be stated clearly.

**(4)**   **Form & Number of Copies (9th Cir. R. 40-1; Fed. R. App. P. 32(c)(2))**
- The petition shall not exceed 15 pages unless it complies with the alternative length limitations of 4,200 words or 390 lines of text.
- The petition must be accompanied by a copy of the panel's decision being challenged.
- An answer, when ordered by the Court, shall comply with the same length limitations as the petition.
- If a pro se litigant elects to file a form brief pursuant to Circuit Rule 28-1, a petition for panel rehearing or for rehearing en banc need not comply with Fed. R. App. P. 32.

- The petition or answer must be accompanied by a Certificate of Compliance found at Form 11, available on our website at www.ca9.uscourts.gov under *Forms.*
- You may file a petition electronically via the appellate ECF system. No paper copies are required unless the Court orders otherwise. If you are a pro se litigant or an attorney exempted from using the appellate ECF system, file one original petition on paper. No additional paper copies are required unless the Court orders otherwise.

## Bill of Costs (Fed. R. App. P. 39, 9th Cir. R. 39-1)

- The Bill of Costs must be filed within 14 days after entry of judgment.
- See Form 10 for additional information, available on our website at www.ca9.uscourts.gov under *Forms.*

## Attorneys Fees

- Ninth Circuit Rule 39-1 describes the content and due dates for attorneys fees applications.
- All relevant forms are available on our website at www.ca9.uscourts.gov under *Forms* or by telephoning (415) 355-7806.

## Petition for a Writ of Certiorari

- Please refer to the Rules of the United States Supreme Court at www.supremecourt.gov

## Counsel Listing in Published Opinions

- Please check counsel listing on the attached decision.
- If there are any errors in a published <u>opinion</u>, please send a letter **in writing within 10 days** to:
  - ► Thomson Reuters; 610 Opperman Drive; PO Box 64526; Eagan, MN 55123 (Attn: Jean Green, Senior Publications Coordinator);
  - ► and electronically file a copy of the letter via the appellate ECF system by using "File Correspondence to Court," or if you are an attorney exempted from using the appellate ECF system, mail the Court one copy of the letter.

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 10. Bill of Costs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form10instructions.pdf*

**9th Cir. Case Number(s)**

**Case Name**

The Clerk is requested to award costs to (*party name(s)*):

I swear under penalty of perjury that the copies for which costs are requested were actually and necessarily produced, and that the requested costs were actually expended.

**Signature**                                         **Date**

*(use "s/[typed name]" to sign electronically-filed documents)*

| COST TAXABLE | REQUESTED *(each column must be completed)* | | | |
|---|---|---|---|---|
| DOCUMENTS / FEE PAID | No. of Copies | Pages per Copy | Cost per Page | TOTAL COST |
| Excerpts of Record* | | | $ | $ |
| Principal Brief(s) *(Opening Brief; Answering Brief; 1st, 2nd, and/or 3rd Brief on Cross-Appeal; Intervenor Brief)* | | | $ | $ |
| Reply Brief / Cross-Appeal Reply Brief | | | $ | $ |
| Supplemental Brief(s) | | | $ | $ |
| Petition for Review Docket Fee / Petition for Writ of Mandamus Docket Fee | | | $ | |
| TOTAL: | | | | $ |

***Example:** Calculate 4 copies of 3 volumes of excerpts of record that total 500 pages [Vol. 1 (10 pgs.) + Vol. 2 (250 pgs.) + Vol. 3 (240 pgs.)] as:*
*No. of Copies: 4; Pages per Copy: 500; Cost per Page: $.10 (or actual cost IF less than $.10);*
*TOTAL: 4 x 500 x $.10 = $200.*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*